UNITED STATES of America Plaintiff,

v.

THE ATLAS LEDERER COMPANY,
et al. Defendants.

No. 91–CV–309.

United States District Court,
S.D. Ohio,
Western Division.

Sept. 12, 2001.

David F. Musel, Deborah M. Reyher, Gregory L. Sukys, Joseph W.C. Warren, Matthew A. Fogelson, US Department of Justice, Washington, DC, Jacqueline Schuster Hobbs, Ulmer & Berne, Cincinnati, OH, Patrick Dennis Quinn, United States Attorney's Office, Dayton, OH, Sherry L. Estes, Assistant Regional Counsel, Chicago, IL, for Plaintiff.

Ben Lefever Pfefferle, III, Louis L. McMahon, Thompson Hine LLP, Columbus, OH, Michael A. Cyphert, Walter Haverfield, Cleveland, OH, Douglas G. Haynam, Louis E. Tosi, Shumaker, Loop & Kendrick, Toledo, OH, Matthew Yackshaw, Day, Ketterer, Raley, Wright & Rybolt, Canton, OH, Richard Paul Fahey, Vorys, Sater, Seymour & Pease, Columbus, OH, Laura Alicia Ringenbach, Taft, Stettinius & Hollister, Cincinnati, OH, Charles H. Pangburn, III, Hemmer, Spoor, Pangburn, DeFrank & Kasson, PLLC, Ft. Mitchell, KY, Jonathan P. Saxton, William Roger Fry, Rendigs, Fry, Kiely & Dennis, LLP, Cincinnati, OH, Jacqueline F. Allen, Philadelphia, PA, Philip R. Boxell, Pepper, Hamilton & Scheetz, Philadelphia, PA, Charles Patrick Houdyschell, Jr., Charleston, WV, Darrell V. McGraw, Jr., West Virginia Attorney General, Charleston, WV, Stephen Neal Haughey, Frost Brown Todd LLC, Cincinnati, OH, Susan W. Horn, Barger & Wolen LLP, Los Angeles, CA, Martha Ellen Horvitz, Bricker & Eckler, Columbus, OH, Thomas A. Linton, Cleveland, OH, James Alan Dyer, Martin A. Beyer, Sebaly, Shillito & Dyer, Dayton, OH, Peter M. Burrell, Wood & Lamping, Cincinnati, OH, Richard A. Frye, Chester, Willcox & Saxbe, Columbus, OH, Daniel C. Murray, Frederick S. Mueller, Johnson & Bell, Ltd, Chicago, IL, James R. Sheatsley, Gorman, Sheatsley & Company LC, Beckley, WV, Bedford Auto Wrecking, Gary William Auman, William Hadwen Barney, III, Dunlevey, Mahan & Furry, Dayton, OH, Richard H. Friedman, McNees, Wallace & Nurick, Harrisburg, PA, Ralph C. Megargel, Delbene & Megargel, Kent, OH, Jerome David Catanzaro, Catanzaro & Rosenberger, Waverly, OH, for Defendants.

---

1. When discussing the United States and the Respondent Group collectively, the Court will refer to them as the "Movants."

**EXPANDED OPINION SETTING FORTH REASONING AND CITATION OF AUTHORITY IN SUPPORT OF DECISION AND ENTRY (DOC. # 427) SUSTAINING IN PART AND OVERRULING IN PART MOTION FOR SUMMARY JUDGMENT (DOC. # 333) FILED BY PLAINTIFF UNITED STATES OF AMERICA AND UNITED SCRAP LEAD RESPONDENT GROUP; UNITED SCRAP LEAD RESPONDENT GROUP GRANTED LEAVE TO FILE CONTRIBUTION CLAIMS, WITHIN 14 DAYS FROM DATE; FURTHER PROCEDURES ORDERED OF PLAINTIFF UNITED STATES OF AMERICA, WITHIN SEVEN DAYS FROM DATE; PLAINTIFF UNITED STATES OF AMERICA DIRECTED TO FILE STATUS REPORT WITHIN 20 DAYS FROM DATE**

RICE, Chief Judge.

This litigation involves an effort by Plaintiff United States of America and the United Scrap Lead Respondent Group ("Respondent Group") to recover response costs incurred in remediating environmental contamination at the United Scrap Lead Company Superfund Site ("USLC Site" or "Site") in Troy, Ohio.[1] Each Defendant in this action allegedly is liable for a portion of those response costs, as a result of its role in arranging for the disposal of hazardous waste. In a Decision and Entry filed on February 29, 2000 (Doc. # 427), the Court sustained in part and overruled in part a Motion for Summary Judgment (Doc. # 333) filed by the Movants. In so doing, the Court noted that it would file an Expanded Opinion, with reasoning and citation of authority, to support

its ruling on that Motion. This Expanded Opinion supplies that reasoning and citation of authority.

### I. *Summary Judgment Standard*

The Court first will set forth the parties' relative burdens once a motion for summary judgment is made. Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

> Of course, [the moving party] always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Id.* at 323, 106 S.Ct. 2548; *see also Boretti v. Wiscomb*, 930 F.2d 1150, 1156 (6th Cir. 1991) (The moving party has the "burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, construed favorably to the non-moving party, do not raise a genuine issue of material fact for trial[,]" quoting *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 [6th Cir.1987] ). The burden then shifts to the non-moving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (quoting Fed.R.Civ.P. 56(e)). Thus, "[o]nce the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial." *Talley v. Bravo Pitino Restaurant, Ltd.*, 61 F.3d 1241, 1245 (6th Cir.1995). Read together, *Liberty Lob-*

*by* and *Celotex* stand for the proposition that a party may move for summary judgment by demonstrating that the opposing party will not be able to produce sufficient evidence at trial to withstand a motion for judgment as a matter of law under Fed. R.Civ.P. 50. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir.1989).

Once the burden of production has shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also Michigan Protection and Advocacy Service, Inc. v. Babin*, 18 F.3d 337, 341 (6th Cir.1994) ("The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff"). Rather, Rule 56(e) "requires the non-moving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. 2548. Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment shall be denied "[i]f there are … 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir. 1992). Of course, in determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all *reasonable* inferences in the favor of that party.

*Anderson,* 477 U.S. at 255, 106 S.Ct. 2505 (emphasis added). If the parties present conflicting evidence, a court may not decide which evidence to believe, by determining which parties' affiants are more credible; rather, credibility determinations must be left to the fact-finder. 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2726.

In ruling on a motion for summary judgment (in other words, in determining whether there is a genuine issue of material fact), "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller,* 889 F.2d 108, 111 (6th Cir.1989), *cert. denied,* 494 U.S. 1091, 110 S.Ct. 1839, 108 L.Ed.2d 967 (1990); *see also L.S. Heath & Son, Inc. v. AT & T Information Systems, Inc.,* 9 F.3d 561 (7th Cir.1993); *Skotak v. Tenneco Resins, Inc.,* 953 F.2d 909, 915 n. 7 (5th Cir.) ("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment ...."), *cert. denied,* 506 U.S. 832, 113 S.Ct. 98, 121 L.Ed.2d 59 (1992). Thus, a court is entitled to rely, in determining whether a genuine issue of material fact exists on a particular issue, upon only those portions of the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties.

## II. *Analysis of Motion for Partial Summary Judgment (Doc. # 333)*

In their Motion for Partial Summary Judgment, the United States and the Respondent Group seek to establish the liability of certain Defendants under CERCLA.[2] Specifically, the Movants have requested summary judgement on the issue of the Defendants' liability for clean-up or "response" costs in this action. The Movants seek to establish that the Defendants are liable, as a matter of law, for expenses which have been incurred by the United States and the Respondent Group in connection with the release and threatened release of hazardous substances at the USLC Site, where spent lead-acid batteries were discarded for nearly forty years. The United States brings its action for response costs under § 107(a) of CERCLA, 42 U.S.C. § 9607(a), seeking to hold the Defendants jointly and severally liable. The Respondent Group seeks contribution from the Defendants for its costs, pursuant to § 113(f) of CERCLA, 42 U.S.C. § 9613(f).

■ In *Centerior Serv. Co. v. Acme Scrap Iron & Metal,* 153 F.3d 344 (6th Cir.1998), the Sixth Circuit addressed the distinction between response-cost actions brought by the United States under

**2.** The Movants' Motion for Summary Judgment is directed toward the following twenty-seven Defendants: (1) Ace Iron & Metal Co., Inc.; (2) Beckner Iron & Metal; (3) Broadway Iron & Metal Co., Inc.; (4) Burns Iron & Metal Co., Inc.; (5) Caldwell Iron & Metal; (6) Cohen Brothers Metal Corp, Inc. aka Cohen Brothers Metals Co.; (7) Crispen Auto Wrecking; (8) Dayton Auto & Metal Co., Inc.; (9) Decatur Salvage, Inc.; (10) Ebner & Sons Co., Inc.; (11) Edison Automotive, Inc.; (12) Etna Battery Co., Inc.; (13) Galion Auto Wrecking, Inc.; (14) Glazer Scrap Co., Inc.; (15) Joyce Iron & Metal Co., Inc.; (16) Livingston & Co., Inc.; (17) Mid–Ohio Battery, Inc.; (18) Montgomery Iron & Metal, Inc.; (19) Montgomery Iron & Paper Co., Inc. dba Montgomery Paper Co.; (20) Moyer's Auto Wrecking, Inc.; (21) Norman's Auto Wrecking; (22) Piqua Battery, Inc.; (23) Senser Metal Co., Inc.; (24) Tuttle Brothers; (25) U.S. Waste Materials Co.; (26) United Salvage Co., Inc.; and (27) Xenia Iron & Metal, Inc. (hereinafter referred to collectively as the "Defendants").

§ 107(a) and contribution actions brought under § 113(f) by responsible parties who, like the Respondent Group, contributed hazardous waste to a site. The *Centerior* court recognized that § 107(a) authorizes the Government to recover costs that it incurred while cleaning up a hazardous waste site. *Id.* at 347. Private parties also may bring cost-recovery actions directly under § 107(a), if they incurred clean-up costs but were not responsible for the site contamination. *Id.* at 350. Strict liability is imposed when § 107(a) cost-recovery actions are brought by either the United States or innocent private parties. *Id.* at 348. Liability in such cases is nearly always joint and several. *Id.* "After bringing a cost recovery action, plaintiffs must prove only that each defendant is a 'liable' party and not that defendants are responsible for a certain share of the plaintiff's response costs. Only if a defendant can affirmatively demonstrate that the harm is divisible, will damages from a cost-recovery action brought pursuant to § 107(a) be apportioned according to fault." *Id.* In order to establish liability under § 107(a), a plaintiff must prove four elements: (1) that the site in question is a facility; (2) that a release or threatened release of a hazardous substance has occurred; (3) that the release or threatened release has caused the plaintiff to incur necessary response costs; and (4) that the defendant is a responsible party under the statute. *Id.* at 347–48.

Private parties who are themselves responsible for contributing hazardous waste to a site cannot maintain a cost-recovery action directly under § 107(a). Rather, they must proceed under § 113(f) of CERCLA. That provision gives responsible parties a right to contribution from others who are also responsible for clean-up costs associated with the disposal of hazardous waste. "In actions seeking contribution, unlike those for joint and several cost recovery, the burden is placed on the plaintiff to establish the defendant's equitable share of response costs." *Id.* at 348. "Liability is not joint and several, but merely several." *Id.; see also Kalamazoo River Study Group v. Menasha Corp.*, 228 F.3d 648, 653 (6th Cir.2000) ("Unlike with § 107, however, liability under § 113 is not joint and several, but several only[.]"). Although contribution actions arise under § 113(a), the *Centerior* court reasoned that " § 107 provides the basis and the elements of a claim for recovery of response costs and lists the parties who are liable, as well as the defenses to liability. Therefore, one must necessarily look to § 107 in contribution actions involving § 113(f)." *Centerior*, 153 F.3d at 344.

With the foregoing standards in mind, the Court turns now to the Motion for Partial Summary Judgment (Doc. # 333). As a means of analysis, the Court first will address a number of potentially dispositive arguments raised by various Defendants in opposition to the Motion.[3] The Court has chosen to address these arguments at the outset, because they are equally applicable to the CERCLA claims against all of the Defendants and, if successful, they would obviate the need to review the Movants' evidence against each Defendant separately.[4]

---

3. The arguments are contained in one or more of the numerous Memoranda in opposition to summary judgment which have been filed with the Court. Many of those Memoranda also incorporate by reference the arguments contained in the other Defendants' Memoranda.

4. If the Court concludes that these universally applicable arguments do not dispose of the Motion for Partial Summary Judgment, it then will review the evidence against each Defendant to determine whether a genuine issue of material fact exists on the issue of liability.

## A. Universally Applicable Arguments in Opposition to Summary Judgment

Several Defendants have filed a joint Memorandum (Doc. # 353), advancing various arguments which, if successful, would preclude the Court from entering summary judgment in favor of the United States or the Respondent Group. These Defendants, who have identified themselves collectively as "Certain Parties," include Ace Iron and Metal Co., Inc., and its unincorporated division, Norman's Auto Wrecking; Caldwell Iron & Metal; Decatur Salvage, Inc.; Mid–Ohio Battery, Inc.; and Xenia Iron & Metal, Inc.[5] In opposition to the Motion for Partial Summary Judgment, Certain Parties advance five arguments.[6] *First,* they contend that 1995 and 1996 deposition testimony from Charles Bailen, an operator of the USLC Site, cannot be used against them, because they were not joined in this litigation until 1998 and, therefore, did not have an opportunity to "develop his testimony." *Second,* they argue that Bailen's 1999 deposition testimony cannot be used against them, because he had been deposed twice before, and the party taking the 1999 deposition failed to obtain leave to do so. *Third,* they assert that various documents relied on by the Movants cannot be considered by the Court, because the documents are unauthenticated and they are inadmissible hearsay. *Fourth,* they argue that the Respondent Group has failed to demonstrate that any of its response costs are consistent with the National Oil and Hazardous Substances Contingency Plan ("National Contingency Plan").[7] *Fifth,* they contend that the Respondent Group cannot assert CERCLA claims for contribution, without actually filing such claims. For these five reasons, Certain Parties argue that the Movants are not entitled to summary judgment on the issue of their liability under CERCLA. Upon review, the Court rejects Certain Parties' first four arguments, but it agrees that the Respondent Group has not properly asserted contribution claims against them. As a means of analysis, the Court will address each of the foregoing issues separately.

*First,* the Movants properly have relied on Charles Bailen's 1995 and 1996 deposition testimony in support of their Motion. Certain Parties argue that the use of his testimony is precluded by Fed.R.Civ.P. 804(b)(1), which provides a hearsay exception for "[t]estimony given in a deposition ... if the party against whom the testimony is now offered ... had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination." Certain Parties stress that they had no opportunity to cross examine Bailen or to "develop" his 1995 and 1996 testimony, because they were not yet joined in this action.[8] Certain Parties also argue that the Court may not consider Bailen's deposition testimony, because he is not "unavailable" to testify at trial.

Relevant case law reveals that the foregoing arguments lack merit. For purposes of summary judgment, "Rule 56 requires [a party] to present evidence of evidentiary standards for responding to releases of hazardous substances.' " *County Line Inv. Co. v. Tinney,* 933 F.2d 1508, 1511 (10th Cir.1991), quoting 42 U.S.C. § 9605, and citing 40 C.F.R. Part 300 (1988).

---

**5.** For purposes of clarity, the Court will continue to refer to these Defendants collectively as "Certain Parties."

**6.** The Court is aware that several other Defendants have adopted Certain Parties' arguments by reference. The Court's analysis herein applies to all of the Defendants.

**7.** The National Contingency Plan is "a set of regulations that 'establish[es] procedures and

**8.** The Court notes that Defendant Montgomery Iron & Paper Company also raises this argument in its Memorandum (Doc. # 337).

quality ...." *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir.1997). "Examples of such evidence include admissible documents or attested testimony, such as that found in affidavits or depositions." *Id.* "The proffered evidence need not be in admissible form, but its content must be admissible." *Id.* "For instance, deposition testimony will assist a plaintiff in surviving a motion for summary judgment, even if the deposition itself is not admissible at trial, provided substituted oral testimony would be admissible and create a genuine issue of material fact." *Id.*

■ In the present case, the *content* of Bailen's 1995 and 1996 depositions will be admissible at trial through his substituted, live testimony. The fact that his deposition testimony is not in an admissible *form* is immaterial, as is the fact that Bailen is not "unavailable" to testify. The Movants are not attempting to use Bailen's deposition testimony in lieu of his personal appearance at trial. Rather, they are using his testimony in the context of summary judgment, a practice permitted by Rule 56 of the Federal Rules of Civil Procedure.

The Court is equally unpersuaded by Certain Parties' argument that the Movants cannot use Bailen's 1995 and 1996 deposition testimony against them, because they were not joined in this action until 1998. The Ninth Circuit rejected an identical argument in *Hoover v. Switlik Parachute Co.*, 663 F.2d 964 (9th Cir.1981), and the Court finds its reasoning to be persuasive. In the context of summary judgment, the *Hoover* court approved the use of depositions against a party who had not been joined in the action when the depositions were taken. The Ninth Circuit reasoned that the depositions could not be used *as depositions,* because the defendant had lacked an opportunity to cross examine the deponents. Nevertheless, the court concluded that the deposition transcripts were equivalent to Rule 56(c) affidavits, because they were made on personal knowledge, and they set forth facts which would be admissible in evidence. *See also RSBI Aerospace, Inc. v. Affiliated FM Ins. Co.*, 49 F.3d 399, 403–04 (8th Cir.1995) ("While RSBI claims that this statement was not admissible because it did not participate in the taking of the statement, a sworn statement taken under oath is at least as reliable as an affidavit for the purposes of Rule 56(c)."); *Curnow v. Ridgecrest Police,* 952 F.2d 321, 323–24 (9th Cir.1991) (reasoning that a sworn and transcribed statement taken outside the presence of opposing counsel is at least as reliable as an affidavit and, therefore, constitutes proper Rule 56 evidence).

In light of the foregoing authority, which the Court finds to be persuasive, it rejects Certain Parties' argument. Bailen's 1995 and 1996 deposition testimony was provided under oath, and it meets the requirements of a Rule 56 affidavit. Consequently, Certain Parties' inability to examine Bailen at the time of his testimony does not preclude the Court from treating the deposition transcripts as affidavits and considering them in the summary judgment context.[9]

■ *Second,* the fact that no party obtained leave to depose Bailen in 1999 does not preclude the Movants from citing his testimony. In support of this argument, Certain Parties rely on Fed.R.Civ.P. 30(a)(2)(B), which provides that a person may not be deposed more than one time in any action, without leave of court. Upon

---

9. Parenthetically, the Court notes that Certain Parties did have the opportunity to question Bailen about his 1995 and 1996 testimony during his 1999 deposition. That opportunity minimizes any conceivable prejudice arising from their inability to participate in the two earlier depositions.

review, the Court is unpersuaded by Certain Parties' reliance on Rule 30 to preclude Bailen's 1999 deposition testimony. The deposition at issue was noticed by Defendant Broadway Iron & Paper Company. Absent any articulated prejudice to Certain Parties, as a result of Broadway's failure to obtain leave, the Court will not preclude the Movants from relying on Bailen's 1999 testimony. Counsel for Certain Parties never objected to the deposition taking place and participated in the same. *Cf. Kendrick v. Schnorbus,* 655 F.2d 727, 729 (6th Cir.1981) ("[W]e do not believe Rule 30(a), when read in conjunction with Rule 32, creates a per se rule of suppression when a technical violation of Rule 30(a) occurs.... Absent any showing of real injury because of the failure to obtain leave, we do not believe the trial judge abused his discretion in failing to suppress.").

*Third,* the Court rejects Certain Parties' argument that various exhibits identified in Bailen's depositions constitute inadmissible hearsay, and that the Movants have failed to demonstrate the applicability of a hearsay exception. The Court also cannot agree that the documents at issue have not been authenticated. The challenged exhibits consist of a USLC "customer price list" (identified as Exh. ##95 and 96 to Bailen depo. of Sept. 26, 1996) and certain invoices (identified as Exh. ##3, 16, 31, 69 and 70 to Bailen depo. of Aug. 7–8, 1995; Exh. H, I to Bailen depo. of Jan. 22, 1999). In support of their Motion, Certain Parties argue that the Movants have failed to qualify the exhibits as business records, pursuant to Fed.R.Evid. 803(6).

The Sixth Circuit has recognized that "for a business record to be admissible under Rule 803(6), Federal Rules of Evidence, the record must satisfy four requirements: (1) it must have been made in the ordinary course of a regularly conducted business activity; (2) it must have been kept in the regular course of that business; (3) the regular practice of that business must have been to have made the memorandum; and (4) the memorandum must have been made by a person with knowledge of the transaction or from information transmitted by a person with knowledge." *Redken Laboratories, Inc. v. Levin,* 843 F.2d 226, 229 (6th Cir.1988).

In their Memorandum, Certain Parties contend that the Movants have failed to lay a proper foundation to establish the USLC invoices and customer price list as business records. They note that USLC operator Charles Bailen has characterized the documents as "records kept in the ordinary course of business," or as "true and accurate business records." Certain Parties contend, however, that Bailen has never provided testimony sufficient to meet *each* of the four requirements identified by the Sixth Circuit in *Redken.*

In a cursory response, the Movants insist that the records at issue do qualify as business records, because Bailen "has personal knowledge of every facet of the [USLC] business." (Doc. # 374 at 11). The Movants also cite an affidavit in which Bailen avers that, as an owner/operator, he is "familiar with all aspects of United Scrap Lead, including records kept in the ordinary course of business." (Doc. # 333 at Exh. 1). Bailen also avers that the invoices and customer price list at issue "are true and accurate copies of documents kept by United Scrap Lead in the ordinary course of business." (*Id.*).

■ Even if the documents at issue are true and accurate copies of records kept in the ordinary course of USLC's business, the Movants still have not properly qualified the documents as business records. The Movants cite nothing to establish that the documents were made in the ordinary course of a regularly conducted business activity, or that the regular practice of

USLC was to make the records at issue. Furthermore, the fact that Bailen has personal knowledge of "every facet" of USLC's business does not establish that the documents were made by a person with knowledge of the transaction or from information transmitted by a person with knowledge.[10] Although the Movants likely could qualify most of the documents as business records, they have failed to do so.

Instead, they dismiss the business records issue as "irrelevant," arguing that the documents are admissible under the "ancient document" provisions of the Federal Rules of Evidence, namely Fed.R.Evid. 803(16) and 901(b)(8). Rule 803(16) provides that statements contained in ancient documents are not excluded by the hearsay rule. It applies to any document twenty or more years old, provided that its authenticity is established. Rule 901(a) governs the authentication of such documents. It provides that authentication is established "by evidence sufficient to support a finding that the matter in question is what its proponent claims." Rule 901(b)(1) and (b)(8) identify two pertinent methods of authentication. The former rule provides for authentication with "[t]estimony that a matter is what it is claimed to be." Alternatively, the latter rule provides for authentication with evidence that a document: "(A) is in such condition as to create no suspicion concerning its authenticity, (B) was in a place where it, if authentic, would likely be, and (C) has been in existence 20 years or more at the time it is offered."

In the present case, the Movants argue that the various exhibits at issue qualify as ancient documents, because they are more than 20 years old and "they have been sufficiently identified by Mr. Bailen on numerous occasions, most recently in his affidavit accompanying the [e]xhibits." (Doc. # 374 at 11). Upon review, the Court agrees. The documents relied on by the Movants are more than 20 years old.[11] In addition, Bailen has provided affidavit and deposition testimony authenticating the invoices and the USLC "price list." Although his testimony falls short of establishing the documents as business records, he has sufficiently authenticated them for purposes of the ancient document rule. Under Rule 901(b)(1), Bailen's testimony need only establish that the documents are what the Movants claim. His deposition testimony meets this requirement. Bailen previously identified exhibits 95 and 96 as USLC "customer price lists." (*See, e.g.,* Bailen depo. of Sept. 26, 1996 at 11, 48–49). He explained that the lists contain price quotes for USLC customers. (*Id.* at 12). On multiple occasions, Bailen also authenticated the various invoices relied on by the Movants. Indeed, with respect to the authentication issue, Certain Parties do not seriously challenge Bailen's ability to authenticate documents created by USLC. Instead, they argue that he cannot authenticate invoices which originated from companies other than USLC. The Court finds such documents to be authenticated, however, under Rule 901(b)(8). As noted above, under that rule, a document is au-

---

10. Some of the documents were created or signed by Bailen's brother or another company. Although such facts may not preclude the documents from being business records, a mere averment that Bailen has personal knowledge about USLC's business certainly does not qualify them as such.

11. A handful of the numerous invoices attached to the Motion for Partial Summary Judgment (Doc. # 333) bear early 1980 dates and were not quite 20 years old when the Court filed its February 29, 2000, Decision and Entry (Doc. # 427), sustaining in part and overruling in part the Movants' Motion. The Court notes, however, that some 20-year-old invoices existed for each Defendant identified in them. Furthermore, even the invoices bearing early 1980 dates now qualify as ancient documents.

thentic if it "(A) is in such condition as to create no suspicion concerning its authenticity, (B) was in a place where it, if authentic, would likely be, and (C) has been in existence 20 years or more at the time it is offered."

As the Court has recognized, the invoices at issue are more than 20 years old. Certain Parties do not even suggest that the condition of the invoices creates suspicion regarding their authenticity, and the Court finds no basis for any such suspicion. Finally, Bailen has testified that all records were removed from USLC's offices after it closed. He took the records and stored them in boxes in a basement. (Bailen depo. of August 8, 1995, at 230–41). Consequently, all of the invoices at issue were found in a place where, if authentic, they likely would be located.[12] As a result, the authenticity of the exhibits has been established under Rule 901(b)(8).

In a final argument, Certain Parties contend that the Movants have failed to prove that the invoices authenticated in Charles Bailen's depositions are actually the same invoices attached to the Motion for Partial Summary Judgment (Doc. # 333). With respect to the exhibits identified in Bailen's January 22, 1999, deposition, the Court cannot agree. Those exhibits have been filed with the Court, along with the deposition itself, and they are identical to the exhibits attached to the Movants' Motion. Unfortunately, the Court cannot reach the same conclusion with respect to the exhibits identified in Bailen's 1995 or 1996 depositions. Although those depositions have been filed, the accompanying exhibits do not appear to have been filed with the depositions. Based on a review of Bailen's 1995 and 1996 testimony, the exhibits discussed and authenticated therein do appear to correspond to the exhibits attached to the Motion for Partial Summary Judgment. In addition, many of those exhibits were identified during the depositions by their discovery "BAIL" numbers. Consequently, it may be possible to conduct a page-by-page review of Bailen's multi-volume deposition transcript to match the BAIL numbers cited therein with each of the hundreds of pages of exhibits attached to the Motion for Partial Summary Judgment.

Rather than conducting such a review, however, the Court directs the Movants to file an affidavit, within seven days, averring that the various exhibits attached to their Motion for Partial Summary Judgment are true and accurate copies of the exhibits identified by Bailen during his multiple depositions.[13] Based on its expectation that the Movants will file such an affidavit, the Court will consider the invoices attached to the Motion for Partial Summary Judgment. If the Movants fail to file such an affidavit, or otherwise to authenticate the exhibits within seven days from date, the Court will vacate this Expanded Opinion and reconsider its ruling herein, without considering those invoices.

■ *Fourth,* the Court rejects Certain Parties' argument concerning the Respondent Group's alleged failure to establish that its response costs are consistent with the standards set forth in the National

---

12. Eventually, Bailen gave the USLC customer price lists and all invoices to the U.S. EPA. (Bailen depo. of August 8, 1995, at 239, 358–59; Bailen depo. of August 7, 1995, at 120).

13. If the invoices attached to the Motion for Partial Summary Judgment are not true and accurate copies of the exhibits identified by Bailen during his multiple depositions, the Court obviously does not expect the Movants to file an affidavit stating otherwise. If the Movants cannot file the requested affidavit, however, they must establish the authenticity of the exhibits in some other way. If they fail to do so, the Court will vacate its ruling herein, and reconsider the Motion for Partial Summary Judgment, without reviewing the invoices.

Contingency Plan ("NCP"). In 1982, Congress amended CERCLA to require private parties seeking cost recovery to demonstrate that their clean-up costs are consistent with the NCP's standards, procedures and methods for responding to the release of hazardous substances. Private parties must establish consistency with the NCP as an element of their prima facie case. *See, e.g., NutraSweet Co. v. X–L Engineering Co.*, 227 F.3d 776, 791 (7th Cir.2000).

In their Memorandum, Certain Parties contend that the Respondent Group has failed to cite any evidence to establish this element of its contribution claims. Consequently, Certain Parties argue that the Respondent Group's Motion for Partial Summary Judgment (Doc. # 333) should be overruled. Upon review, the Court cannot agree that the Respondent Group has failed to meet its burden of demonstrating consistency with the NCP.

■ When allocating the burden of proof regarding consistency with the NCP, CERCLA distinguishes between governmental and non-governmental entities. When the Government initiates an action to recover response costs, such costs are presumed to be consistent with the NCP, and the potentially responsible parties bear the burden of proving otherwise. *United States v. Chapman*, 146 F.3d 1166, 1170–71 (9th Cir.1998). On the other hand, when non-governmental entities seek to recover CERCLA costs, they must establish consistency with the NCP as an element of their prima facie case. *Bedford Affiliates v. Sills*, 156 F.3d 416, 427 (2nd Cir.1998).

In opposition to Certain Parties' argument, the Respondent Group relies on 40 C.F.R. § 300.700(c)(3)(ii), which, under certain circumstances, creates an irrebuttable presumption that private-party response costs are consistent with the NCP. Specifically, the regulation provides:

(ii) Any response action carried out in compliance with the terms of an order issued by EPA pursuant to section 106 of CERCLA, or a consent decree entered into pursuant to section 122 of CERCLA, will be considered "consistent with the NCP."

*See also Morrison Enterprises v. McShares, Inc.*, 13 F.Supp.2d 1095, 1113–14 (D.Kan.1998) ("Subsection (c)(3)(ii) provides that any response action carried out in compliance with the terms of an order issued by EPA pursuant to 42 U.S.C. § 9606 or a consent decree pursuant to 42 U.S.C. § 9622 will be considered 'consistent with the NCP;' this is sometimes called the irrebuttable presumption of compliance.").

■ Relying on the foregoing regulation, the Respondent Group insists that it "is entitled to an irrebuttable presumption that it's [sic] response costs incurred pursuant to the RD/RA Consent Decree and other EPA orders are consistent with the NCP ...." (Doc. # 374 at 2 n. 2). The Court agrees, at least with respect to some of the costs incurred by the Respondent Group. As noted above, 40 C.F.R. § 300.700(c)(3)(ii) creates an irrebuttable presumption of consistency with the NCP when a private-party response action is "carried out in compliance with" the terms of an EPA order or consent decree.

The record contains evidence establishing, at a minimum, that some of the Respondent Group's response costs were incurred in compliance with the terms of a Consent Decree. That evidence is in the form of an affidavit from Thad Slaughter, a regulatory specialist and scientist at EN-TACT, Inc., a Texas corporation engaged in environmental remediation contracting. (Doc. # 333 at Exh. 8). Slaughter avers, in relevant part:

4. The Respondent Group has contracted with ENTACT as its designated

contractor to conduct the Remedial Action at the United Scrap Lead Superfund Site in Troy, Ohio[,] pursuant to the terms of the Consent Decree entered into with the United States and approved by the United States District Court for the Southern District of Ohio. Pursuant to the contract for Remedial Activities, the Respondent Group has paid ENTACT for its services.

(*Id.* at ¶ 4).

The existing Consent Decree does require the Respondent Group to hire a contractor to perform Remedial Action [14] at the USLC Site. (*See* Doc. # 246, Consent Decree at 13, *et seq.*). Consequently, the Court concludes that the expenses incurred by the Respondent Group for Slaughter's services are consistent with the NCP, as a matter of law. The record reflects that the Respondent Group incurred the expenses while performing a response action in compliance with the terms of the Consent Decree. Pursuant to 40 C.F.R. § 300.700(c)(3)(ii), such expenses are per se consistent with the NCP. As a result, the Court rejects Certain Parties' argument that the Respondent Group has not established that it incurred any response costs consistent with the NCP.

*Fifth,* the Court agrees with Certain Parties' argument that no viable contribution claims exist, because no such claims have been filed by the Respondent Group. In support of their argument, Certain Parties properly note that the Respondent Group has never actually filed a claim for contribution, pursuant to Section 113(f) of CERCLA, against anyone in this action. Instead, the Court established the follow-

ing procedure in its Second Amended Case Management Order:

> The Plaintiff's Complaint is deemed to be asserted against each new defendant unless the Court is advised otherwise .... The defendants who are members of the Settling Group are deemed to have asserted cross-claims for contribution against all other defendants. All new defendants are deemed to have asserted crossclaims or counterclaims for contribution against all other parties, except for defendants who are members of the Settling Group who will receive contribution protection under the Consent Decree. All such counterclaims and crossclaims are deemed denied.

(Doc. # 178 at 2).

It is clear that those who are themselves liable for response costs must bring an action for contribution under § 113(f) of CERCLA. *Centerior,* 153 F.3d at 348. Although the Court previously "deemed" contribution claims to have been filed, Certain Parties insist that such a procedure is contrary to the Federal Rules of Civil Procedure. In support, they cite *Ninth Avenue Remedial Group v. Allis–Chalmers Corp.,* No. 2:94–CV–331–RL (N.D.Ind. Sept.25, 1996) (Lozano, J.), an unreported decision from the United States District Court for the Northern District of Indiana.

Although the Movants do not address the substance of Certain Parties' legal argument, they insist that "the great weight of authority" supports the practice of "deeming" contribution claims to have been filed. (Doc. # 374 at 16–17). Indeed, the Movants do cite several cases in which district courts have "deemed" such

---

**14.** The Consent Decree defines the phrase "Remedial Action" as "those activities, except for Operation and Maintenance, to be undertaken by the Settling Generator Defendants to implement all Work yet to be completed under the [Record of Decision] and its amend-

ments, in accordance with the [Statement of Work] and the final Remedial Design and Remedial Action Work Plans and other plans approved by the U.S. EPA." (Doc. # 246 at 8–9).

claims to have been filed. (*Id.*). This Court also has located a number of cases involving complex, multi-party litigation, in which federal courts have "deemed" cross-claims and counter-claims to have been filed. *See, e.g., United States v. Keystone Sanitation Co., Inc.*, 903 F.Supp. 803, 806 n. 1 (M.D.Pa.1995) ("In its initial case management order, the court deemed all original Defendants to have asserted contribution and indemnification crossclaims against one another."); *In re San Juan Dupont Plaza Hotel Fire Litigation*, 802 F.Supp. 624, 633 n. 17 (D.Puerto Rico 1992) (noting the existence of a case management order under which cross-claims were automatically "deemed" filed); *New Jersey Dept. of Environmental Protection v. Gloucester Environmental Management Serv., Inc.*, 719 F.Supp. 325, 330 (D.N.J. 1989) (deeming cross-claims and counter-claims to have been filed and served without the necessity of formal pleading); *Barton Solvents, Inc. v. Southwest Petro–Chem, Inc.*, 834 F.Supp. 342, 345 (D.Kan. 1993) (recognizing the existence of an order under which "all third-party defendants, in general, were deemed to have filed cross-claims against each other"); *United States v. Conservation Chemical Co.*, 653 F.Supp. 152, 228 (W.D.Mo.1986) (noting the existence of "deemed filed" cross-claims); *In re Orthopedic Bone Screw Products Liability Litigation*, 1998 WL 118060 (E.D.Pa. Jan.12, 1998) (unpublished) ("For purposes of indemnification and contribution claims, all cross-claims among defendants, third-party defendants, fourth-party defendants, and any other classes of defendants ... such claims are deemed filed, answered, and denied.").

■ Contrary to the Movants' argument, however, the foregoing cases are not persuasive authority for the proposition that cross-claims and counter-claims may be "deemed" to have been filed. In none of those cases did the district court analyze this issue or explain the source of its au-thority for "deeming" cross-claims and counter-claims to have been filed. After reviewing the unreported decision cited by Certain Parties, the Court agrees that such a practice is inconsistent with the Federal Rules of Civil Procedure.

In *Ninth Avenue Remedial Group,* the district court overruled a motion to deem cross-claims and counter-claims under § 107 and § 113 of CERCLA to have been filed and denied. In so doing, Judge Rudy Lozano reasoned:

> The Motion[ ] at hand draw[s] on Federal Rule of Civil Procedure 5, which states in pertinent part as follows:
>
>> In any action in which there are unusually large numbers of defendants, the court, upon motion or of its own initiative, may order that service of the pleadings of the defendants and replies thereto need not be made as between the defendants and that any cross-claim, counterclaim, or matter constituting an avoidance or affirmative defense contained therein shall be deemed to be denied or avoided by all other parties and that the filing of any such pleading and service thereof upon the plaintiff constitutes due notice of it to the parties. A copy of every such order shall be served upon the parties in such manner and form as the court directs.
>
> Fed.R.Civ.P. 5(c).
>
> Rule 5(c) has not generated much interpretation in case law. However, one well-regarded authority has summed up the purpose and scope of the Rule:
>
>> Rule 5(c) seeks to lessen the burden of service imposed upon individual defendants in a case in which there is an unusually large number of them, a good example being litigation involving water rights or a toxic tort action against all of the members of an entire industry. The Court, upon mo-

tion or its own initiative, may exempt defendants from service inter se of their own pleadings or replies thereto. Any cross-claims, counterclaims, and matters constituting avoidance or affirmative defense, interposed by individual defendants are presumed to be denied by all parties and the filing and service on plaintiff of such a pleading constitutes due notice of its contents to all the parties. However, the court's order authorizing the Rule 5(c) procedure must be filed and served on all the parties before it is effective.

One consequence of Rule 5(c) is that when it is employed a plaintiff need not respond to any counterclaims set forth in the answers and none of the defendants are obligated to answer any crossclaims interposed by their coparties. Note that in this regard Rule 5(c) alters the normal pleading practice set forth in Rule 7(a).

It should be emphasized that [R]ule 5(c) does not apply to service on numerous plaintiffs or to papers other than pleadings; all other papers must be served on the attorney for each party. Moreover the filing requirement of Rule 5(d) is not affected by Rule 5(c). In fact, filing in this context serves the function of providing notice to all defendants.

4B Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1151, at pp. 437–438 (2d ed.1987) (footnotes omitted). Essentially, then, Rule 5(c) "is just a way of dispensing with" requiring service of "many copies" of pleadings in cases involving an "unusually large number [ ]" of defendants. *Id.* p. 438 (quoting Proceedings, Cleveland Institute on the Federal Rules, 1938, p. 209).

Although appreciative of the parties' efforts to streamline this case, the Court has reservations regarding Plaintiffs' Motion. First, Plaintiffs appear to be reading more into Rule 5(c)—which focuses on service of pleadings—than it provides. Plaintiff's Motion is captioned as one to deem cross-claims and counterclaims "FILED AND DENIED"; similarly, Plaintiffs' proposed order would deem that all Defendants have "asserted cross-claims and counterclaims." As such, it appears that Plaintiffs want to dispense with *asserting* cross-claims and counterclaims at all, rather than just dispensing with *service* of those claims upon certain parties. The language of Rule 5(c) and its interpretation in Wright & Miller do not clearly indicate that the Rule provides authority for what Plaintiffs seem to request. . . .

*Ninth Avenue Remedial Group,* No. 2:94–CV–331–RL, at 2–4.

Upon review, the Court finds the foregoing reasoning to be persuasive. As the *Ninth Avenue* court recognized, nothing in Rule 5(c) authorizes a district court to dispense with the *filing* of cross-claims or counter-claims in complex, multi-party litigation. Rather, the Rule obviates the need for *service* of such claims in cases involving numerous defendants. Furthermore, a noted authority on the Federal Rules of Civil Procedure has concluded that "[w]here the court has waived *service* of the pleadings on each of the parties because of the appearance of numerous defendants, the *filing* requirements for these papers still apply." Moore's Federal Practice (3rd ed.1999), § 5.31[3][c] (Emphasis added). The Court simply finds no authority, and the Movants cite no authority, for the proposition that counter-claims or cross-claims for contribution properly may be "deemed" filed, notwithstanding the procedure set forth in the Second Amended Case Management Order. As a result, the Court is compelled to agree that no viable counter-claims or cross-claims

for contribution presently exist.[15] Consequently, the Court, *sua sponte*, will grant the Respondent Group leave to file claims for contribution under Section 113(f) of CERCLA.[16] Such claims shall be filed within fourteen days from date.

Having resolved the five arguments raised by Certain Parties, the Court turns now to an issue raised by Defendant Burns Iron & Metal Company ("Burns"). In its Memorandum (Doc. #357), Burns contends that a genuine issue of material fact exists as to the Government's entitlement to summary judgment on the issue of the Defendants' joint and several liability under § 107(a) of CERCLA. Like the arguments advanced by Certain Parties above, Burns' argument has widespread applicability to all of the Defendants.

In its Memorandum, Burns insists that summary judgment on the issue of liability is premature, because the harm caused by the release of hazardous substances at the USLC Site is arguably divisible. Burns insists that this issue must be resolved through an evidentiary hearing, before the Court resolves the Motion for Partial Summary Judgment. After reviewing the parties' respective arguments, the Court agrees with Burns that a genuine issue of material fact exists as to the Defendants' joint and several liability to the Government under § 107(a). The Court cannot agree, however, that the existence of such a factual dispute precludes it from determining whether the United States has established *any* liability (regardless of whether such liability is strict *and* joint and several, or merely strict), as a matter of law. In other words, in the context of summary judgment, the Court cannot determine the *type* of liability the Defendants may face under CERCLA. Nevertheless, the Court still may determine whether the United States has established *any* liability, regardless of whether that liability is joint and several or divisible.

In support of its argument, Burns properly notes that the United States seeks to impose joint and several liability on the Defendants under § 107(a) of CERCLA. (Doc. #357 at 9). As noted above, when the Government brings an action under § 107(a), liability is nearly always joint and several. *Centerior*, 153 F.3d at 348. "Given the nature of hazardous waste disposal, rarely if ever will a [potentially responsible party] be able to demonstrate divisibility of harm, and therefore joint and several liability is the norm." *Id.*

---

15. The Court reaches a different conclusion, however, regarding the Government's claims against the Defendants in this action. In its Second Amended Case Management Order (Doc. #178), the Court "deemed" the original Complaint to be asserted against each new Defendant, unless the United States advised otherwise. (*Id.* at 2). Notably, however, an actual Complaint *did* exist at the time of the Court's Order, as it had been filed in 1991 to commence this litigation. Furthermore, pursuant to the Court's Second Amended Case Management Order, newly added Defendants were provided with, *inter alia*, a copy of that Complaint, two copies of a Waiver of Service of Summons and a Notice of Joinder under Fed.R.Civ.P. 20. That procedure is markedly different than "deeming" non-existent cross-claims and counter-claims to be asserted when no such claims have been filed at all. Consequently, the Court is unpersuaded by Defendant Edison Automotive, Inc.'s assertion that it has never been sued by the Government and has never "received notice of the claims made against it ...." (Doc. #359 at 3).

16. In light of Certain Parties' objection, the Court is compelled to agree that no contribution claims presently exist. At the same time, however, the Court questions the purpose of objecting to the procedure set forth in the *Second Amended Case Management Order*. The only practical effects of Certain Parties' objection are (1) to delay this litigation further while the Respondent Group files formal *contribution claims, and (2) to cause the Re-*spondent Group and the other Defendants to incur additional expenses filing formal Answers to those claims.

In *United States v. Township of Brighton*, 153 F.3d 307 (6th Cir.1998), the Sixth Circuit addressed the circumstances under which a defendant can establish divisibility of the harm, thereby avoiding joint and several liability. In so doing, the *Brighton* court looked to the Restatement (Second) of Torts, § 433A (1995), which provides that "[d]amages for harm are to be apportioned among two or more causes where (a) there are distinct harms, or (b) there is a reasonable basis for determining the contribution of each cause to a single harm." *Id.* at 318. In the present case, Burns insists that there is a "reasonable basis" for determining the contribution of each Defendant to the single harm existing at the USLC Site. Specifically, Burns asserts that there is a reasonable basis for determining the volume of hazardous waste contributed by each Defendant. In *Brighton*, the Sixth Circuit recognized that apportionment might be appropriate under § 107(a) when a reasonable basis exists for establishing the volume or amount of waste contributed by each defendant. *Id.* at 318–19. When discussing the "reasonable basis" issue, the *Brighton* court cited a hypothetical example of several factories polluting one stream, with damages apportioned based on the volume of pollution released by each factory. *Id.* at 318. The *Brighton* court also stated that relevant "divisibility" factors include a party's ability to distinguish its contribution of hazardous waste from the contributions of others, and its ability to identify the amount of such waste. *Id.* at 318–19; *see also id.* at 320 ("Divisibility seeks to apportion liability based on relative contribution to harm,

if such is reasonably ascertainable.").[17] Finally, the Sixth Circuit recognized that divisibility is a legal defense to joint and several liability. *Id.* at 319 (explaining that "a defendant can avoid joint and several liability if it can prove divisibility in the district court").

In the present case, Burns contends that a "reasonable basis" does exist for determining each Defendant's contribution of junk batteries to the USLC Site. In support, Burns notes that the Respondent Group has developed a written volumetric ranking of more than 300 USLC customers, including Burns and the other Defendants. Burns alleges that this volumetric ranking has been used to support the Movants' settlement demands. According to Burns, the existence of this ranking list, at a minimum, creates a genuine issue of material fact on the divisibility question. *Cf. United States v. Alcan Aluminum Corp.*, 990 F.2d 711, 722 (2nd Cir.1993) (noting that to avoid summary judgment on the issue of divisibility, a party "need only show that there are genuine issues of material fact regarding a reasonable basis for apportionment of liability").

In response, the Movants properly note that divisibility is an affirmative defense to joint and several liability under § 107(a).[18] *United States v. Mottolo*, 26 F.3d 261, 263 (1st Cir.1994); *United States v. Monsanto Co.*, 858 F.2d 160, 168 (4th Cir.1988). However, the Court rejects the Movants' argument that Burns cannot establish a genuine issue of material fact on this affirmative defense by relying on the volumetric ranking spreadsheet. The Movants cite *Monsanto* for the proposition that di-

---

17. The Sixth Circuit used care to distinguish between "the divisibility defense to joint and several liability" and "the equitable allocation principles available to defendants under CERCLA's contribution provision." *Brighton*, 153 F.3d at 319. As a defense to joint and several liability, the divisibility analysis must be reserved for cases in which causation is

apportionable "on a reasonable basis." On the other hand, apportionment in the context of a § 113(f) claim for contribution may involve equitable concerns such as blame or fault. *Id.*

18. Burns has set forth the divisibility affirmative defense in its Answer (Doc. # 215 at 4).

visibility and apportionment are inappropriate, even if each Defendant contributed an identifiable volume of waste to the USLC Site. The Movants' reliance on *Monsanto* is misplaced. In that case, the Fourth Circuit rejected the proposition that divisibility could be based on the volume of waste contributed by each defendant, but only because the defendants in that case had contributed different types of hazardous substances:

> [I]n light of the commingling of hazardous substances, the district court could not have reasonably apportioned liability without some evidence disclosing the individual and interactive qualities of the substances deposited there. Common sense counsels that a million gallons of certain substances could be mixed together without significant consequences, whereas a few pints of others improperly mixed could result in disastrous consequences. *Under other circumstances proportionate volumes of hazardous substances may well be probative of contributory harm.*

*Id.* at 172 (Emphasis added); *see also In the Matter of Bell Petroleum Services,* *Inc.,* 3 F.3d 889, 895 n. 7 (5th Cir.1993) ("Many of the cases in which joint and several liability has been imposed involve hazardous waste sites at which numerous substances have been commingled.... Under such circumstances, it is hardly surprising that defendants have had difficulty in meeting their burden of proving that apportionment is feasible.").

 In the present case, the Defendants all contributed the same type of hazardous substance, namely junk batteries containing lead. Consequently, *Monsanto* does not undermine Burns' divisibility argument.[19] The Movants next cite *Chesapeake and Potomac Tel. Co. of Virginia v. Peck Iron & Metal Co.,* 814 F.Supp. 1269 (E.D.Va.1992), a case involving the sale of junk batteries, for the proposition that liability is not reasonably divisible in the present case. Upon review, the Court finds *Chesapeake* to be distinguishable. Notably, the *Chesapeake* court recognized that "volumetric contributions can, in appropriate circumstances, provide a reasonable basis for apportioning liability ...." *Id.* at 1279. Based on the record before it, however, the court concluded that "there

---

**19.** The Movants also rely on two other cases involving defendants who contributed different types of waste. Neither case, however, demonstrates that divisibility is inappropriate, as a matter of law, when potentially responsible parties all contribute the same type of waste. In *United States v. Tyson,* 1986 WL 9250 (E.D.Pa. Aug.22, 1986) (unpublished), the site had been polluted with trichlorobenzene, dichlorobenzene, toluene, ethylbenzene, eylene trichloropropane and copper. One of the defendants asserted a "relative innocence defense," alleging that another defendant had engaged in "reckless disposal of industrial waste." The district court rejected this argument, noting that willful misconduct by one party will not relieve others of liability. *Id.* at *11. This conclusion is consistent with the Sixth Circuit's determination in *Brighton* that equitable considerations, such as blame and fault, have no place in a CERCLA liability analysis, which is concerned only with causa-

tion. In *Kelley v. Thomas Solvent Co.,* 714 F.Supp. 1439, 1448 (W.D.Mich.1989), several contaminants from different sources migrated to the hazardous waste site. Upon review, the district court noted that "defendants may not propose an arbitrary or theoretical basis for apportioning response costs." *Id.* at 1449. While the Court does not dispute this statement, it cannot say, as a matter of law, that determining the volume of junk batteries contributed by each Defendant—based on the Movants' own volumetric rankings—is necessarily an "arbitrary or theoretical" basis for apportionment. As noted above, the Sixth Circuit expressly recognized in *Brighton* that the amount or volume of hazardous waste contributed by each defendant, if reasonably ascertainable, may constitute a legitimate basis for dividing the harm. Presumably, the Movants do not intend to argue that their own volumetric rankings are "arbitrary or theoretical."

simply will never be enough evidence ... from which a *reasonable* volumetric study could be constructed." *Id.* In the present case, however, a volumetric study has been constructed. Whether that study is a "reasonable" one cannot be resolved in the context of summary judgment. The study, which has been attached to various documents filed with the Court, purports to set forth the volume of hazardous waste contributed by the Defendants. It identifies the total volume of each Defendant's contributions within one ten-thousandth of one percent. For example, the study identifies Burns as having contributed .4281 percent of the combined volume of waste at the USLC Site. (*See, e.g.,* Doc. # 250). Given the precision of these computations, the volumetric ranking spreadsheet supports a fair inference that each Defendant's contribution to the Site *is* reasonably ascertainable, particularly in light of the Movants' failure to identify the origin or accuracy of the calculations set forth therein.[20] As a result, based on the evidence before it, the Court finds a genuine issue of material fact on the issue of divisibility.[21]

 Despite this conclusion, the Court rejects Burns' ultimate argument that the Motion for Partial Summary Judgment (Doc. # 333) must be overruled in its entirety. The existence of a question of fact regarding divisibility plainly precludes the Court from finding the Defendants jointly and severally liable to the United States for response costs. *Brighton,* 153 F.3d at 319 (noting that "a defendant can avoid joint and several liability if it can prove divisibility in the district court"); *see also Akzo Coatings, Inc. v. Aigner Corp.,* 909 F.Supp. 589, 591 (N.D.Ind.1993) (recognizing that "divisibility of harm may be used to preclude summary judgment as to joint and several liability" under CERCLA). A dispute about the nature of the Defendants' liability (i.e., divisible or non-divisible), however, does not preclude the Court from determining whether *any* liability has been established. On its face, § 107(a) of CERCLA, under which the United States is proceeding herein, does not expressly impose joint and several liability. Rather, it merely creates liability for response costs if four prerequisites are established.[22] As a result, the Court discerns no reason why it cannot determine, as a threshold matter, whether the Defendants

---

**20.** It may be that the spreadsheet represents nothing more than the Movants' "best guess," and that its accuracy cannot be relied upon for purposes of apportioning liability under § 107(a). Absent some explanation from the Movants, however, the Court cannot conclude, as a matter of law, that the spreadsheet's computations are unreasonable or arbitrary. On its face, the spreadsheet purports to establish each Defendant's volumetric contribution with remarkable precision. Consequently, the Court finds a genuine issue of material fact on the question of divisibility.

**21.** In their Reply Memorandum, the Movants also argue that divisibility does not apply to the Respondent Group's contribution action under § 113(f) of CERCLA. In addition, the Movants note that apportionment of liability among the Defendants in connection with the Respondent Group's contribution claims has been reserved for Phase II of this litigation. The Court does not dispute these assertions. "In actions seeking contribution, unlike those for joint and several cost recovery, the burden is placed on the plaintiff to establish the defendant's equitable share of response costs.... Liability is not joint and several, but merely several." *Centerior,* 153 F.3d at 348. As a result, the concept of divisibility, as an affirmative defense to joint and several liability, has no application in actions brought under § 113(f). This fact, however, does nothing to defeat Burns' divisibility argument, which is directed toward the Government's cost-recovery action under § 107(a), which, as noted above, presumes the existence of joint and several liability.

**22.** The Court will discuss these prerequisites, *infra.*

are liable under CERCLA at all. After determining the *existence* of § 107(a) liability, the Court then can conduct an evidentiary hearing, if necessary, to resolve the *nature* of that liability (i.e., joint and several or divisible). As noted above, courts have construed the statute as creating a presumption of joint and several liability, with the burden on a defendant to establish divisibility, *United States v. Burlington Northern Railroad Co.*, 200 F.3d 679, 696 (10th Cir.1999). The divisibility issue, however, need not be resolved prior to the Court determining whether the Defendants are liable at all under CERCLA. Consequently, the Court rejects Burns' argument that a question of fact on the divisibility issue defeats the Motion for Partial Summary Judgment in its entirety.

Having concluded that the United States may proceed on its Motion on the issue of liability (without regard to whether liability is joint and several or subject to division) the Court turns now to a review of the evidence against each Defendant. As an initial matter, the Court notes that the Government has not asserted *any* CERCLA claims against Defendants Etna Battery Co., Inc., and Tuttle Brothers, both of which are named in the Motion for Partial Summary Judgment. Although the Government is not asserting any claims against Etna or Tuttle, the Respondent Group seeks summary judgment on its purported "contribution claims" against those Defendants. (Doc. # 333 at 2 n.1). Given that no such claims currently exist, however, the Court overrules the Motion for Partial Summary Judgment (Doc.

# 333), as moot, insofar as the Respondent Group seeks to obtain contribution from Etna Battery, Tuttle Brothers and any other Defendants.

The Court also notes that eighteen Defendants recently entered into a Consent Decree with the United States and the Respondent Group, including six of the parties against whom the present Motion for Partial Summary Judgment is directed. Those six Defendants are: (1) Cohen Brothers Metal Corp., Inc., aka Cohen Brothers Metals Co.; (2) Galion Auto Wrecking, Inc.; (3) Glazer Scrap Co., Inc.; (4) Joyce Iron & Metal Co., Inc.; (5) Montgomery Iron & Paper Co., dba Montgomery Paper Co.; and (6) Piqua Battery, Inc. (Doc. # 454). Given that the Consent Decree has been approved by the Court, it resolves all CERCLA claims against these Defendants.[23] As a result, the Movants' Motion for Partial Summary Judgment is overruled, as moot, insofar as it relates to the foregoing six entities.

In the remainder of its analysis, the Court will address the potential CERCLA liability of the other nineteen Defendants against whom the Motion for Partial Summary Judgment (Doc. # 333) is directed. In order to prevail on its claims for response costs, which arise under § 107(a) of CERCLA, 42 U.S.C. § 9607(a), the Government must prove four essential elements: (1) that the USLC Site is a "facility," as that term is defined by statute; (2) the existence of a "release" or "threatened release" of a "hazardous substance" from the facility; (3) that the release or threatened release caused the United States to incur response costs[24]; and (4) that the

**23.** In a July 29, 1999, Entry (Doc. # 379), the Court sustained a Motion to Stay Decision (Doc. # 377) on the present Motion for Partial Summary Judgment, insofar as it relates to the foregoing Defendants. The Motion to Stay failed to include Defendant Montgomery Iron & Paper Co., dba Montgomery Paper Co.

The Court notes, however, that Montgomery Iron & Paper Co. is a party to the Consent Decree, despite its failure to be named in the Motion to Stay Decision.

**24.** Although private-party plaintiffs also must prove that the response costs were consistent

Defendants fit within one of four statutory classes making them subject to liability. *Kalamazoo*, 228 F.3d 648, 653; *Centerior*, 153 F.3d at 347–48.

In support of its Motion, the Government contends that the first three elements are undisputed. (Doc. # 333 at 11–16). Indeed, a number of the Defendants have admitted that the USLC Site is a "facility," that a release or threatened release of a hazardous substance has occurred, and that the Government has incurred response costs. (*Id.* at Exh. 3A–3L). Insofar as other Defendants do dispute the first three elements, however, the Court finds no genuine issue of material fact for trial.

Under CERCLA, a "facility" is defined as "(A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; but does not include any consumer product in consumer use or any vessel." 42 U.S.C. § 9601(9).

■ In light of CERCLA's expansive definition of the term "facility," the Court has no difficulty concluding, as a matter of law, that the USLC Site fits within its scope. The records reveals that Charles Bailen and others operated the Site as a "battery breaking" operation. The process involved "cracking" the batteries and extracting scrap lead from the worthless acid and contaminated casings, which were discarded on the property. Bailen has testified that battery breaking involved cutting off battery tops, draining the acid into a pit and grinding the lead-contaminated casings for disposal at the Site. (Bailen depo., August 7, 1995, at 58–75). Lead is a "hazardous substance" under CERCLA. *See* 40 C.F.R. § 302.4; *Gould, Inc. v. A & M Battery & Tire Serv.*, 232 F.3d 162, 167 (3rd Cir.2000); *Axel Johnson, Inc. v. Carroll Carolina Oil Co., Inc.*, 191 F.3d 409, 411 (4th Cir.1999). As a matter of law, the USLC Site qualifies as a "facility," because it is a "site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located . . . ." 42 U.S.C. § 9601(9).

■ The Government also has established, as a matter of law, the existence of a "release" or "threatened release" of a hazardous substance from the facility. Although some of the Defendants dispute this issue,[25] the record reveals no genuine issue of material fact for trial. Indeed, uncontroverted evidence reveals the existence of both a "release" and a "threatened release" of a hazardous substance from the

---

with the National Contingency Plan, this requirement does not apply when the Government initiates an action to recover response costs from potentially responsible parties. In such a case, response costs are presumed to be consistent with the NCP, and potentially responsible parties bear the burden of proving inconsistency. *See, e.g., Chapman*, 146 F.3d at 1170–71.

25. Edison Automotive and United Salvage Company contend that the Government may have established a "release" or "threatened release" *at* a facility, but not *from* a facility, as required by 42 U.S.C. § 9607(a). (*See* Doc.

# 359 at 5–6; Doc. # 368 at 10). With respect to United Salvage Company, the Court notes that it previously *admitted,* in response to requests for admissions, that "a release or threatened release of a hazardous substance from the Site has occurred." United Salvage has attached a copy of this admission to its own Memorandum. (*See* Admissions, attached to Doc. # 368). In any event, for the reasons set forth, *infra,* the Defendants' argument lacks legal merit, because uncontroverted evidence establishes the existence of both a "release" and a "threatened release" *from* the USLC Site.

USLC Site. CERCLA defines the term "release" to mean "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant)[.]" 42 U.S.C. § 9601(22). As noted above, Bailen and others discharged, dumped or disposed lead-contaminated battery casings at the USLC Site. As a matter of law, such conduct constitutes the "release" of a hazardous substance *at* the facility. In addition, the uncontroverted evidence establishes the existence of a "release" or "threatened release" *from* the facility, as required by 42 U.S.C. § 9607(a). John J. O'Grady, an environmental scientist employed by the U.S. EPA, has provided the Court with a declaration in which he explains that the Government has replaced contaminated off-Site soil with clean soil. (Doc. # 333 at Exh. 11, ¶ 22). In addition, a June, 1997, Superfund Record of Decision ("ROD") Amendment published by the U.S. EPA addresses the release and threatened release of lead from the USLC Site. In relevant part, that Amendment recognizes that "[a]ctual or threatened releases of hazardous substances from the site, if not addressed by implementing the response action selected in this ROD Amendment, may present an imminent and substantial endangerment to public health, welfare, or the environment." (*Id.* at Exh. 9 pg. i). Furthermore, the ROD Amendment explains risk of a release as follows:

> The principal contaminant of concern is lead in soil and lead in battery casing chips.... The contaminated soils on-site represent a continuing source of lead contamination for off-site soils, and possibly the waters and sediments of McKaig Ditch. Soil is the primary medium impacted by lead.

> ... Lead is considered the primary contaminant of concern at the Site, and occurs mainly as metallic lead or lead compounds associated with lead-contaminated battery casing chips and lead-contaminated soils. Other metals (arsenic and antimony) found in the former process area at the Site have been found to be co-located with the lead.

> ... Direct and indirect contact to environmental media contaminated by a release from the Site has the potential to result in lead exposure from the inadvertent ingestion and inhalation of soil and dust. Receptors include humans, animals, and plants.

> ... [T]he potential exists for an increased risk of exposure of the nearby population via the migration of contaminated media by flooding. Removal of the source material (i.e., battery casing chips and lead-contaminated soils) from the Site would reduce the possibility that the source material could impact the groundwater aquifer and water supply to adjacent residences ...

(*Id.* at 9–11).

The U.S. EPA also prepared a February, 1988, Remedial Investigation Report, which establishes both the release and threatened release of lead from the USLC Site. In relevant part, the Report states:

> ... Virtually all samples collected at the USL site exhibited lead concentrations greater than the average background total lead concentration of 44 mg/kg as did some off-site areas. In summary, the soils in and around the USL site contain lead concentrations in excess of the designated background surface soil concentrations virtually throughout the site and to a depth of several feet. With the exception of the Ishmael property, located adjacent to the site, offsite areas did not exhibit significant lead concentrations in surface soils which exceeded

background. An area near the Ishmael house did show lead concentrations of over 500 mg/kg (one sample). . . .

. . . Because the entire United Scrap Lead site is in a flood plain and on-site wastes could be subjected to flooding under extreme conditions, the potential for off-site transport of contaminants from the site could increase. Under these conditions, exposure to contaminants transported from the site could pose increased risks to human or environmental receptors not considered under exposure scenarios for conditions currently at the site.

(*Id.* at Exh. 10, p. 12, 31).[26]

In light of the foregoing uncontroverted evidence, the Government has proven the existence of an actual "release" of a hazardous substance from the USLC Site, as a matter of law. The same evidence demonstrates, as a matter of law, that the Government has established a "threatened release" of a hazardous substance from the Site. As a result, the Court finds no genuine issue of material fact on this element of the Government's CERCLA claim against the Defendants.

With respect to the third element, the undisputed evidence also establishes that the release or threatened release from the Site has caused the United States to incur necessary response costs. The Sixth Circuit has recognized that "response costs" " include both direct and indirect costs inherent in the cleanup operation." *United ed States v. R.W. Meyer, Inc.*, 889 F.2d 1497, 1503 (6th Cir.1989). In the present case, the Government has provided two uncontroverted declarations, detailing response costs of more than $6,000,000 that it has incurred in connection with the

USLC Site. (Doc. # 333 at Exh. 11, 12). As a result, the Court finds no genuine issue of material fact on this element of the Government's CERCLA claims against the Defendants.

The only remaining issue, then, is whether the Defendants fit within one of four statutory classes, rendering them subject to CERCLA liability. In the present case, the Government alleges that the Defendants fit within the scope of 42 U.S.C. § 9607(a)(3), which imposes liability on any party "who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances[.]"

For present purposes, the key portion of § 9607(a)(3) is its "arranged for" disposal language. The Government contends that the Defendants "arranged for" disposal of hazardous waste when they sold junk batteries to USLC. Conversely, the Defendants contend that they merely "arranged for" the recycling of lead when they sold the batteries. Although CERCLA does not define the phrase "arranged for," the Sixth Circuit engaged in a lengthy discussion of its meaning, in the context of § 9607(a)(3) "arranger liability," in *United States v. Cello–Foil Products, Inc.*, 100 F.3d 1227 (6th Cir.1996). Therein, the Sixth Circuit reasoned that the proper inquiry, with respect to "arranger" liability, "is whether the party intended to enter into a transaction that included an 'arrangement for' the disposal [or treatment]

---

**26.** The Court notes that the ROD Amendment quoted, *supra,* and the Remedial Investigation Report have been authenticated by U.S. EPA Deputy Regional Administrator David Ullrich. In addition, insofar as they are relied on herein, both documents are admissible under Fed.R.Evid. 803(8)(C), as "factual findings resulting from an investigation made pursuant to authority granted by law . . . ."

of hazardous substances." The *Cello–Foil* court also noted that "[t]he intent need not be proven by direct evidence, but can be inferred from the totality of the circumstances." *Id.* at 1231. Although CERCLA is a strict liability statute, the Sixth Circuit explained that courts must "recognize the indispensable role that state of mind must play in determining whether a party has 'otherwise arranged for disposal . . . of hazardous substances.' " *Id.* Specifically, a "court must inquire into what transpired between the parties and what the parties had in mind with regard to disposition of the hazardous substance." *Id.* Such an inquiry "does not undermine the strict liability nature of CERCLA." *Id.* at 1232. This is so because "[t]he intent inquiry is geared only toward[ ] determining whether the party in question is a potentially liable party. Once a party is determined to have the requisite intent to be an arranger, then strict liability takes effect." *Id.* Therefore, "if an arrangement has been made, that party is liable for damages caused by the disposal regardless of the party's intent that the damages not occur. Moreover, a party can be responsible for 'arranging for' disposal, even when it has no control over the process leading to the release of substances." *Id.* A "party cannot escape liability by claiming that it had no intent to have the waste disposed in a particular manner or at a particular site." *Id.*

Applying the foregoing standards, the *Cello–Foil* court found a genuine issue of material fact as to whether the purchasers of drums containing solvent faced "arranger liability" under CERCLA, based on their return of the reusable drums with small quantities of the solvent remaining in them. Following the return of the drums through a drum-deposit program, the seller of the solvent had dumped any remaining contents on the ground and then had refilled the drums for resale. After discovering that the discarded contents had contaminated the ground, the Government brought an action under CERCLA to recover response costs from several solvent purchasers who had returned their drums. The Government alleged that the solvent purchasers had "arranged for" the disposal of hazardous substances (the residual quantities of solvent allegedly remaining in the drums) when they returned their drums to the seller. The district court rejected the Government's argument and entered summary judgment in favor of the solvent purchasers, reasoning:

> "[T]he court concludes, therefore, that Defendants are not liable under section 107(a)(3) absent a showing that they intended to dispose of the residual amounts of the hazardous substances remaining in their returned drums. It is immediately clear that the Government's claim against Defendants fails to establish liability. The purpose of Defendants returning of the drums was to recover the deposits that Defendants had paid; the Government has absolutely no proof that Defendants' purpose was to dispose of residual amounts of hazardous substances remaining in those drums. That Defendants incidentally got rid of these residues does not mean that it was Defendants' purposeful intent to dispose of the residues; rather, this was merely incidental to the drum return."

*Id.* at 1233.

Upon review, the Sixth Circuit reversed the district court's judgment, concluding that the lower court had "employed an overly restrictive view on what is necessary to prove intent, state of mind, or purpose, by assuming that intent could not be inferred from the indirect action of the parties." *Id.* While agreeing that the purchasers' primary purpose in returning the drums was to recover their deposits, the Sixth Circuit found a reasonable inference that a "further purpose was to dispose of

the residual wastes returned with the drums." *Id.* Specifically, the *Cello–Foil* court noted that the purchasers arguably had taken affirmative steps to dispose of the solvent: "By leaving amounts of solvent in drums ranging from one-half to ten gallons, which Defendants knew [the seller] would carry away, a trier of fact could infer that Defendants were taking affirmative acts to dispose." *Id.* at 1233.[27] As a result, the Sixth Circuit concluded that the Defendants were not entitled to summary judgment.

On the other hand, the *Cello–Foil* court found that a trier of fact reasonably also could infer a lack of intent to dispose of the residual waste. Consequently, the Sixth Circuit reasoned that summary judgment was inappropriate for any party:

> In this case, summary judgment would have been appropriate only if no genuine issues regarding intent existed. Our review of the record, however, reveals genuine issues of material fact regarding whether the parties returned solvents to Thomas Solvent with the additional purpose of disposal of unused solvents. The volumes of deposition testimony create scenarios, some conflicting, from which a trier of fact could conclude that Defendants, without a contract or agreement, otherwise arranged for disposal of their hazardous substances by Thomas Solvent. Such a finding would preclude the district court's conclusion that any disposal was incidental to the primary drum return transaction. For example, deposition

testimony elicited from employees of Thomas Solvent and Defendants creates an issue as to whether the Defendants ever took "affirmative acts to dispose" of unused solvent, as required by *AM Int'l,* 982 F.2d at 999. By leaving amounts of solvents in drums ranging from one-half to ten gallons, which Defendants knew Thomas Solvent would carry away, a trier of fact could infer that Defendants were taking affirmative acts to dispose. By the same token, the finder of fact could conclude that Defendants did not leave solvents in the drums or that their acts in leaving residual amounts of solvents in the drums does not support an inference of purposeful or intentional disposal, or find that the drums were filled with waste water and other debris. A finder of fact must resolve this issue, and thus, the district court acted too hastily in finding no showing of intent. The district court overlooked genuine issues of material fact that make the resolution of this issue inappropriate at the summary judgment stage. As the Fourth Circuit has noted, issues regarding parties' intent, with respect to agreements or contracts, "present interpretive issues traditionally understood to be for the trier of fact." *Charbonnages,* 597 F.2d at 415. We hold the same should apply to issues of intent concerning "otherwise arranged" liability under CERCLA.

*Id.* at 1233–34 (footnotes omitted).[28]

In light of *Cello–Foil,* some of the Defendants urge this Court to adopt a per se

---

**27.** In reaching this conclusion, the Sixth Circuit recognized that " '[f]requently, the most probative evidence of intent will be objective evidence of what actually happened rather than evidence describing the subjective state of mind of the actor. For normally, the actor is presumed to have intended the natural consequences of his deeds.' " *Id.,* quoting *Washington v. Davis,* 426 U.S. 229, 253, 96 S.Ct.

2040, 48 L.Ed.2d 597 (1976) (Stevens, J., concurring).

**28.** In finding genuine issues of material fact regarding the Defendants' intent to dispose of hazardous waste, the *Cello–Foil* court noted the existence of testimony that the drums were "tipped until dry" prior to being returned. *Cello–Foil,* 100 F.3d at 1233–34 n. 3. The court also noted that, even if the Defen-

rule, declaring summary judgment on the issue of "arranger liability" to be inappropriate in any CERCLA case. (*See, e.g.,* Memo. in Opp. filed by Defendant United Salvage, Doc. # 368 at 9) ("The Sixth Circuit has clearly held that a determination of the selling party's intent should be determined after a trial based upon all facts and circumstances adduced at trial and not by way of summary judgment."); (Memo. in Opp. filed by Defendant Senser Metal, Doc. # 354 at 5) ("The *Cello–Foil* court specifically found that resolution of the intent issue is inappropriate at the summary judgment stage."). In fact, Defendant Senser Metal insists that, in the wake of *Cello–Foil*, the Government "can cite no case where a summary judgment determination was made against a potentially responsible party where that PRP properly raised the issue of intent as to CERCLA arranger liability." (Doc. # 354 at 5).

Having reviewed the Sixth Circuit's ruling, however, the Court concludes that the Defendants significantly overstate its holding. The *Cello–Foil* court did not hold that summary judgment on the issue of intent in an "arranger liability" case is never appropriate. To the contrary, the court expressly recognized that summary judgment would have been appropriate in

that case "if no genuine issues regarding intent existed." *Cello–Foil,* 100 F.3d at 1233.

The Court is equally unpersuaded by Senser Metal's assertion on page five of its Memorandum that the Government cannot cite a single post-*Cello–Foil* "intent" case imposing arranger liability in the context of summary judgment. Without regard to the Government's ability to locate such a case, the Court notes that Senser Metal itself has cited one, *E.P.A. v. TMG Enterprises, Inc.,* 979 F.Supp. 1110, 1122–24, 1131 (W.D.Ky.1997), on page seven of its Memorandum.[29]

With *Cello–Foil* as a guide, the Court turns now to the Government's evidence that the Defendants "arranged for" the disposal of a hazardous substance at the USLC Site. For purposes of clarity, the Court will address the Government's claim against each of the nineteen Defendants separately.[30]

### 1. *Ace Iron & Metal Company, Inc.*

With respect to Defendant Ace Iron & Metal Company, Inc., the Government advances the following argument[31]:

> Ace Iron & Metal Co., Inc.[,] has admitted that it sold lead batteries to Unit-

---

dants did leave some solvent in the drums, a trier of fact could find that such conduct did not support an inference of intentional disposal. In reaching this conclusion, the court noted the existence of testimony that the Defendants had attempted to get the drums "as empty as possible." *Id.* at 1234 n. 4. Finally, the court noted the existence of testimony that the returned drums contained nothing but water. *Id.* at 1234 n. 5. In light of the foregoing testimony, the Sixth Circuit determined that genuine issues of material fact precluded the entry of summary judgment for any party.

**29.** In *TMG,* the district court concluded that defendant K & R Corporation had the intent to "arrange for disposal," as a matter of law, when it sold scrap copper wire to a reclamation business, without first removing the insu-

lation that covered the wire. *TMG,* 979 F.Supp. at 1122–24. As a result, the district court entered summary judgment in favor of the Government and against K & R Corporation. *Id.* at 1131.

**30.** The Court's analysis herein is directed only toward the Defendants' liability to the United States under § 107(a). Given its conclusion that the Respondent Group has not yet asserted any claims for contribution under § 113(f), the Court cannot resolve the issue of the Defendants' liability to the Respondent Group. At this time, no contribution claims exist.

**31.** On the issue of arranger liability, the Government sets forth a separate brief argument against each Defendant.

ed Scrap Lead. Ace Iron & Metal Company is listed on the United Scrap Lead Customer Price List. Invoices document individual transactions in junk batteries between Ace Iron & Metal Company and United Scrap Lead. Charles Bailen has testified that Ace Iron & Metal Company was a customer of United Scrap Lead. Therefore, no genuine issue of material fact exists that Ace Iron & Metal Company arranged for the treatment or disposal of hazardous substances at the United Scrap Lead Site. (Doc. # 333 at 21) (footnotes with citations omitted).

■ Upon review, the Court concludes that the Government has demonstrated its entitlement to judgment as a matter of law on the issue of this Defendant's "arranger" liability under CERCLA.[32] Ace Iron & Metal Company, Inc., has admitted its "[s]ale of lead batteries to United Scrap Lead" from 1966 to 1977. (*Id.* at Exh. 4A). Furthermore, the record reflects that USLC never re-sold the whole batteries that it purchased, never sent them out for processing, and never shipped them to other sites. (Bailen depo., August 7, 1995, at 40–41). Rather, as noted, *supra*, Charles Bailen and others operated the Site as a "battery breaking" operation, which involved "cracking" the batteries and extracting scrap lead from the worthless acid and casings. The acid and lead-contaminated casings then were discarded on the property. In particular, the undis-

puted evidence establishes that "battery-breaking" involved cutting off battery tops, draining the acid into a pit and grinding the lead-contaminated casings for disposal at the USLC Site. (*Id.* at 58–75).

Based on the evidence before it, the Court concludes that the role of Ace Iron & Metal Company, Inc., in the foregoing transactions constituted arrangements for disposal, as a matter of law. Construing the evidence and all reasonable inferences drawn therefrom in a light most favorable to Ace, the record also supports a reasonable inference that it intended to enter into a transaction that included an arrangement for disposal. In reaching this conclusion, the Court notes that Ace did not sell lead in the form of a raw material. Rather, it sold junk batteries that had to be "cracked" in order for the scrap lead to be extracted from the lead-contaminated casings. "The battery casings ... unlike the lead plates within the casings, were not the subject of recycling." *Catellus Development Corp. v. United States,* 34 F.3d 748, 753 (9th Cir. 1994). "They retained their character as waste throughout and would have to be 'gotten rid of,' either by [Ace], which could have cracked the batteries itself before selling the scrap lead, or as was the case here, by [the United Scrap Lead Company] after it bought the entire battery." *Id.* Ace Iron & Metal Company, Inc., "cannot escape having the battery casings defined as a discarded material

32. Ace Iron & Metal Company, Inc., is one of the "Certain Parties" who filed a joint Memorandum in Opposition to the present Motion. (*See* Doc. # 353). The Court fully addressed Certain Parties' arguments, *supra*, and need not repeat that analysis. Certain Parties also previously adopted, by reference, a Motion for Summary Judgment (Doc. # 330) filed by Defendant Livingston & Co., Inc. The Court overruled that Motion in *United States v. Atlas Lederer Co.,* 85 F.Supp.2d 828 (S.D.Ohio 2000). Finally, Certain Parties previously adopted, by reference, other unspecified "summary judgment pleadings" filed by: (1) Beckner Iron & Metal Co.; (2) Broadway Iron & Metal Co.; (3) Burns Iron & Metal Company; (4) Cohen Brothers Metal Company; (5) Livingston & Co., Inc.; (6) Senser Metal Company, Inc.; and (7) United Salvage Company, Inc. (*See* Doc. # 375). The Court has overruled any and all summary judgment motions filed by the foregoing Defendants. Consequently, Certain Parties' reliance on these other pleadings is unavailing.

simply by selling the battery to another party who then disposes of the casings." *Id.; see also Douglas County, Nebraska v. Gould, Inc.,* 871 F.Supp. 1242, 1247 (D.Neb.1994) ("In selling whole spent batteries, the seller is merely getting rid of a product which has no use except to reclaim the lead inside. In such a case, the sale is actually a disposal."); *United States v. Pesses,* 794 F.Supp. 151, 157 (W.D.Pa.1992) ("Since all of the moving defendants sent scrap materials to Metcoa which necessarily required processing in order to be productively used, they 'arranged for' the treatment and disposal of hazardous substances there.... Since it appears that each of the moving defendants 'by contract, agreement, or otherwise' arranged for the disposal and/or treatment of hazardous substances at Metcoa, they are liable as a matter of law under Section 107(a)(3) of CERCLA."); *TMG Enterprises,* 979 F.Supp. at 1123–24 ("K & R could have chosen to dispose of its remaining scrap [copper wire] in a nonhazardous manner. However, K & R chose to sell its remaining 'inventory' to another scrap metal dealer, thereby creating a threat that hazardous substances contained in the insulation would be released into the environment during the reclamation process. Although the copper retained some residual value, the insulation material did not. Reclamation of the copper necessitated removal and disposal of the insulation material covering the copper wire. In the process of disposing of the insulation, a hazardous substance ultimately was released into the environment.").

Given that the recovery of the lead plates from a junk battery necessarily requires the disposal of worthless hazardous material (namely, lead-contaminated casings), the record supports a reasonable inference that Ace Iron & Metal Company, Inc., intended to arrange for such disposal when it sold whole batteries, without asking for the contaminated casings to be returned or attempting to remove the recyclable lead before completing the sales. In addition, based on the evidence before it, the Court concludes that the foregoing inference is the only reasonable one that can be drawn. In reaching this conclusion, the Court is cognizant of the Sixth Circuit's observation that whether a party possessed the requisite intent to enter into a transaction that included an arrangement for the disposal of a hazardous substance is a question of fact. *Cello–Foil,* 100 F.3d at 1233. The Court is equally aware of the Sixth Circuit's admonition that questions of intent, with respect to "arranger" liability under CERCLA, " 'present interpretative issues traditionally understood to be for the trier of fact.' " *Id.* at 1234. Unlike *Cello–Foil,* however, the facts in the present case do not lend themselves to competing inferences.

As noted, *supra,* the *Cello–Foil* court found a reasonable inference that, "[b]y leaving amounts of solvent in drums ranging from one-half to ten gallons, which [d]efendants knew [the seller] would carry away[,]" the defendants had intended to arrange for disposal of a hazardous substance. *Id.* at 1233. On the other hand, the record contained evidence suggesting (1) that some of the defendants had tried to remove all of the solvent before returning the drums, (2) that some of the returned drums actually were returned completely empty, and (3) that some of the returned drums contained nothing but water. *Id.* at 1234. Given that the evidence revealed "conflicting scenarios," some of which supported an inference of intent to arrange for disposal and some of which did not, the Sixth Circuit reasoned that summary judgment for any party was inappropriate. *Id.* at 1233–34.

In the present case, however, the evidence does not reveal the existence of conflicting inferences, some of which would

support a finding of "arranger" liability and some of which would not. Unlike *Cello–Foil,* Ace cites no evidence to suggest that it tried to remove all hazardous material before selling its junk batteries to USLC, or that the batteries it sold contained no hazardous material. As noted above, Ace also cites nothing to suggest that it asked for the lead-contaminated battery casings to be returned after USLC salvaged the lead plates. In short, unlike the defendants in *Cello–Foil,* Ace fails to cite any evidence from which a trier of fact could conclude that its sale of junk batteries did not include an intentional arrangement for the disposal of a hazardous substance.[33] As a result, the record reveals no genuine issue of material fact precluding the entry of summary judgment in favor of the Government on its "arranger" liability CERCLA claim against Ace Iron & Metal Company, Inc.

2. *Beckner Iron & Metal Company*

With respect to Defendant Beckner Iron & Metal Company, the Government argues as follows:

> Beckner Iron & Metal Company has admitted that it was a party to a trans-

action or transactions whereby lead materials it owned, possessed or controlled came to be located at the United Scrap Lead Site. Beckner Iron & Metal Company is listed on the United Scrap Lead Customer Price List as a customer. Charles Bailen has testified that Beckner Iron & Metal Company was a customer of United Scrap Lead. Therefore, no genuine issue of material fact exists that Beckner Iron & Metal Company arranged for the treatment or disposal of hazardous substances at the United Scrap Lead Site.

(Doc. # 333 at 21–22) (footnotes with citations omitted).

Upon review, the Court concludes that the Government has demonstrated its entitlement to judgment as a matter of law on the issue of this Defendant's "arranger" liability under CERCLA. Beckner Iron & Metal Company has admitted it was "a party to a transaction or transactions whereby lead materials [it] owned, possessed or controlled came to be located at the [United Scrap Lead] Site." (Doc. # 333 at Exh. 3A). Beckner also concedes in its Memorandum that it sold lead batteries to USLC.[34] (Doc. # 345 at 5–6). Further-

---

**33.** With respect to Defendant Ace and certain other Defendants, the Court believes that the present case is more analogous to *TMG Enterprises* than it is to *Cello–Foil.* As noted, *supra,* the district court in *TMG Enterprises* concluded that defendant K & R Corporation had the intent to "arrange for disposal," as a matter of law, when it sold scrap copper wire to a reclamation business, without first attempting to remove and to dispose of the hazardous insulation that covered the wire. *TMG Enterprises,* 979 F.Supp. at 1122–24. Likewise, in the present case, a number of Defendants, including Ace Iron & Metal Company, Inc., sold junk batteries to a "battery breaking" operation, without first attempting to remove and to dispose of the lead-contaminated battery casings. In so doing, Ace and these other Defendants created "a threat that hazardous substances contained in the [battery casings] would be released into the envi-

ronment during the reclamation process." *Id.* at 1124.

**34.** Although Beckner has admitted being "a party to a transaction or transactions whereby lead materials [it] owned, possessed or controlled came to be located at the [USLC] Site," it implicitly disputes, at least early in its Memorandum, whether it ever sold lead *batteries* to USLC. For example, Beckner argues that it is not named on the USLC "customer price list." (Doc. # 345 at 2). Beckner also argues that Charles Bailen did not definitively identify it as a USLC customer. (*Id.* at 3). Finally, Beckner notes the absence of other written documentation, establishing that it was a USLC customer. (*Id.*). Elsewhere in its Memorandum, however, Beckner acknowledges that the "lead materials" it admittedly sold to USLC were, in fact, lead batteries. For example, Beckner argues that "[n]ot every transaction involving spent lead acid bat-

more, the record reflects that USLC never re-sold the whole batteries that it purchased, never sent them out for processing, and never shipped them to other sites. (Bailen depo., August 7, 1995, at 40–41). Rather, as noted, *supra,* Charles Bailen and others operated the Site as a "battery breaking" operation, which involved "cracking" the batteries and extracting scrap lead from the worthless acid and casings. The acid and lead-contaminated casings then were discarded on the property. In particular, the undisputed evidence establishes that "battery-breaking" involved cutting off battery tops, draining the acid into a pit and grinding the lead-contaminated casings for disposal at the USLC Site. (*Id.* at 58–75).

Based on the evidence before it, the Court concludes that the role of Beckner Iron & Metal Company in the foregoing transactions constituted "arrangements for disposal," as a matter of law. Construing the evidence and all reasonable inferences drawn therefrom in a light most favorable to Beckner, the record also supports a reasonable inference that it intended to enter into a transaction that included an arrangement for disposal. In reaching this conclusion, the Court notes that Beckner did not sell lead in the form of a raw material. Rather, it sold junk batteries that had to be "cracked" in order for the scrap lead to be extracted from the lead-contaminated casings. "The battery cas-

ings ... unlike the lead plates within the casings, were not the subject of recycling." *Catellus,* 34 F.3d at 753. "They retained their character as waste throughout and would have to be 'gotten rid of,' either by [Beckner], which could have cracked the batteries itself before selling the scrap lead, or as was the case here, by [USLC] after it bought the entire battery." *Id.* Beckner Iron & Metal Company "cannot escape having the battery casings defined as a discarded material simply by selling the battery to another party who then disposes of the casings." *Id.*

Given that the recovery of the lead plates from a junk battery necessarily requires the disposal of worthless hazardous materials, the record supports a reasonable inference that Beckner intended to arrange for such disposal when it sold whole batteries, without asking for the contaminated casings to be returned or attempting to remove the recyclable lead before completing the sales. In addition, based on the evidence before it, the Court concludes that the foregoing inference is the only reasonable one that can be drawn. Unlike, *Cello–Foil,* upon which Beckner relies, the evidence does not reveal the existence of conflicting inferences, some of which would support a finding of "arranger" liability and some of which would not. Unlike the defendants in *Cello–Foil,* Beckner cites no evidence to suggest that it

teries is one intended to dispose of or treat the batteries." (*Id.* at 4). Beckner also contends that USLC made the crucial decision regarding the disposal of "the batteries." (*Id.* at 5). Finally, Beckner argues that "the proper inference to be drawn from the transaction involving Beckner Iron is that Beckner Iron did not intend to dispose of or treat the batteries when [it] entered into the transaction ...." (*Id.* at 6). In light of these representations, Beckner appears to have conceded that the "lead materials" it admittedly sold were, in fact, lead batteries. If Beckner does intend to contest this point, and if it can do so

consistent with Rule 11 of the Federal Rules of Civil Procedure, it may so advise the Court. For present purposes, however, it appears to be undisputed that the lead materials sold by Beckner were lead batteries. If so, then it is immaterial whether Beckner is named on the USLC "customer price list," whether Charles Bailen positively identified Beckner as a USLC customer or whether other written documents establish that it was a USLC customer. Indeed, if, as it appears, Beckner admits that it sold lead batteries to USLC, then it admits to being a "customer" of that Company.

tried to remove all hazardous material before selling its junk batteries to USLC, or that the batteries it sold contained no hazardous materials. Beckner also cites nothing to suggest that it asked for the lead-contaminated battery casings to be returned after USLC salvaged the lead plates. In short, unlike the defendants in *Cello–Foil*, Beckner fails to cite any evidence from which a trier of fact could conclude that its sale of junk batteries did not include an intentional arrangement for the disposal of a hazardous substance.

In opposition to the foregoing conclusion, Beckner argues that it cannot be liable under CERCLA for three reasons: (1) it did not make the "crucial decision" regarding how its batteries would be disposed of or treated; (2) it did not retain ownership of the batteries or have the authority to control the manner in which they were disposed of or treated; and (3) it sold the batteries without knowledge that they would be disposed of at the USLC Site. (Doc. # 345 at 4–6). Under Sixth Circuit law, however, the foregoing facts are not relevant to the existence of CERCLA liability. In *Cello–Foil*, the Sixth Circuit concluded that "a party can be responsible for 'arranging for' disposal, even when it has no control over the process leading to the release of substances." *Cello–Foil*, 100 F.3d at 1232. The Sixth Circuit also explained that "a party cannot escape liability by claiming that it had no intent to have the waste disposed [of] in a particular manner or at a particular site." *Id.; see also Catellus*, 34 F.3d at 752 (rejecting the argument that liability cannot attach when a defendant "did not control the eventual disposition" of hazardous waste, and noting that "continued ownership or control of a hazardous substance" is not a prerequisite for CERCLA liability).

Finally, Beckner argues that the Court may not infer an "intent to dispose" from its sale of junk batteries to USLC. According to Beckner, "[t]o so infer would be to impermissibly construe an inference of fact in the moving party's favor." (Doc. # 345 at 5–6). In the summary judgment context, Beckner insists that "the proper inference to be drawn from the transaction involving Beckner Iron is that Beckner Iron did not intend to dispose of or treat the batteries when [it] entered into the transaction, as there is no direct evidence of Beckner Iron's intent." (*Id.* at 6).

Upon review, the Court cannot agree with Beckner's position regarding the drawing of inferences. As an initial matter, the Court notes that if the record contained "direct evidence" of Beckner's intent, there would be no need to resort to inference drawing at all. Contrary to Beckner's argument, however, the absence of direct evidence does not mean that the only permissible inferences are those favorable to it. Rather, in the context of summary judgment, the drawing of an inference *against* Beckner is improper only when the facts support two or more reasonable inferences, at least one of which is favorable to Beckner.

In the present case, the Court has determined, for the reasons set forth above, that the only reasonable inference to be drawn from the evidence is that, by selling junk batteries, Beckner did intend to enter into a transaction that included an "arrangement for" the disposal of a hazardous substance. As noted, *supra*, Beckner sold whole batteries without asking for the lead-contaminated casings to be returned or attempting to remove the recyclable lead before completing the sales. The act of selling recyclable lead and contaminated battery casings supports a reasonable inference of an intent to dispose, when the seller does not seek the return of the worthless casings. In the present case, Beckner cites absolutely no facts that

would support a contrary inference. As a result, the record reveals no genuine issue of material fact precluding the entry of summary judgment in favor of the Government on its "arranger" liability CERCLA claim against Beckner Iron & Metal Company, Inc.

### 3. *Broadway Iron & Metal Company*

With respect to Defendant Broadway Iron & Metal Company, the Government argues as follows:

> Broadway Iron & Metal Company is listed on the United Scrap Lead Customer Price List. Charles Bailen has testified that Broadway Iron & Metal Company was a customer of United Scrap Lead. Therefore, no genuine issue of material fact exists that Broadway Iron & Metal Company arranged for the treatment or disposal of hazardous substances at the United Scrap Lead Site.

(Doc. # 333 at 22) (footnotes with citations omitted).

Upon review, the Court *cannot agree* that the Government is entitled to summary judgment against this Defendant. In a February 22, 2000, Decision and Entry (Doc. # 424), the court overruled a summary judgment motion filed by Broadway. In so doing, the Court noted the existence of evidence from which a trier of fact could conclude that Broadway, either directly or through a middle man, sent junk batteries to USLC. *See United States v. Atlas Lederer*, 97 F.Supp.2d 834, 837–40 (S.D.Ohio 2000). On the other hand, the Court noted the existence of evidence from which a trier of fact reasonably could conclude that Broadway never sent any junk batteries to USLC and never sent any such batteries to another entity which, in turn, sold them to USLC. *Id.* at 838–39. For the reasons set forth in that February 22, 2000, Decision and Entry, the Court concludes that genuine issues of material fact exist with respect to Broadway's "ar-

ranger" liability under CERCLA. As a result, the Government is not entitled to summary judgment against this Defendant.

### 4. *Burns Iron & Metal Company*

With respect to Defendant Burns Iron & Metal Company, the Government argues as follows:

> Burns Iron & Metal Co., Inc., has admitted that it was a party to transactions whereby lead materials it owned, possessed or controlled came to be located at the United Scrap Lead Site. Burns Iron & Metal Company is listed on the United Scrap Lead Customer Price List. Invoices evidence individual transactions involving junk batteries between Burns Iron & Metal Company and United Scrap Lead. Therefore, no genuine issue of material fact exists that Burns Iron & Metal Company arranged for the treatment or disposal of hazardous substances at the United Scrap Lead Site.

(Doc. # 333 at 22) (footnotes with citations omitted).

Upon review, the Court concludes that the Government has demonstrated its entitlement to judgment as a matter of law on the issue of this Defendant's "arranger" liability under CERCLA. Burns Iron & Metal Company has admitted that it was "a party to a transaction or transactions whereby lead materials [it] owned, possessed or controlled came to be located at the [United Scrap Lead] Site." (*Id.* at Exh. 3C, ¶ 11). Burns also has admitted that it "sold used lead materials," in the form of junk batteries, sometime between 1946 and 1980. (*Id.* at ¶ 5–6). In its Memorandum, Burns admits that it sold these junk batteries to USLC. (*See* Doc. # 357) ("The only uncontested evidence is that Burns admits that it sold used batteries to the United Scrap Lead Company."). As noted above, the record reflects that USLC nev-

er re-sold the whole batteries that it purchased, never sent them out for processing, and never shipped them to other sites. (Bailen depo., August 7, 1995, at 40–41). Rather, Charles Bailen and others operated the Site as a "battery breaking" operation, which involved "cracking" the batteries and extracting scrap lead from the worthless acid and casings. The acid and lead-contaminated casings then were discarded on the property. In particular, the undisputed evidence establishes that "battery-breaking" involved cutting off battery tops, draining the acid into a pit and grinding the lead-contaminated casings for disposal at the USLC Site. (*Id.* at 58–75).

Based on the evidence before it, the Court concludes that the role of Burns Iron & Metal Company in the foregoing transactions constituted "arrangements for disposal," as a matter of law. Construing the evidence and all reasonable inferences drawn therefrom in a light most favorable to Burns, the record also supports a reasonable inference that it intended to enter into a transaction that included an arrangement for disposal. In reaching this conclusion, the Court notes that Burns did not sell lead in the form of a raw material. Rather, it sold junk batteries that had to be "cracked" in order for the scrap lead to be extracted from the lead-contaminated casings. "The battery casings ... unlike the lead plates within the casings, were not the subject of recycling." *Catellus,* 34 F.3d at 753. "They retained their character as waste throughout and would have to be 'gotten rid of,' either by [Burns], which could have cracked the batteries itself before selling the scrap lead, or as was the case here, by [USLC] after it bought the entire battery." *Id.* Burns Iron & Metal Company "cannot escape having the battery casings defined as a discarded material simply by selling the battery to another party who then disposes of the casings." *Id.*

Given that the recovery of the lead plates from a junk battery necessarily requires the disposal of worthless hazardous materials, the record supports a reasonable inference that Burns intended to arrange for such disposal when it sold whole batteries, without asking for the contaminated casings to be returned or attempting to remove the recyclable lead before completing the sales. In addition, based on the evidence before it, the Court concludes that the foregoing inference is the only reasonable one that can be drawn. Unlike *Cello–Foil,* upon which Burns relies, the evidence does not reveal the existence of conflicting inferences, some of which would support a finding of "arranger" liability and some of which would not. Unlike the defendants in *Cello–Foil,* Burns cites no evidence to suggest that it tried to remove all hazardous material before selling its junk batteries to USLC, or that the batteries it sold contained no hazardous materials. Burns also cites nothing to suggest that it asked for the lead-contaminated battery casings to be returned after USLC salvaged the lead plates. In short, unlike the defendants in *Cello–Foil,* Burns fails to cite any evidence from which a trier of fact could conclude that its sale of junk batteries did not include an intentional arrangement for the disposal of a hazardous substance.

In opposition to the foregoing conclusion, Burns relies on responses to requests for admissions in which it denied intending to arrange for the disposal of a hazardous substance. Burns insists that it merely intended to arrange for the recycling of a useful product, namely lead. Burns also cites responses to requests for admissions in which it expressed a belief that USLC had been shipping its batteries to Indiana for recycling, rather than "cracking" them on-site and dumping the lead-contaminated casings. (Doc. # 357 at 7–8). According to Burns, it "assumed that the United

Scrap Lead Company was a reputable company because it dealt with large and small companies around the State." (*Id.* at 8). Burns insists that it "had no reason to know or suspect that the United Scrap Lead Company was handling the batteries in a manner different than was represented by the owners." (*Id.*). In light of this evidence, Burns argues that "significant genuine issues of fact [exist] regarding whether [it] had the requisite intent in order to be adjudged liable under CERCLA . . . ." (*Id.*).

Having reviewed Burns' arguments, the Court concludes that they fail to raise a genuine issue of material fact for trial. As an initial matter, the Court previously has rejected the legal argument that the sale of junk batteries constitutes the sale of a "useful product." *See Atlas Lederer*, 85 F.Supp.2d at 836 ("The spent batteries purchased by USLC were useless *as batteries*. The sale of junk batteries is not the sale of a 'useful product.' "). In addition, Burns' conclusory assertion that it only intended to enter into an arrangement for "recycling" is belied by its own affirmative acts, which included selling recyclable lead encased in worthless, contaminated battery casings. Significantly, Burns did not sell lead in the form of a raw material. Rather, it sold junk batteries that had to be "cracked" in order for the lead to be extracted. As noted, *supra*, Burns did not ask for the contaminated battery casings to be returned. Nor did it attempt to "crack" the batteries and remove the lead plates from the casings before selling them to USLC. As the Sixth Circuit recognized in *Cello–Foil*, a party's intent to dispose of hazardous substances "need not be proven by direct evidence, but can be inferred from the totality of the circumstances." *Cello–Foil*, 100 F.3d at 1231. Furthermore, the best evidence of intent is often " 'evidence of what actually happened rather than evidence describing the subjective state of mind of the actor.' "

*Id.* at 1233. Indeed, "courts have not hesitated to look beyond defendants' characterizations to determine whether a transaction in fact involves an arrangement for the disposal of a hazardous substance." *United States v. Aceto Agr. Chemicals Corp.*, 872 F.2d 1373, 1381 (8th Cir.1989); *see also TMG Enterprises*, 979 F.Supp. at 1123 ("It is the nature of the transaction, not the parties' characterization that determines whether the transaction was a sale of a useful product or an arrangement for disposal."). In the present case, Burns' uncontroverted actions demonstrate that it necessarily intended to enter into a transaction that included an arrangement for the disposal of a hazardous substance. Indeed, it cites absolutely no facts that would support a contrary inference.

Finally, for purposes of establishing CERCLA liability, Burns' belief that its batteries were being shipped to Indiana is irrelevant, as is its belief that USLC was operating in an environmentally responsible manner. The Sixth Circuit has recognized that "a party can be responsible for 'arranging for' disposal, even when it has no control over the process leading to the release of the substances." *Cello–Foil*, 100 F.3d at 1232. Moreover, "[a] party cannot escape liability by claiming that it had no intent to have the waste disposed of in a particular manner or at a particular site." *Id.* Once it has been determined that Burns intended to arrange for the disposal of a hazardous substance by selling lead and contaminated battery casings, "strict liability takes effect," and it is responsible for any resulting damages. *Id.; see also Aceto*, 872 F.2d at 1381 (recognizing that "[c]ourts have also held defendants 'arranged for' disposal of wastes at a particular site even when defendants did not know the substances would be deposited at that site or in fact believed they would be deposited elsewhere"). As a result, the Court concludes that the Govern-

ment is entitled to summary judgment on the issue of Burns' "arranger" liability under CERCLA.[35]

### 5. *Caldwell Iron & Metal*

With respect to Defendant Caldwell Iron & Metal, the Government argues as follows:

> Caldwell Iron & Metal is listed on the United Scrap Lead Customer Price List. Invoices document individual transactions involving junk batteries between Caldwell Iron & Metal and United Scrap Lead. Charles Bailen has testified that Caldwell Iron & Metal was a customer of United Scrap Lead. Therefore, no genuine issue of material fact exists that Caldwell Iron & Metal Company arranged for the treatment or disposal of hazardous substances at the United Scrap Lead Site.

(Doc. # 333 at 23) (footnotes with citations omitted).

Upon review, the Court concludes that the Government has demonstrated its entitlement to judgment as a matter of law on the issue of this Defendant's "arranger" liability under CERCLA. The record contains numerous invoices and other documents establishing that Caldwell Iron & Metal sold "scrap batteries" to USLC. (*Id.* at Exh. 1D). The record also reflects that USLC never re-sold the whole batteries that it purchased, never sent them out for processing, and never shipped them to other sites. (Bailen depo., August 7, 1995, at 40–41). Rather, as noted, *supra*, Charles Bailen and others operated the Site as a "battery breaking" operation, which involved "cracking" the batteries and ex-tracting scrap lead from the worthless acid and casings. The acid and lead-contaminated casings then were discarded on the property. In particular, the undisputed evidence establishes that "battery-breaking" involved cutting off battery tops, draining the acid into a pit and grinding the lead-contaminated casings for disposal at the USLC Site. (*Id.* at 58–75).

Based on the evidence before it, the Court concludes that the role of Caldwell Iron & Metal in the foregoing transactions constituted "arrangements for disposal," as a matter of law. Construing the evidence and all reasonable inferences drawn therefrom in a light most favorable to Caldwell, the only reasonable inference is that it intended to enter into a transaction that included an arrangement for disposal. In reaching this conclusion, the Court notes that Caldwell did not sell lead in the form of a raw material. Rather, it sold junk batteries that had to be "cracked" in order for the scrap lead to be extracted from the lead-contaminated casings. "The battery casings ... unlike the lead plates within the casings, were not the subject of recycling." *Catellus*, 34 F.3d at 753 (9th Cir. 1994). "They retained their character as waste throughout and would have to be 'gotten rid of,' either by [Caldwell], which could have cracked the batteries itself before selling the scrap lead, or as was the case here, by [USLC] after it bought the entire battery." *Id.* Caldwell Iron & Metal "cannot escape having the battery casings defined as a discarded material simply by selling the battery to another party who then disposes of the casings." *Id.*

---

**35.** In its Memorandum, Burns also argues that genuine issues of material fact exist regarding the divisibility of the environmental harm at the USLC Site. (*See* Doc.# 357 at 9–14). Burns insists that the harm is divisible. Therefore, it reasons that its liability to the Government should not be joint and several. (*Id.*). As noted, *supra*, the Court agrees that genuine issues of material fact exist regarding the divisibility of the environmental harm. For present purposes, the Court holds only that the Government is entitled to summary judgment on the *existence* of Burns' liability, not the *nature* of that liability (i.e., joint and several or divisible and, therefore, subject to apportionment).

Unlike *Cello–Foil,* the facts in the present case do not lend themselves to competing inferences, some of which would support the imposition of CERCLA liability on Caldwell and some of which would not. Unlike the defendants in *Cello–Foil,* Caldwell Iron & Metal cites no evidence to suggest that it tried to remove all hazardous material before selling its junk batteries to USLC, or that the batteries it sold contained no hazardous material. As noted above, Caldwell also cites nothing to suggest that it asked for the lead-contaminated battery casings to be returned after USLC salvaged the lead plates. In short, unlike the defendants in *Cello–Foil,* Caldwell fails to cite any evidence from which a trier of fact could conclude that its sale of junk batteries did not include an intentional arrangement for the disposal of a hazardous substance. As a result, the record reveals no genuine issue of material fact precluding the entry of summary judgment in favor of the Government on its "arranger" liability claim against Caldwell Iron & Metal.

### 6. *Crispin Auto Wrecking*

With respect to Defendant Crispin Auto Wrecking, the Government argues as follows:

> Invoices document that Crispin Auto Wrecking engaged in transactions whereby junk batteries came to be located at the United Scrap Lead Site. Therefore, no genuine issue of material fact exists that Crispin Auto Wrecking arranged for the treatment or disposal of hazardous substances at the United Scrap Lead Site.

(Doc. # 333 at 24) (footnotes with citations omitted).

Upon review, the Court concludes that the Government has demonstrated its entitlement to judgment as a matter of law on the issue of this Defendant's "arranger" liability under CERCLA. The record contains numerous invoices establishing that Crispin sold junk batteries to USLC. (*Id.* at Exh. 1F). Furthermore, the record reflects that USLC never re-sold the whole batteries that it purchased, never sent them out for processing, and never shipped them to other sites. (Bailen depo., August 7, 1995, at 40–41). Rather, as noted, *supra,* Charles Bailen and others operated the Site as a "battery breaking" operation, which involved "cracking" the batteries and extracting scrap lead from the worthless acid and casings. The acid and lead-contaminated casings then were discarded on the property. In particular, the undisputed evidence establishes that "battery-breaking" involved cutting off battery tops, draining the acid into a pit and grinding the lead-contaminated casings for disposal at the USLC Site. (*Id.* at 58–75).

Based on the evidence before it, the Court concludes that the role of Crispin Auto Wrecking in the foregoing transactions constituted "arrangements for disposal," as a matter of law. Construing the evidence and all reasonable inferences drawn therefrom in a light most favorable to Crispin, the *only* reasonable inference is that it intended to enter into a transaction that included an arrangement for disposal. In reaching this conclusion, the Court notes that Crsipin did not sell lead in the form of a raw material. Rather, it sold junk batteries that had to be "cracked" in order for the scrap lead to be extracted from the lead-contaminated casings. "The battery casings ... unlike the lead plates within the casings, were not the subject of recycling." *Catellus,* 34 F.3d at 753. "They retained their character as waste throughout and would have to be 'gotten rid of,' either by [Crispin], which could have cracked the batteries itself before selling the scrap lead, or as was the case here, by [USLC] after it bought the entire battery." *Id.* Crispin Auto Wrecking "can-

not escape having the battery casings defined as a discarded material simply by selling the battery to another party who then disposes of the casings." *Id.*

Unlike *Cello–Foil,* the facts in the present case do not lend themselves to competing inferences, some of which would support the imposition of CERCLA liability on Crispin and some of which would not. Unlike the defendants in *Cello–Foil,* Crispin cites no evidence to suggest that it tried to remove all hazardous material before selling its junk batteries to USLC, or that the batteries it sold contained no hazardous material. As noted above, Crispin also cites nothing to suggest that it asked for the lead-contaminated battery casings to be returned after USLC salvaged the lead plates. In short, unlike the defendants in *Cello–Foil,* Crispin fails to cite any evidence from which a trier of fact could conclude that its sale of junk batteries did not include an intentional arrangement for the disposal of a hazardous substance. As a result, the record reveals no genuine issue of material fact precluding the entry of summary judgment in favor of the Government on its "arranger" liability claim against Crispin Auto Wrecking.

### 7. *Dayton Iron & Metal Company*

With respect to Defendant Dayton Iron & Metal Company, the Government argues as follows:

> Dayton Iron & Metal Company is listed on the United Scrap Lead Customer Price List. Charles Bailen has testified that Dayton Iron & Metal Company was a customer of United Scrap Lead. Therefore, no genuine issue of material fact exists that Dayton Iron & Metal Company arranged for the treatment or

disposal of hazardous substances at the United Scrap Lead Site.

(Doc. # 333 at 24) (footnotes with citations omitted).

Upon review, the Court concludes that the Government has demonstrated its entitlement to judgment as a matter of law on the issue of this Defendant's "arranger" liability under CERCLA. In uncontroverted testimony, Charles Bailen has identified Dayton Iron & Metal as a seller of batteries to USLC.[36] (Bailen depo., August 8, 1995, at 335; Bailen depo., August 9, 1995, at 434). The record reflects that USLC never re-sold the whole batteries that it purchased, never sent them out for processing, and never shipped them to other sites. (Bailen depo., August 7, 1995, at 40–41). Rather, as noted, *supra,* Charles Bailen and others operated the Site as a "battery breaking" operation, which involved "cracking" the batteries and extracting scrap lead from the worthless acid and casings. The acid and lead-contaminated casings then were discarded on the property. In particular, the undisputed evidence establishes that "battery-breaking" involved cutting off battery tops, draining the acid into a pit and grinding the lead-contaminated casings for disposal at the USLC Site. (*Id.* at 58–75).

Based on the evidence before it, the Court concludes that the role of Dayton Iron & Metal Company in the foregoing transactions constituted "arrangements for disposal," as a matter of law. Construing the evidence and all reasonable inferences drawn therefrom in a light most favorable to Dayton Iron & Metal Company, the only reasonable inference is that it intended to enter into a transaction that included

---

**36.** In his uncontroverted deposition testimony, Bailen stated that he recalled Dayton Iron & Metal's name from "business invoices." (Bailen depo., August 8, 1995, at 335). Read in context, it is beyond dispute that his testi- mony relates to invoices for the sale of junk batteries. He also discussed a particular invoice documenting Dayton Iron & Metal's sale of batteries to USLC. (Bailen depo., August 9, 1995, at 434).

an arrangement for disposal. In reaching this conclusion, the Court notes that Dayton Iron & Metal Company did not sell lead in the form of a raw material. Rather, it sold junk batteries that had to be "cracked" in order for the scrap lead to be extracted from the lead-contaminated casings. "The battery casings . . . unlike the lead plates within the casings, were not the subject of recycling." *Catellus*, 34 F.3d at 753. "They retained their character as waste throughout and would have to be 'gotten rid of,' either by [Dayton Iron & Metal Company], which could have cracked the batteries itself before selling the scrap lead, or as was the case here, by [USLC] after it bought the entire battery." *Id.* Dayton Iron & Metal Company "cannot escape having the battery casings defined as a discarded material simply by selling the battery to another party who then disposes of the casings." *Id.*

Unlike *Cello–Foil*, the facts in the present case do not lend themselves to competing inferences, some of which would support the imposition of CERCLA liability on Dayton Iron & Metal Company and some of which would not. Unlike the defendants in *Cello–Foil*, Dayton Iron & Metal cites no evidence to suggest that it tried to remove all hazardous material before selling its junk batteries to USLC, or that the batteries it sold contained no hazardous material. As noted above, Dayton Iron & Metal also cites nothing to suggest that it asked for the lead-contaminated battery casings to be returned after USLC salvaged the lead plates. In short, unlike the defendants in *Cello–Foil*, Dayton Iron & Metal Company fails to cite any evidence from which a trier of fact could conclude that its sale of junk batteries did not include an intentional arrangement for the disposal of a hazardous substance. As a result, the record reveals no genuine issue of material fact precluding the entry of summary judgment in favor of the Gov-

ernment on its "arranger" liability claim against Dayton Iron & Metal Company.

### 8. *Decatur Salvage, Inc.*

With respect to Defendant Decatur Salvage, Inc., the Government argues as follows:

> Decatur Salvage, Inc.[,] has admitted that it sent used batteries to the United Scrap Lead Site. Invoices document individual transactions involving junk batteries between Decatur Salvage, Inc.[,] and United Scrap Lead. Charles Bailen has testified that Decatur Salvage, Inc.[,] was a customer of United Scrap Lead. Therefore, no genuine issue of material fact exists that Decatur Salvage, Inc.[,] arranged for the treatment or disposal of hazardous substances at the United Scrap Lead Site.

(Doc. # 333 at 24) (footnotes with citations omitted).

Upon review, the Court concludes that the Government has demonstrated its entitlement to judgment as a matter of law on the issue of this Defendant's "arranger" liability under CERCLA. Decatur has admitted its sale of automobile and truck batteries to USLC. (*Id.* at Exh. 5D). The record reflects that USLC never resold the whole batteries that it purchased, never sent them out for processing, and never shipped them to other sites. (Bailen depo., August 7, 1995, at 40–41). Rather, as noted, *supra*, Charles Bailen and others operated the Site as a "battery breaking" operation, which involved "cracking" the batteries and extracting scrap lead from the worthless acid and casings. The acid and lead-contaminated casings then were discarded on the property. In particular, the undisputed evidence establishes that "battery-breaking" involved cutting off battery tops, draining the acid into a pit and grinding the lead-contaminated cas-

ings for disposal at the USLC Site. (*Id.* at 58–75).

Based on the evidence before it, the Court concludes that the role of Decatur Salvage, Inc., in the foregoing transactions constituted "arrangements for disposal," as a matter of law. Construing the evidence and all reasonable inferences drawn therefrom in a light most favorable to Decatur, the *only* reasonable inference is that it intended to enter into a transaction that included an arrangement for disposal. In reaching this conclusion, the Court notes that Decatur did not sell lead in the form of a raw material. Rather, it sold junk batteries that had to be "cracked" in order for the scrap lead to be extracted from the lead-contaminated casings. "The battery casings ... unlike the lead plates within the casings, were not the subject of recycling." *Catellus*, 34 F.3d at 753 (9th Cir. 1994). "They retained their character as waste throughout and would have to be 'gotten rid of,' either by [Decatur], which could have cracked the batteries itself before selling the scrap lead, or as was the case here, by [USLC] after it bought the entire battery." *Id.* Decatur Salvage, Inc., "cannot escape having the battery casings defined as a discarded material simply by selling the battery to another party who then disposes of the casings." *Id.*

Unlike *Cello–Foil*, the facts in the present case do not lend themselves to competing inferences, some of which would support the imposition of CERCLA liability on Decatur and some of which would not. Unlike the defendants in *Cello–Foil*, Decatur cites no evidence to suggest that it tried to remove all hazardous material before selling its junk batteries to USLC, or that the batteries it sold contained no hazardous material. As noted above, Decatur also cites nothing to suggest that it asked for the lead-contaminated battery casings to be returned after USLC salvaged the lead plates. In short, unlike the defen-

dants in *Cello–Foil*, Decatur fails to cite any evidence from which a trier of fact could conclude that its sale of junk batteries did not include an intentional arrangement for the disposal of a hazardous substance. As a result, the record reveals no genuine issue of material fact precluding the entry of summary judgment in favor of the Government on its "arranger" liability claim against Decatur Salvage, Inc.

### 9. *Ebner & Sons Company*

With respect to Defendant Ebner & Sons Company, the Government argues as follows:

> Ebner & Sons Company has admitted that it was a party to transactions whereby junk batteries it owned, possessed or controlled came to be located at the United Scrap Lead Site. Ebner & Sons Co. is listed on the United Scrap Lead Customer Price List. Invoices document individual transactions involving junk batteries between Ebner & Sons Company and United Scrap Lead. Charles Bailen has testified that Ebner & Sons Company was a customer of United Scrap Lead. The President of the Springfield Waste Material Company has executed an Affidavit stating that batteries he picked up from Ebner & Sons Company were in turn sold and delivered to United Scrap Lead for treatment or disposal. Therefore, no genuine issue of material fact exists that Ebner & Sons Company arranged for the treatment or disposal of hazardous substances at the United Scrap Lead Site.

(Doc. # 333 at 25) (footnotes with citations omitted).

Upon review, the Court concludes that the Government has demonstrated its entitlement to judgment as a matter of law on the issue of this Defendant's "arranger" liability under CERCLA. Ebner & Sons

Company has admitted that it was a "party to a transaction or transactions whereby lead materials [it] owned, possessed or controlled came to be located at the [United Scrap Lead] Site." (*Id.* at Exh. 3E). In addition, the record contains invoices establishing that Ebner sold batteries to USLC. (*Id.* at Exh. 1H). The record also reflects that USLC never resold the whole batteries that it purchased, never sent them out for processing, and never shipped them to other sites. (Bailen depo., August 7, 1995, at 40–41). Rather, as noted, *supra,* Charles Bailen and others operated the Site as a "battery breaking" operation, which involved "cracking" the batteries and extracting scrap lead from the worthless acid and casings. The acid and lead-contaminated casings then were discarded on the property. In particular, the undisputed evidence establishes that "battery-breaking" involved cutting off battery tops, draining the acid into a pit and grinding the lead-contaminated casings for disposal at the USLC Site. (*Id.* at 58–75).

Based on the evidence before it, the Court concludes that the role of Ebner & Sons Company in the foregoing transactions constituted "arrangements for disposal," as a matter of law. Construing the evidence and all reasonable inferences drawn therefrom in a light most favorable to Ebner, the only reasonable inference is that it intended to enter into a transaction that included an arrangement for disposal. In reaching this conclusion, the Court notes that Ebner did not sell lead in the form of a raw material. Rather, it sold junk batteries that had to be "cracked" in order for the scrap lead to be extracted from the lead-contaminated casings. "The battery casings ... unlike the lead plates within the casings, were not the subject of recycling." *Catellus,* 34 F.3d at 753. "They retained their character as waste throughout and would have to be 'gotten rid of,' either by [Ebner], which could have

cracked the batteries itself before selling the scrap lead, or as was the case here, by [USLC] after it bought the entire battery." *Id.* Ebner "cannot escape having the battery casings defined as a discarded material simply by selling the battery to another party who then disposes of the casings." *Id.*

Unlike *Cello–Foil,* the facts in the present case do not lend themselves to competing inferences, some of which would support the imposition of CERCLA liability on Ebner and some of which would not. Unlike the defendants in *Cello–Foil,* Ebner cites no evidence to suggest that it tried to remove all hazardous material before selling its junk batteries to USLC, or that the batteries it sold contained no hazardous material. As noted above, Ebner also cites nothing to suggest that it asked for the lead-contaminated battery casings to be returned after USLC salvaged the lead plates. In short, unlike the defendants in *Cello–Foil,* Ebner fails to cite any evidence from which a trier of fact could conclude that its sale of junk batteries did not include an intentional arrangement for the disposal of a hazardous substance. As a result, the record reveals no genuine issue of material fact precluding the entry of summary judgment in favor of the Government on its "arranger" liability claim against Ebner & Sons Company.

### 10. *Edison Automotive, Inc.*

With respect to Defendant Edison Automotive, Inc., the Government argues as follows:

> Edison Automotive, Inc.[,] has admitted that it delivered batteries to the Site. Edison Automotive, Inc.[,] is listed on the United Scrap Lead Customer Price List. Invoices document individual transactions involving junk batteries between Edison Automotive, Inc.[,] and United Scrap Lead. Charles Bailen has testified that Edison Automotive, Inc.[,] was a customer of United Scrap Lead.

Therefore, no genuine issue of material fact exists that Edison Automotive, Inc.[,] arranged for the treatment or disposal of hazardous substances at the United Scrap Lead Site.

(Doc. # 333 at 26) (footnotes with citations omitted).

Upon review, the Court concludes that the Government has demonstrated its entitlement to judgment as a matter of law on the issue of this Defendant's "arranger" liability under CERCLA. Edison Automotive, Inc., has admitted that it sold tons of automobile batteries to USLC. (*Id.* at Exh. 5E). In addition, the record contains invoices establishing that Edison sold "scrap" or "junk" batteries to USLC. (*Id.* at Exh. 11). The record also reflects that USLC never re-sold the whole batteries that it purchased, never sent them out for processing, and never shipped them to other sites. (Bailen depo., August 7, 1995, at 40–41). Rather, as noted, *supra*, Charles Bailen and others operated the Site as a "battery breaking" operation, which involved "cracking" the batteries and extracting scrap lead from the worthless acid and casings. The acid and lead-contaminated casings then were discarded on the property. In particular, the undisputed evidence establishes that "battery-breaking" involved cutting off battery tops, draining the acid into a pit and grinding the lead-contaminated casings for disposal at the USLC Site. (*Id.* at 58–75).

Based on the evidence before it, the Court concludes that the role of Edison in the foregoing transactions constituted "arrangements for disposal," as a matter of law. Construing the evidence and all reasonable inferences drawn therefrom in a light most favorable to Edison, the *only* reasonable inference is that it intended to enter into a transaction that included an arrangement for disposal. In reaching this conclusion, the Court notes that Edison did not sell lead in the form of a raw material. Rather, it sold junk batteries that had to be "cracked" in order for the scrap lead to be extracted from the lead-contaminated casings. "The battery casings . . . unlike the lead plates within the casings, were not the subject of recycling." *Catellus,* 34 F.3d at 753. "They retained their character as waste throughout and would have to be 'gotten rid of,' either by [Edison], which could have cracked the batteries itself before selling the scrap lead, or as was the case here, by [USLC] after it bought the entire battery." *Id.* Edison "cannot escape having the battery casings defined as a discarded material simply by selling the battery to another party who then disposes of the casings." *Id.*

Unlike *Cello–Foil,* the facts in the present case do not lend themselves to competing inferences, some of which would support the imposition of CERCLA liability on Edison and some of which would not. Unlike the defendants in *Cello–Foil,* Edison cites no evidence to suggest that it tried to remove all hazardous material before selling its junk batteries to USLC, or that the batteries it sold contained no hazardous material. As noted above, Edison also cites nothing to suggest that it asked for the lead-contaminated battery casings to be returned after USLC salvaged the lead plates. In short, unlike the defendants in *Cello–Foil,* Edison fails to cite any evidence from which a trier of fact could conclude that its sale of junk batteries did not include an intentional arrangement for the disposal of a hazardous substance. As a result, the record reveals no genuine issue of material fact precluding the entry of summary judgment in favor of the Government on its "arranger" liability claim against Edison Automotive, Inc.[37]

---

**37.** In opposition to this conclusion, Edison "incorporates by reference" various argu-

In opposition to the foregoing conclusion, Edison relies on an affidavit from its President, David Edison, who avers, in relevant part, as follows:

3. During all times relevant to this case, Edison was engaged in the purchase and sale at retail and wholesale of new, used and rebuilt automobile parts.

4. Edison bought material for resale only.

5. On occasion Edison sold batteries to United Scrap Lead Company ("USL").

6. On other occasions, Edison sold batteries to other buyers or simply continued to hold the batteries until Edison could obtain the best price.

7. USL would pick up the purchased batteries at Edison's place of business in Columbus, Ohio.

8. Edison never considered the batteries to be an unwanted waste; in fact, the batteries which Edison sold had been purchased by Edison and put into inventory to be sold at a profit.

9. It was never Edison's intent to dispose of the batteries it had purchased for resale.

10. Edison had no knowledge, involvement, control, or influence about where USL or any purchaser took the batteries or what was ultimately done with the batteries which Edison sold.

11. Edison sold batteries to USL and others for a consideration that varied based upon the market price for lead.

12. After a sale to USL or others Edison retained no interest, title, or control over the batteries, or their transportation, storage, handling or disposition.

13. Upon the sale, Edison relinquished all of its ownership and control of the batteries, and the purchaser acquired full and complete ownership and control of the batteries.

14. Edison did not know where the batteries were to be taken.

15. Edison did not direct where the batteries were to be taken.

16. Edison had no knowledge of where batteries it sold to USL were taken by USL, or if those batteries were actually taken to USL's facility near Troy, Ohio.

17. Edison did not contract, agree or otherwise arrange with USL for the disposal or treatment of the batteries or any part of the batteries it sold to USL.

18. Edison did not intend to dispose of any hazardous substances when it sold the batteries to USL.

19. Edison did not consider the batteries it purchased and sold to be waste, but rather a valuable commodity that could be sold to different prospective

ments raised in the following filings: (1) Certain Parties' Response to the United States and Respondent Group's Motion for Partial Summary Judgment on Liability (Doc. # 353); (2) Defendant Montgomery Iron & Paper Company's Memorandum Opposing United States' and Respondent Group's Motion for Partial Summary Judgment (Doc. # 337); (3) Defendant Senser Metal Company, Inc.'s Memorandum in Opposition to United States and Respondent Group's Motion for Partial Summary Judgment (Doc. # 354); (4) Response of Defendant Burns Iron & Metal Co. to United States and Respondent Group's Mo-

tion for Partial Summary Judgment (Doc. # 357); and (5) Memorandum of Livingston & Co., Inc., in Opposition to Joint Motion for Summary Judgment on Liability Filed by United States and Respondent Group (Doc. # 343). Insofar as the foregoing Memoranda address the issue of the Defendants' "arranger" liability to the Government under CERCLA, the Court, at various places in this Expanded Opinion, has reviewed and rejected each of the arguments adopted by Edison. The Court hereby adopts and incorporates that analysis, which is set forth both *supra* and *infra,* by reference.

purchasers in a competitive marketplace at the best price for a profit.

20. Edison had no knowledge or intent that the batteries or any part thereof sold to USL would be disposed of in whole or in part at the USL site.

(Edison affidavit, attached to Doc. # 359).

Having reviewed Edison's averments, the Court concludes that they fail to demonstrate a genuine issue of material fact for trial. The fact that Edison "never considered the batteries to be an unwanted waste" is immaterial. As a matter of law, the lead-contaminated battery casings sold by Edison *were* hazardous waste, without respect to Edison's position on the issue. In addition, Edison's conclusory averments that his company lacked the "intent to dispose of the batteries it had purchased for resale," that it "did not contract, agree or otherwise arrange ... for the disposal or treatment of the batteries or any part of the batteries," and that it "did not intend to dispose of any hazardous substances when it sold the batteries to USL" are insufficient to avoid summary judgment. Edison's averment that he only intended to enter into an arrangement for the sale of a "valuable commodity" is belied by his company's own affirmative acts, which included selling recyclable lead enclosed in worthless, contaminated battery casings. Significantly, Edison did not sell lead in the form of a raw material. Rather, it sold junk batteries that had to be "cracked" in order for the lead to be extracted. As noted above, Edison did not ask for the contaminated battery casings to be returned. Nor did it attempt to "crack" the batteries and remove the lead plates from the casings before selling them to USLC. As the Sixth Circuit recognized in *Cello–Foil*, a party's intent to dispose of hazardous substances "need not be proven by direct evidence, but can be inferred from the totality of the circumstances." *Cello–Foil*, 100 F.3d at 1231. Furthermore, the best evidence of intent is often " 'evidence of what actually happened rather than evidence describing the subjective state of mind of the actor.' " *Id.* at 1233. Indeed, "courts have not hesitated to look beyond defendants' characterizations to determine whether a transaction in fact involves an arrangement for the disposal of a hazardous substance." *Aceto,* 872 F.2d at 1381; *see also TMG Enterprises,* 979 F.Supp. at 1123 ("It is the nature of the transaction, not the parties' characterization that determines whether the transaction was a sale of a useful product or an arrangement for disposal."). Under the facts of the present case, Edison's actions demonstrate that it necessarily intended to enter into a transaction that included an arrangement for the disposal of a hazardous substance. Indeed, Edison's affidavit cites absolutely no facts that would support a contrary inference.

Finally, for purposes of establishing CERCLA liability, it is immaterial that Edison relinquished all control over the batteries that it sold, and had no knowledge about where USLC took them or what happened to them. The Sixth Circuit has recognized that "a party can be responsible for 'arranging for' disposal, even when it has no control over the process leading to the release of the substances." *Cello–Foil,* 100 F.3d at 1232. Moreover, "[a] party cannot escape liability by claiming that it had no intent to have the waste disposed of in a particular manner or at a particular site." *Id.* Once it has been determined that Edison intended to arrange for the disposal of a hazardous substance by selling lead enclosed in contaminated battery casings, "strict liability takes effect" and it is responsible for any resulting damages. *Id.; see also Aceto,* 872 F.2d at 1381 (recognizing that "[c]ourts have also held defendants 'arranged for' disposal of wastes at a particular site even when defendants did not know the substances would be deposited at that site or in fact believed they would be deposited else-

where"). As a result, the Court concludes that the Government is entitled to summary judgment on the issue of Edison's "arranger" liability under CERCLA.

11. *Livingston & Company, Inc.*

With respect to Defendant Livingston & Company, Inc., the Government argues as follows:

> Livingston & Company, Inc.[,] has admitted that it sent junk batteries to the Site. Livingston & Company, Inc.[,] is listed on the United Scrap Lead Customer Price List. Invoices document individual transactions involving junk batteries between Livingston & Company, Inc.[,] and United Scrap Lead. Charles Bailen has testified that Livingston & Company, Inc.[,] was a customer of United Scrap Lead. Therefore, no genuine issue of material fact exists that Livingston & Company, Inc.[,] arranged for the treatment or disposal of hazardous substances at the United Scrap Lead Site.

(Doc. # 333 at 28) (footnotes with citations omitted).

Upon review, the Court concludes that the Government has demonstrated its entitlement to judgment as a matter of law on the issue of this Defendant's "arranger" liability under CERCLA. Livingston admits that it "has sold batteries containing lead to [the] United Scrap Lead [Company] for recycling[.]" (*Id.* at Exh. 3H). The record reflects that USLC never resold the whole batteries that it purchased, never sent them out for processing, and never shipped them to other sites. (Bailen depo., August 7, 1995, at 40–41). Rather, as noted, *supra*, Charles Bailen and others operated the Site as a "battery breaking" operation, which involved "cracking" the batteries and extracting scrap lead from the worthless acid and casings. The acid and lead-contaminated casings then were discarded on the property. In particular,

the undisputed evidence establishes that "battery-breaking" involved cutting off battery tops, draining the acid into a pit and grinding the lead-contaminated casings for disposal at the USLC Site. (*Id.* at 58–75).

Based on the evidence before it, the Court concludes that the role of Livingston in the foregoing transactions constituted "arrangements for disposal," as a matter of law. Construing the evidence and all reasonable inferences drawn therefrom in a light most favorable to Livingston, the only reasonable inference is that it intended to enter into a transaction that included an arrangement for disposal. In reaching this conclusion, the Court notes that Livingston did not sell lead in the form of a raw material. Rather, it sold junk batteries that had to be "cracked" in order for the scrap lead to be extracted from the lead-contaminated casings. "The battery casings ... unlike the lead plates within the casings, were not the subject of recycling." *Catellus*, 34 F.3d at 753. "They retained their character as waste throughout and would have to be 'gotten rid of,' either by [Livingston], which could have cracked the batteries itself before selling the scrap lead, or as was the case here, by [USLC] after it bought the entire battery." *Id.* Livingston "cannot escape having the battery casings defined as a discarded material simply by selling the battery to another party who then disposes of the casings." *Id.*

Unlike *Cello–Foil*, the facts in the present case do not lend themselves to competing inferences, some of which would support the imposition of CERCLA liability on Livingston and some of which would not. Unlike the defendants in *Cello–Foil*, Livingston cites no evidence to suggest that it tried to remove all hazardous material before selling its junk batteries to USLC, or that the batteries it sold con-

tained no hazardous material. As noted above, Livingston also cites nothing to suggest that it asked for the lead-contaminated battery casings to be returned after USLC salvaged the lead plates. In short, unlike the defendants in *Cello–Foil*, Livingston fails to cite any evidence from which a trier of fact could conclude that its sale of junk batteries did not include an intentional arrangement for the disposal of a hazardous substance. As a result, the record reveals no genuine issue of material fact precluding the entry of summary judgment in favor of the Government on its "arranger" liability claim against Livingston & Company, Inc.

In opposition to this conclusion, Livingston advances a number of arguments, none of which demonstrates a genuine issue of material fact for trial. Livingston first insists that the record contains *no* evidence of its intent to arrange for the disposal of hazardous substances. In support, it relies on an affidavit from it Vice President, Roger Livingston, who avers:

3. Livingston & Co. is a family-owned and operated scrap metal business with one location in Portsmouth, Ohio. The company has 16 employees and has been in business since being founded by my now deceased father, Kenneth Edward Livingston, in 1950.

4. In our business, we obtain scrap materials for resale and processing if necessary.

5. I have first hand knowledge concerning sales to Bailen Brothers, also known to me as United Scrap Lead or United Scrap Lead Corporation (USLC).

6. USLC over the years approached our company seeking to purchase used lead batteries for its use.

7. It is my understanding that USLC was purchasing used lead batteries from us to recover and recycle the lead.

8. We did not give away the batteries, but rather we sold the batteries to USLC.

9. The sale price was agreed upon and USLC would pick up its purchased batteries and take them presumably to its facility in Troy, Ohio.

10. My intention and our company's intention was to sell these batteries to USLC for its recycling of the lead.

11. It was my understanding that the batteries USLC purchased were in a form useful to USLC.

12. It was never my intention to send the batteries to USLC to dispose of them.

13. I did not consider the batteries we sold to USLC as unwanted waste to be disposed of.

14. I did not have any involvement, control, or influence over how USLC recycled the lead from the batteries it purchased from us.

(Doc. # 343 at Livingston affidavit; *see also* Livingston affidavit, Doc. # 401).

For the reasons set forth more fully, *supra*, the Court concludes that the foregoing averments fail to demonstrate a genuine issue of material fact for trial. The fact that Livingston did not consider the batteries to be "waste" is immaterial. As a matter of law, the lead-contaminated battery casings sold by Livingston were hazardous waste, without respect to Livingston's position on the issue.[38] In addition, Livingston's conclusory assertion that it lacked the intent to arrange for the dispos-

---

**38.** If a defendant could avoid liability simply by averring that it did not "consider" its product to be unwanted hazardous waste, successful cost-recovery actions under CERC-LA likely would disappear. In the Court's view, it is the actual nature of the substance at issue, not a defendant's perception of it, that must control.

al of hazardous waste is insufficient to avoid summary judgment. Livingston's contention that it only intended to enter into an arrangement for recycling is belied by its own affirmative acts, which included selling recyclable lead enclosed in worthless, contaminated battery casings. Significantly, Livingston did not sell lead in the form of a raw material. Rather, it sold junk batteries that had to be "cracked" in order for the lead to be extracted. As noted above, Livingston did not ask for the contaminated battery casings to be returned. Nor did it attempt to "crack" the batteries and remove the lead plates from the casings before selling them to USLC. As the Sixth Circuit recognized in *Cello–Foil*, a party's intent to dispose of hazardous substances "need not be proven by direct evidence, but can be inferred from the totality of the circumstances." *Cello–Foil*, 100 F.3d at 1231. Furthermore, the best evidence of intent is often " 'evidence of what actually happened rather than evidence describing the subjective state of mind of the actor.' " *Id.* at 1233. Indeed, "courts have not hesitated to look beyond defendants' characterizations to determine whether a transaction in fact involves an arrangement for the disposal of a hazardous substance." *Aceto*, 872 F.2d at 1381; *see also TMG Enterprises*, 979 F.Supp. at 1123 ("It is the nature of the transaction, not the parties' characterization that determines whether the transaction was a sale of a useful product or an arrangement for disposal."). In the present case, the actions of Livingston demonstrate that it necessarily intended to enter into a transaction that included an arrangement for the disposal of a hazardous substance. Indeed, Livingston cites absolutely no facts that would support a contrary inference.[39]

For purposes of establishing CERCLA liability, it is also immaterial that Livingston relinquished all control over the batteries that it sold and had no control over how USLC recycled the lead. Defendants cannot avoid CERCLA liability simply by "closing their eyes" to the disposal of their hazardous substances. *Catellus*, 34 F.3d at 752, quoting *Aceto*, 872 F.2d at 1382. The Sixth Circuit has recognized that "a party can be responsible for 'arranging for' disposal, even when it has no control over the process leading to the release of the substances." *Cello–Foil*, 100 F.3d at 1232. Moreover, "[a] party cannot escape liability by claiming that it had no intent to have the waste disposed of in a particular manner or at a particular site." *Id.* Once it has been determined that Livingston intended to arrange for the disposal of a hazardous substance by selling lead enclosed in contaminated battery casings, "strict liability takes effect" and it is responsible for any resulting damages. *Id.; see also Aceto*, 872 F.2d at 1381 (recognizing that "[c]ourts have also held defendants 'arranged for' disposal of wastes at a particular site even when defendants did

---

**39.** In its Memorandum, Livingston repeatedly insists that the Government has failed to cite any evidence to support an inference that it intended to arrange for the disposal of a hazardous substance. This argument is belied by the record. As noted above, the facts demonstrating Livingston's intent to dispose are uncontroverted, and they consists of the company's own actions. In short, Livingston sold lead *and* lead-contaminated casings to a "battery breaking" operation, without seeking the return of the casings. Although the lead retained value as a recyclable material, the cas-

ings did not. Livingston understandably focuses solely on the lead plates in the scrap batteries that it sold, but this case is not about those plates. Rather, it is about the contaminated casings that inevitably remain after a battery is "broken." Livingston sold those casings along with the lead plates. In so doing, it arranged for their disposal, as a matter of law. Indeed, as explained above, Livingston's actual conduct with respect to the battery casings supports no other reasonable inference.

not know the substances would be deposited at that site or in fact believed they would be deposited elsewhere."). Based on the reasoning and citation of authority set forth above, the Court concludes that the Government is entitled to summary judgment on the issue of Livingston & Co., Inc.'s "arranger" liability under CERCLA.

### 12. *Mid–Ohio Battery, Inc.*

With respect to Defendant Mid–Ohio Battery, Inc., the Government argues as follows:

> Mid–Ohio Battery, Inc.[,] has admitted that it sent junk batteries to the Site. Mid–Ohio Battery, Inc.[,] is listed on the United Scrap Lead Customer Price List. Invoices document individual transactions involving junk batteries between Mid–Ohio Battery, Inc.[,] and United Scrap Lead. Charles Bailen has testified that Mid–Ohio Battery, Inc.[,] was a customer of United Scrap Lead. Therefore, no genuine issue of material fact exists that Mid–Ohio Battery, Inc.[,] arranged for the treatment or disposal of hazardous substances at the United Scrap Lead Site.

(Doc. # 333 at 28) (footnotes with citations omitted).

Upon review, the Court concludes that the Government has demonstrated its entitlement to judgment as a matter of law on the issue of this Defendant's "arranger" liability under CERCLA. Mid–Ohio Battery has admitted that it "sold used batteries" to USLC. (*Id.* at Exh. 5F). The record reflects that USLC never re-sold the whole batteries that it purchased, never sent them out for processing, and never shipped them to other sites. (Bailen depo., August 7, 1995, at 40–41). Rather, as noted, *supra*, Charles Bailen and others operated the Site as a "battery breaking" operation, which involved "cracking" the batteries and extracting scrap lead from the worthless acid and casings. The acid and lead-contaminated casings then were discarded on the property. In particular, the undisputed evidence establishes that "battery-breaking" involved cutting off battery tops, draining the acid into a pit and grinding the lead-contaminated casings for disposal at the USLC Site. (*Id.* at 58–75).

Based on the evidence before it, the Court concludes that the role of Mid–Ohio Battery, Inc., in the foregoing transactions constituted "arrangements for disposal," as a matter of law. Construing the evidence and all reasonable inferences drawn therefrom in a light most favorable to Mid–Ohio Battery, the only reasonable inference is that it intended to enter into a transaction that included an arrangement for disposal. In reaching this conclusion, the Court notes that Mid–Ohio Battery did not sell lead in the form of a raw material. Rather, it sold junk batteries that had to be "cracked" in order for the scrap lead to be extracted from the lead-contaminated casings. "The battery casings ... unlike the lead plates within the casings, were not the subject of recycling." *Catellus*, 34 F.3d at 753 (9th Cir.1994). "They retained their character as waste throughout and would have to be 'gotten rid of,' either by [Mid–Ohio Battery], which could have cracked the batteries itself before selling the scrap lead, or as was the case here, by [USLC] after it bought the entire battery." *Id.* Mid–Ohio Battery, Inc., "cannot escape having the battery casings defined as a discarded material simply by selling the battery to another party who then disposes of the casings." *Id.*

Unlike *Cello–Foil*, the facts in the present case do not lend themselves to competing inferences, some of which would support the imposition of CERCLA liability on Mid–Ohio Battery and some of which would not. Unlike the defendants in *Cello–Foil*, Mid–Ohio Battery cites no evi-

dence to suggest that it tried to remove all hazardous material before selling its junk batteries to USLC, or that the batteries it sold contained no hazardous material. As noted above, Mid–Ohio Battery also cites nothing to suggest that it asked for the lead-contaminated battery casings to be returned after USLC salvaged the lead plates. In short, unlike the defendants in *Cello–Foil,* Mid–Ohio Battery fails to cite any evidence from which a trier of fact could conclude that its sale of junk batteries did not include an intentional arrangement for the disposal of a hazardous substance. As a result, the record reveals no genuine issue of material fact precluding the entry of summary judgment in favor of the Government on its "arranger" liability claim against Mid–Ohio Battery, Inc.

### 13. *Montgomery Iron & Metal, Inc.*

With respect to Defendant Montgomery Iron & Metal, Inc., the Government argues as follows:

> Montgomery Iron & Metal, Inc.[,] is listed on the United Scrap Lead Customer Price List. Charles Bailen has testified that Montgomery Iron & Metal, Inc.[,] was a customer of United Scrap Lead. Therefore, no genuine issue of material fact exists that Montgomery Iron & Metal, Inc.[,] arranged for the treatment or disposal of hazardous substances at the United Scrap Lead Site.

(Doc. # 333 at 28) (footnotes with citations omitted).

Upon review, the Court concludes that the Government has demonstrated its entitlement to judgment as a matter of law on the issue of this Defendant's "arranger" liability under CERCLA. In uncontroverted testimony, Charles Bailen has identified Montgomery Iron & Metal, Inc., as a "low volume" contributor of junk batteries to USLC. (Bailen depo., Sept. 26, 1996, at 39; Bailen depo., Jan. 22, 1999, at 38–39). The record reflects that USLC never re-sold the whole batteries that it purchased, never sent them out for processing, and never shipped them to other sites. (Bailen depo., August 7, 1995, at 40–41). Rather, as noted, *supra,* Charles Bailen and others operated the Site as a "battery breaking" operation, which involved "cracking" the batteries and extracting scrap lead from the worthless acid and casings. The acid and lead-contaminated casings then were discarded on the property. In particular, the undisputed evidence establishes that "battery-breaking" involved cutting off battery tops, draining the acid into a pit and grinding the lead-contaminated casings for disposal at the USLC Site. (*Id.* at 58–75).

Based on the evidence before it, the Court concludes that the role of Montgomery Iron & Metal, Inc., in the foregoing transactions constituted "arrangements for disposal," as a matter of law. Construing the evidence and all reasonable inferences drawn therefrom in a light most favorable to Montgomery Iron & Metal, the only reasonable inference is that it intended to enter into a transaction that included an arrangement for disposal. In reaching this conclusion, the Court notes that Montgomery Iron & Metal did not sell lead in the form of a raw material. Rather, it sold junk batteries that had to be "cracked" in order for the scrap lead to be extracted from the lead-contaminated casings. "The battery casings ... unlike the lead plates within the casings, were not the subject of recycling." *Catellus,* 34 F.3d at 753. "They retained their character as waste throughout and would have to be 'gotten rid of,' either by [Montgomery Iron & Metal], which could have cracked the batteries itself before selling the scrap lead, or as was the case here, by [USLC] after it bought the entire battery." *Id.* Montgomery Iron & Metal, Inc., "cannot escape having the battery casings defined as a discarded material simply by selling the

battery to another party who then disposes of the casings." *Id.*

Unlike *Cello–Foil,* the facts in the present case do not lend themselves to competing inferences, some of which would support the imposition of CERCLA liability on Montgomery Iron & Metal and some of which would not. Unlike the defendants in *Cello–Foil,* Montgomery Iron & Metal cites no evidence to suggest that it tried to remove all hazardous material before selling its junk batteries to USLC, or that the batteries it sold contained no hazardous material. As noted above, Montgomery Iron & Metal also cites nothing to suggest that it asked for the lead-contaminated battery casings to be returned after USLC salvaged the lead plates. In short, unlike the defendants in *Cello–Foil,* Montgomery Iron & Metal fails to cite any evidence from which a trier of fact could conclude that its sale of junk batteries did not include an intentional arrangement for the disposal of a hazardous substance. As a result, the record reveals no genuine issue of material fact precluding the entry of summary judgment in favor of the Government on its "arranger" liability claim against Montgomery Iron & Metal, Inc.

### 14. *Moyer's Auto Wrecking, Inc.*

With respect to Defendant Moyer's Auto Wrecking, Inc., the Government argues as follows:

Moyer['']s Auto Wrecking has admitted that it sold junk batteries to United Scrap Lead. Moyer['']s Auto Wrecking is listed on the United Scrap Lead Customer Price List. Numerous invoices evidence individual transactions involving junk batteries between Moyer['']s Auto Wrecking and United Scrap Lead. Charles Bailen has testified that Moyer['']s Auto Wrecking was a customer of United Scrap Lead. Therefore, no genuine issue of material fact exists that Moyer['']s Auto Wrecking arranged for the treatment or disposal of hazardous substances at the United Scrap Lead Site.

(Doc. # 333 at 29) (footnotes with citations omitted).

Upon review, the Court *cannot agree* that the Government is entitled to summary judgment against this Defendant. The evidence cited by the Government establishes that Moyer's Auto Wrecking sold junk batteries to USLC. In addition, the Court's analysis, *supra,* establishes that the act of selling whole junk batteries to a battery-breaking operation, without seeking the return of the lead-contaminated casing, constitutes "arranging for disposal" of a hazardous substance, as a matter of law, at least under the facts of the present case.

■ Nevertheless, the Government is not entitled to summary judgment, because its evidence establishes that Moyer's Auto Wrecking sold the junk batteries to USLC, whereas the Defendant in this action is Moyer's Auto Wrecking, *Inc.* This distinction is stressed in an affidavit from Terry Moyer, the President of Moyer's Auto Wrecking, Inc. (*See* Memo. in Opp., Doc. # 338 at Affidavit). The Court previously addressed this issue in a Decision and Entry overruling a Motion for Summary Judgment (Doc. # 339) filed by Moyer's Auto Wrecking, Inc. In relevant part, the Court reasoned as follows:

The basis for Moyer's Motion is that Moyer's Auto Wrecking (as opposed to Moyer's Auto Wrecking, *Inc.*) is responsible for the costs incurred by the Plaintiff in responding to the release of hazardous substances at the United Scrap Lead Superfund site, where spent lead-acid batteries were discarded between 1946 and 1983. Moyer contends that it never conducted any business with an entity known as the United Scrap Lead Company ("USLC"). As a result, Moyer argues that it is not responsible for

any clean-up costs at the Superfund Site, as a matter of law.

In support of its Motion, Moyer has provided the Court with an affidavit from Terry Moyer, who avers:

1. He is the president of Moyer's Auto Wrecking, Inc.

2. Moyer's Auto Wrecking, Inc., is an Ohio corporation.

3. He has reviewed the records of Moyer's Auto Wrecking, Inc.

4. The records of Moyer's Auto Wrecking, Inc.[,] indicate that Moyer's Auto Wrecking, Inc.[,] has never had any dealings with United Scrap Lead.

5. The records of Moyer's Auto Wrecking, Inc.[,] indicate that Moyer's Auto Wrecking, Inc.[,] has never entered into any agreements or contracts with United Scrap Lead to transport, dispose or treat hazardous substances. His personal recollection is that Moyer's Auto Wrecking, Inc.[,] has never entered into any agreements or contracts with United Scrap Lead to transport, dispose or treat hazardous substances.

6. The records of Moyer's Auto Wrecking, Inc.[,] indicate that Moyer's Auto Wrecking, Inc.[,] has never entered into any agreement or contract with a broker or third party to transport, remove, store or dispose of lead materials. His personal recollection is that Moyer's Auto Wrecking, Inc.[,] has never entered into any agreements or contracts with a broker or third party to transport, remove, store or dispose of lead materials.

7. Moyer's Auto Wrecking, Inc.[,] has never had any dealings with United Scrap Lead.

8. If Moyer's Auto Wrecking sold batteries in 1976 and 1977, those sales did not involve this Defendant. During those years[,] Moyer's Auto Wrecking was owned and operated by Clarence C. Moyer and Donald Moyer. Anna Moyer was the owner of the land upon which the business was located. Moyer's Auto Wrecking, Inc.[,] did not come into existence until 1986.

9. None of the officers or shareholders of Defendant, Moyer's Auto Wrecking, Inc.[,] ever had any ownership in Moyer's Auto Wrecking.

(Moyer affidavit, attached to Doc. # 339).

Based upon the foregoing affidavit, Moyer asserts that the United States and the United Scrap Lead Respondent Group ("Respondents") cannot prove that it contributed any lead-containing batteries to the Superfund site....

The Respondents have not filed a Memorandum in Opposition to Moyer's Motion for Summary Judgment. However, they have filed their own Motion for Partial Summary Judgment (Doc. # 333). Because that document addresses, among other things, the arguments set forth in Moyer's Motion, the Court will construe the Respondents' Motion for Summary Judgment as a Memorandum in Opposition to Moyer's Motion for Summary Judgment.

In their Motion for Partial Summary Judgment, the Respondents contend that "Moyer's Auto Wrecking has admitted that it sold junk batteries to United Scrap Lead." (Doc. # 333 at 29). The Respondents also note that "Moyer's Auto Wrecking" is included on a document identified as a USLC customer price list. (Id.). In addition, the Respondents note that "[n]umerous invoices evidence individual transactions involving junk batteries between Moyer's Auto Wrecking and United Scrap Lead." (Id.). Finally, the Respondents cite deposition testimony from USLC operator Charles Bailen, who stated that "Moyer's Auto Wrecking" was a USLC customer. (Id.). Based upon this evidence, the Respondents argue that "no

genuine issue of material fact exists that Moyer's Auto Wrecking arranged for the treatment or disposal of hazardous substances at the United Scrap Lead Site." (*Id.*).

Upon review, the Court concludes that the Respondents' evidentiary materials might support a finding that Moyer's Auto Wrecking arranged for the treatment or disposal of hazardous materials at the Superfund site. The Respondents' evidence does little, if anything, however, to support a finding that Moyer's Auto Wrecking, *Inc.*, engaged in such conduct. The Respondents' evidentiary materials indicate only that: (1) Moyer's Auto Wrecking has admitted contributing junk batteries to the site; (2) Moyer's Auto Wrecking has been named on a USLC customer price list; (3) Moyer's Auto Wrecking is identified on invoices from the mid–1970s involving the sale of batteries to USLC; and (4) Moyer's Auto Wrecking has been identified by Charles Bailen as a USLC customer. Notably, none of this evidence demonstrates that Moyer's Auto Wrecking, *Inc.*, has been identified as having contributed anything to the Superfund site.

As set forth above, Moyer's Auto Wrecking, *Inc.*, does not dispute that its predecessor, Moyer's Auto Wrecking, sold junk batteries to USLC. Rather, the basis of the present Motion for Summary Judgment is (1) that all such sales occurred prior to the 1986 incorporation of Moyer's Auto Wrecking, *Inc.*, and (2) that the present owners of Moyer's Auto Wrecking, *Inc.*, never had any ownership interest in Moyer's Auto Wrecking. The Respondents' evidence does not controvert these assertions, which are support by the affidavit of Terry Moyer.

Nevertheless, the Court cannot agree that Moyer is entitled to judgment as a matter of law. The present state of the evidence reveals an issue which has not been briefed by either party, namely whether Moyer's 1986 incorporation relieves it of CERCLA liability for the pre-incorporation actions of its predecessor, Moyer Auto Wrecking. The Court has found case law suggesting that such liability might exist, despite Moyer's incorporation. *See United States v. Mottolo*, 695 F.Supp. 615, 624 (D.N.H.1988) ("[O]ne of CERCLA's goals is to ensure 'that those responsible for problems caused by the disposal of chemical poisons bear the costs and responsibility for remedying the harmful conditions they created.' ... This goal would .be frustrated if the mere act of incorporation were allowed to impede the recovery of response costs, for a nonincorporated violator could avoid liability simply by changing company structure."). Given that neither party has briefed this issue, however, the Court need not resolve it at this time.[40] The parties may

---

40. The Movants do allude to this issue, without any substantive analysis or citation to legal authority, in a lone footnote in their Reply Memorandum. In that footnote, the Movants allege: "Moyer's Auto Wrecking, Inc., which is operated by the same family at the same address in the same business as the listing on the [United Scrap Lead] Customer Price List, is liable because it admitted in 1988 that the business, which was finally incorporated in 1986, sent batteries to the Site." (Doc. # 374 at 12 n. 21). The Movants cite no evidence, however, to support their assertion that Moyer's Auto Wrecking and Moyer's Auto Wrecking, Inc., are operated by the same family members at the same location. Furthermore, the Respondents have not addressed Moyer's assertion that "[n]one of the officers or shareholders of Defendant, Moyer's Auto Wrecking, Inc., ever had any ownership in Moyer's Auto Wrecking." (Doc. # 339, Moyer affidavit at ¶ 9). In any event, as the Supreme Court recognized in *United States v. Bestfoods*, 524 U.S. 51, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998), ordinary corporate law principles apply to CERCLA liability determinations. Under well-recognized ten-

wish to address the issue in a Renewed Motion for Summary Judgment, if they believe that it can be resolved as a matter of law.

(Doc. # 418) (footnote omitted).

The Court finds the foregoing reasoning to be equally applicable to the present Motion. The same unresolved, and unbriefed, issue that precluded the Court from entering summary judgment in favor of Moyer's Auto Wrecking, Inc., now precludes it from entering summary judgment in favor of the Government. With respect to this Defendant, the crucial question is whether its 1986 incorporation relieves it of CERCLA liability for the pre-incorporation actions of its predecessor. Given that the Government has not addressed this issue (which has been raised by Moyer's Auto Wrecking, Inc.), it is not entitled to summary judgment.

### 15. Norman's Auto Wrecking

With respect to Defendant Norman's Auto Wrecking, the Government argues as follows:

> Norman's Auto Wrecking is listed on the United Scrap Lead Customer Price List. Invoices document individual transactions involving junk batteries between

Norman's Auto Wrecking and United Scrap Lead. Therefore, no genuine issue of material fact exists that Norman's Auto Wrecking arranged for the treatment or disposal of hazardous substances at the United Scrap Lead Site.

(Doc. # 333 at 30) (footnotes with citations omitted).

Upon review, the Court concludes that the Government has demonstrated its entitlement to judgment as a matter of law on the issue of this Defendant's "arranger" liability under CERCLA. The record contains invoices establishing that Norman's Auto Wrecking sold "scrap batteries" to USLC. (Id. at Exh. 1N). Furthermore, the record reflects that USLC never resold the whole batteries that it purchased, never sent them out for processing, and never shipped them to other sites. (Bailen depo., August 7, 1995, at 40–41). Rather, as noted, *supra*, Charles Bailen and others operated the Site as a "battery breaking" operation, which involved "cracking" the batteries and extracting scrap lead from the worthless acid and casings. The acid and lead-contaminated casings then were discarded on the property. In particular, the undisputed evidence establishes that "battery-breaking" involved cutting off

---

ets of Ohio corporate law, a newly formed corporation is not automatically liable for the acts of an unincorporated predecessor. *Five Star Supply Co. v. Rinella*, 88 Ohio App.3d 303, 623 N.E.2d 1277, 1278 (8th Dist.1993); *see also City Management Corp. v. U.S. Chemical Co., Inc.*, 43 F.3d 244, 250 (6th Cir.1994) (recognizing that "the liability of a successor corporation for CERCLA obligations is determined by reference to state corporation law, rather than federal common law"); *cf. Shillman v. United States*, 221 F.3d 1336, 2000 WL 923761 (June 29, 2000) (unreported) (reasoning that CERCLA liability could be imposed on J.V. Peters & Co., Inc., as the successor to J.V. Peters & Co., a partnership, "consistent with the standard of successor liability that has been applied in CERCLA cases," when the corporate form was adopted merely to avoid liability). In addition, it is not at all

clear that finding Moyer's Auto Wrecking, Inc., to be not liable for the actions of its predecessor, Moyer's Auto Wrecking, would frustrate the goals of CERCLA. Assuming that Moyer's Auto Wrecking, Inc., were not responsible for remediation costs, the person or persons who operated Moyer's Auto Wrecking prior to incorporation would appear to remain personally liable. In any event, absent proper briefing by the parties, the Court declines to decide, based on the limited information before it, whether Moyer's Auto Wrecking, *Inc.*, may be found liable for response costs under CERCLA, based on the conduct of its predecessor, Moyer's Auto Wrecking. If either party believes that this issue is capable of being resolved through summary judgment, it may brief the issue and file a renewed Motion.

battery tops, draining the acid into a pit and grinding the lead-contaminated casings for disposal at the USLC Site. (*Id.* at 58–75).

Based on the evidence before it, the Court concludes that the role of Norman's Auto Wrecking in the foregoing transactions constituted "arrangements for disposal," as a matter of law. Construing the evidence and all reasonable inferences drawn therefrom in a light most favorable to Norman's, the only reasonable inference is that it intended to enter into a transaction that included an arrangement for disposal. In reaching this conclusion, the Court notes that Norman's did not sell lead in the form of a raw material. Rather, it sold junk batteries that had to be "cracked" in order for the scrap lead to be extracted from the lead-contaminated casings. "The battery casings . . . unlike the lead plates within the casings, were not the subject of recycling." *Catellus*, 34 F.3d at 753. "They retained their character as waste throughout and would have to be 'gotten rid of,' either by [Norman's], which could have cracked the batteries itself before selling the scrap lead, or as was the case here, by [USLC] after it bought the entire battery." *Id.* Norman's Auto Wrecking "cannot escape having the battery casings defined as a discarded material simply by selling the battery to another party who then disposes of the casings." *Id.*

Unlike *Cello–Foil*, the facts in the present case do not lend themselves to competing inferences, some of which would support the imposition of CERCLA liability on Norman's and some of which would not. Unlike the defendants in *Cello–Foil*, Norman's Auto Wrecking cites no evidence to suggest that it tried to remove all hazardous material before selling its junk batteries to USLC, or that the batteries it sold contained no hazardous material. As noted above, Norman's also cites nothing to suggest that it asked for the lead-contaminated battery casings to be returned after USLC salvaged the lead plates. In short, unlike the defendants in *Cello–Foil*, Norman's fails to cite any evidence from which a trier of fact could conclude that its sale of junk batteries did not include an intentional arrangement for the disposal of a hazardous substance. As a result, the record reveals no genuine issue of material fact precluding the entry of summary judgment in favor of the Government on its "arranger" liability claim against Norman's Auto Wrecking.

### 16. *Senser Metal Co., Inc.*

With respect to Defendant Senser Metal Co., Inc., the Government argues as follows:

Senser Metal[ ] Co., Inc.[,] has admitted that it delivered junk batteries to United Scrap Lead. Invoices document individual transactions involving junk batteries between Senser Metal[ ] and United Scrap Lead. Charles Bailen has testified that Senser Metal[ ] was a customer of United Scrap Lead. Therefore, no genuine issue of material fact exists that Senser Metal[ ] arranged for the treatment or disposal of hazardous substances at the United Scrap Lead Site.

(Doc. # 333 at 31) (footnotes with citations omitted).

Upon review, the Court concludes that the Government has demonstrated its entitlement to judgment as a matter of law on the issue of this Defendant's "arranger" liability under CERCLA. Senser admits that it sold batteries to USLC. (*Id.* at Exh. 7). The record reflects that USLC never re-sold the whole batteries that it purchased, never sent them out for processing, and never shipped them to other sites. (Bailen depo., August 7, 1995, at 40–41). Rather, as noted, *supra*, Charles Bailen and others operated the Site as a "battery

breaking" operation, which involved "cracking" the batteries and extracting scrap lead from the worthless acid and casings. The acid and lead-contaminated casings then were discarded on the property. In particular, the undisputed evidence establishes that "battery-breaking" involved cutting off battery tops, draining the acid into a pit and grinding the lead-contaminated casings for disposal at the USLC Site. (*Id.* at 58–75).

Based on the evidence before it, the Court concludes that the role of Senser in the foregoing transactions constituted "arrangements for disposal," as a matter of law. Construing the evidence and all reasonable inferences drawn therefrom in a light most favorable to Senser, the only reasonable inference is that it intended to enter into a transaction that included an arrangement for disposal. In reaching this conclusion, the Court notes that Senser did not sell lead in the form of a raw material. Rather, it sold junk batteries that had to be "cracked" in order for the scrap lead to be extracted from the lead-contaminated casings. "The battery casings ... unlike the lead plates within the casings, were not the subject of recycling." *Catellus,* 34 F.3d at 753. "They retained their character as waste throughout and would have to be 'gotten rid of,' either by [Senser], which could have cracked the batteries itself before selling the scrap lead, or as was the case here, by [USLC] after it bought the entire battery." *Id.* Senser "cannot escape having the battery casings defined as a discarded material simply by selling the battery to another party who then disposes of the casings." *Id.*

Unlike *Cello–Foil,* the facts in the present case do not lend themselves to competing inferences, some of which would support the imposition of CERCLA liability on Senser and some of which would not. Unlike the defendants in *Cello–Foil,* Sen-

ser cites no evidence to suggest that it tried to remove all hazardous material before selling its junk batteries to USLC, or that the batteries it sold contained no hazardous material. As noted above, Senser also cites nothing to suggest that it asked for the lead-contaminated battery casings to be returned after USLC salvaged the lead plates. In short, unlike the defendants in *Cello–Foil,* Senser fails to cite any evidence from which a trier of fact could conclude that its sale of junk batteries did not include an intentional arrangement for the disposal of a hazardous substance. As a result, the record reveals no genuine issue of material fact precluding the entry of summary judgment in favor of the Government on its "arranger" liability claim against Senser Metals Co., Inc.

In opposition to this conclusion, Senser advances a number of arguments, none of which demonstrates a genuine issue of material fact for trial. Senser first insists that it did not intend to arrange for the disposal of hazardous substances. In support, it relies on an affidavit from its President, Saul Senser, who avers, in relevant part:

3. During all times relevant to this case, Senser Metal was primarily engaged in the purchase and sale of non-ferrous metals.

4. Senser Metal only bought material for resale.

5. From time to time, Senser Metal was approached by Ed Bailen and/or his company[,] United Scrap Lead Company (hereafter collectively referred to as "Ed Bailen") to sell them batteries.

6. If the price was right, Senser Metal would sell some batteries to Ed Bailen.

7. If the price was not right, Senser Metal would sell batteries to other buyers or simply continue to hold the batteries.

8. If Senser Metal made a sale of batteries to Ed Bailen, then Ed Bailen would pick up the purchased batteries at Senser Metal's place of business in Barberton, Ohio.

9. Senser Metal never considered the batteries sold to Ed Bailen to be an unwanted waste.

10. It was never Senser Metal's intent to dispose of the batteries with or through Ed Bailen.

11. Senser Metal had no knowledge, involvement, control or influence about where Ed Bailen took the batteries or what was done with the batteries.

12. Senser Metal sold used batteries to Ed Bailen for a cash consideration that varied based upon the market price for lead.

13. The sales of batteries were made with the intent of making a profit.

14. Senser Metal did not want to get rid of the batteries whether they could be sold at a good price or not.

15. A viable market for used batteries existed at all times here.

16. After the sale, Senser Metal retained no interest, title, or control over the batteries or their handling.

17. Upon the sale, Senser Metal relinquished any ownership and control to the batteries; and the purchaser assumed full and complete ownership and control of the batteries.

18. Senser Metal did not know where the batteries were to be taken.

19. Senser Metal did not direct where the batteries were to be taken.

20. Senser Metal has not seen nor is it aware of any evidence or proof that any batteries it sold to Ed Bailen ended up at the United Scrap Lead site.

21. Senser Metal has no knowledge about what was actually done with or to the batteries it sold to Ed Bailen.

22. Senser Metal has no knowledge about what was to be done to the batteries it sold to Ed Bailen.

23. Senser Metal did not contract or agree with Ed Bailen for the disposal or treatment of the batteries.

24. Senser Metal did not otherwise arrange for the disposal or treatment of the batteries it sold to Ed Bailen.

25. Senser Metal had no hand in or knowledge about the release of lead upon the United Scrap Lead site.

26. Senser Metal did not give Ed Bailen any directions, suggestions, or advice about how to handle the batteries it sold to him.

27. Senser Metal did not intend to dispose of any hazardous substances when it sold the batteries to Ed Bailen.

28. Senser Metal had no role whatsoever in the selection of any location where the batteries it sold to Ed Bailen were taken.

29. Senser Metal did not consider the batteries to be waste, but a valuable commodity that could be sold to different prospective purchasers in a competitive marketplace.

30. Senser Metal was not directly or indirectly involved with any post-sale transportation, processing, recycling or disposal activity concerning the batteries.

31. Senser Metal had no knowledge that the batteries would be disposed of in whole or in part at the United Scrap Lead site.

32. Senser Metal did not make the decision to take the batteries to the United Scrap Lead site assuming that any of the batteries it sold to Ed Bailen ended up at that site.

(Senser affidavit, attached to Doc. # 354).

Upon review, the Court concludes that the foregoing averments fail to demon-

strate a genuine issue of material fact for trial. The fact that Senser did not consider the batteries to be "unwanted waste" is immaterial. As a matter of law, the lead-contaminated battery casings sold by Senser were hazardous waste, without respect to Senser's position on the issue.[41] In addition, Senser cannot avoid summary judgment based on its conclusory assertions that it "did not otherwise arrange for the disposal or treatment of the batteries it sold to Ed Bailen" and "did not intend to dispose of any hazardous substances when it sold the batteries to Ed Bailen." These contentions are belied by Senser's own affirmative acts, which included selling recyclable lead enclosed in worthless, contaminated battery casings. Significantly, Senser did not sell lead in the form of a raw material. Rather, it sold junk batteries that had to be "cracked" in order for the lead to be extracted. As noted above, Senser did not ask for the contaminated battery casings to be returned. Nor did it attempt to "crack" the batteries and remove the lead plates from the casings before selling them to USLC. As the Sixth Circuit recognized in *Cello–Foil*, a party's intent to dispose of hazardous substances "need not be proven by direct evidence, but can be inferred from the totality of the circumstances." *Cello–Foil*, 100 F.3d at 1231. Furthermore, the best evidence of intent is often " 'evidence of what actually happened rather than evidence describing

the subjective state of mind of the actor.' " *Id.* at 1233. Indeed, "courts have not hesitated to look beyond defendants' characterizations to determine whether a transaction in fact involves an arrangement for the disposal of a hazardous substance." *Aceto*, 872 F.2d at 1381; *see also TMG Enterprises*, 979 F.Supp. at 1123 ("It is the nature of the transaction, not the parties' characterization that determines whether the transaction was a sale of a useful product or an arrangement for disposal."). Under the facts of the present case, the actions of Senser demonstrate that it necessarily intended to enter into a transaction that included an arrangement for the disposal of a hazardous substance. Indeed, Senser cites absolutely no facts that would support a contrary inference.[42]

In addition, for purposes of CERCLA liability, the averments upon which Senser relies are immaterial. As noted, *supra,* Senser Metal insists that it had no knowledge, involvement or influence regarding where Bailen took the batteries or what was done with them. Senser Metal also stresses that it retained no interest, title or control over the batteries or their handling. Likewise, the company notes that it did not know, or direct, where the batteries were to be taken. Senser also notes that it "had no hand in or knowledge about the release of lead upon the United Scrap Lead site." Furthermore, Senser insists that it did not give Bailen any "directions,

**41.** If a defendant could avoid liability simply by averring that it did not "consider" its product to be unwanted hazardous waste, successful cost-recovery actions under CERCLA likely would disappear. In the Court's view, it is the actual nature of the substance at issue, not a defendant's perception of it, that must control.

**42.** In its Memorandum, Senser repeatedly insists that the Government has failed to cite any evidence to support an inference that it intended to arrange for the disposal of a hazardous substance. This argument is belied by

the record. As noted above, the facts demonstrating Senser's intent to dispose are uncontroverted, and they consists of the company's own actions. In short, Senser sold lead *and* lead-contaminated casings to a "battery breaking" operation, without seeking the return of the casings. Although the lead retained value as a recyclable material, the casings did not. Senser sold those casings along with the lead plates. In so doing, it arranged for their disposal, as a matter of law. Indeed, as explained above, Senser's actual conduct with respect to the battery casings supports no other reasonable inference.

suggestions, or advice about how to handle the batteries." Finally, Senser argues that it (1) was not involved with any post-sale transportation, processing, recycling or disposal activity concerning the batteries, (2) had no knowledge that the batteries would be disposed of at the USLC Site, and (3) did not make the decision to take the batteries to the Site.

■ The foregoing facts, which are supported by Saul Senser's affidavit, do not demonstrate a genuine issue of material fact for trial. As an initial matter, the Court notes that Defendants cannot avoid CERCLA liability simply by "closing their eyes" to the disposal of their hazardous substances. *Catellus*, 34 F.3d at 752, quoting *Aceto*, 872 F.2d at 1382. The Sixth Circuit has recognized that "a party can be responsible for 'arranging for' disposal, even when it has no control over the process leading to the release of the substances." *Cello–Foil*, 100 F.3d at 1232. Moreover, "[a] party cannot escape liability by claiming that it had no intent to have the waste disposed of in a particular manner or at a particular site." [43] *Id.* Once it has been determined that Senser intended to arrange for the disposal of a hazardous substance by selling lead enclosed in contaminated battery casings, "strict liability takes effect" and it is responsible for any resulting damages. *Id.; see also Aceto*, 872 F.2d at 1381 (recognizing that "[c]ourts have also held defendants 'ar-

ranged for' disposal of wastes at a particular site even when defendants did not know the substances would be deposited at that site or in fact believed they would be deposited elsewhere"); *Catellus*, 34 F.3d at 752 (rejecting the argument that liability cannot attach when a defendant "did not control the eventual disposition" of hazardous waste, and noting that "continued ownership or control of a hazardous substance" is not a prerequisite for CERCLA liability).

Senser also insists that its sale of old batteries constituted the sale of a useful product or "valuable materials," rather than the disposal of a hazardous substance.[44] (Doc. # 354 at 7). What Senser and many of the other Defendants fail to acknowledge, however, is that the issue of "intent to sell valuable materials" versus "intent to dispose of a hazardous substance" is not always an "either/or" proposition. *See, e.g., Catellus*, 34 F.3d at 752 (recognizing that the sale of junk batteries involves the recycling of a valuable material *and* the disposal of a hazardous substance). The Court does not dispute that Senser intended to make a profit by selling its spent batteries, which retained some value because they contained recyclable lead. The present case, however, is not about the recyclable lead. It is about the contaminated battery casings that inevitably must be disposed of after a battery is "cracked" or "broken" and the recyclable

---

**43.** Senser's argument that it "did not make the decision to take the batteries to the United Scrap Lead site," implicates the so-called "critical decision" test, which provides for the imposition of CERCLA liability only if a defendant made the decision to dispose of hazardous waste at a particular site. (*See* Doc. # 354 at 8). In light of *Cello-Foil*, the "critical decision" test, at least as articulated by Senser, is not the law of the Sixth Circuit. *See Cello–Foil*, 100 F.3d at 1232 (recognizing that "a party cannot escape liability by claiming that it had no intent to have the waste disposed of ... at a particular site"); *see also*

*TMG Enterprises*, 979 F.Supp. at 1124 (reasoning that the only relevant "crucial decision" was the defendant's decision to "sell insulated copper wire for disposal and treatment").

**44.** Insofar as Senser suggests that its batteries constituted a useful product, the Court previously rejected this legal argument in *Atlas Lederer*, 85 F.Supp.2d at 836 ("The spent batteries purchased by USLC were useless *as batteries*. The sale of junk batteries is not the sale of a 'useful product.' ").

lead is removed. Senser cites no evidence to suggest that the lead-contaminated battery casings at issue were "valuable materials."

In support of its claim that its transactions with USLC constituted the sale of "valuable materials" rather than hazardous substances, Senser cites *Pneumo Abex Corp. v. High Point Thomasville & Denton Railroad Co.*, 142 F.3d 769, 772 (4th Cir.1998). In that case, the Fourth Circuit found no arrangement for the treatment of hazardous substances, based on a railroad's sale of broken or worn out wheel bearings to a foundry. After receiving the old bearings, the foundry melted them and created new bearings. The melting process caused various impurities ("slag and dust") to float to the top, where they were skimmed and then dumped on the foundry's property. After conducting a fact-specific inquiry, the Fourth Circuit determined that the sale of the old bearings was more akin to the sale of a useful product than to a transaction for disposal of hazardous substances. *Id.* at 775. In reaching its conclusion, the *Pneumo* court noted that slag and dust would have been produced during the melting process, even if the railroad had sold the foundry virgin materials. *Id.* The court also stressed that "the removal of contaminants was not the purpose of the transaction ...." Rather, "[t]he removal of the dirt and grease was incidental to remolding new bearings, just as it would have been incidental to the molding of new bearings from virgin materials." *Id.* The *Pneumo* court also noted that "[t]he intent of both parties to the transaction was that the wheel bearings would be reused in their entirety in the creation of new wheel bearings." *Id.*

Upon review, the Court finds the Fourth Circuit's decision to be distinguishable. Unlike *Pneumo*, there is no evidence that environmental contamination would have occurred, if Senser had sold virgin lead in the form of a raw material. Unlike *Pneumo*, the removal and disposal of lead-contaminated battery casings would not have been necessary, if Senser had sold raw materials to USLC. Finally, unlike *Pneumo*, the intent of the parties was not that the spent batteries would be reused in their entirety. Rather, the company intended to recycle the lead plates contained in the batteries, and Senser, by its own admission, had absolutely no idea what USLC planned to do with the contaminated casings that it received.[45]

45. In opposition to the Court's conclusion that it sold hazardous waste, Senser also makes a passing reference to *G.J. Leasing Co., Inc. v. Union Elec. Co.*, 54 F.3d 379 (7th Cir.1995), a case that is distinguishable. Senser cites *G.J. Leasing* for the proposition that "the sale of a product which contains a hazardous substance cannot be equated to the disposal of the substance itself or even the making of arrangements for its subsequent disposal." (Doc. # 354 at 7). This proposition is undoubtedly true in some cases. For example, as the Seventh Circuit recognized, a contrary rule would mean that the sale of an automobile constitutes an arrangement for disposal of a hazardous substance, because an automobile contains a battery, and a battery contains lead. *G.J. Leasing*, 54 F.3d at 384. On the other hand, the Seventh Circuit recognized that an owner who wants to get rid of a toxic retaining pond cannot avoid "arranger" liability merely by selling his entire facility, which includes the pond, to an unsuspecting purchaser. Finally, the Seventh Circuit recognized a third class of cases, in which a seller's intent is both to dispose of hazardous waste and to make a bona fide profit. Notably, the *G.J. Leasing* court cited the Ninth Circuit's decision in *Catellus* as the quintessential example of such a case. As set forth fully elsewhere in this Decision, *Catellus* involved the sale of spent batteries to a battery "cracking" operation. Upon review, the Ninth Circuit held that the seller of the batteries could be liable under CERCLA. In reaching this decision, the Ninth Circuit reasoned that "[t]he battery casings ... unlike the lead plates within the casings, were not the subject of recycling." *Catellus*, 34 F.3d at 753. "They retained their character as waste

As noted above, Senser also insists that it "has not seen nor is it aware of any evidence or proof that any batteries it sold to Ed Bailen ended up at the United Scrap Lead site." In fact, Senser suggests that "[g]iven the significant difference between [its] place of business in Barberton, Ohio, and the United Scrap Lead site in Troy, Ohio, it is highly doubtful that any batteries sold by Senser Metal ended up there." (Doc. # 354 at 4). This argument does not establish a genuine issue of material fact for trial. In his affidavit, Saul Senser admits that Ed Bailen of USLC picked up batteries at Senser's place of business. (Senser affidavit at ¶ 8). Furthermore, the record contains uncontroverted evidence that USLC never sold the junk batteries that it purchased and never sent them elsewhere. (Bailen depo., August 7, 1995, at 35, 37, 40–41). Instead, the purchased batteries were "processed" at the USLC Site. (*Id.* at 40). In light of the foregoing evidence, the Court finds no genuine issue of material fact as to whether any of Senser's batteries ever arrived at the USLC Site.[46] The uncontroverted evidence establishes that they did. Based on the reasoning and citation of authority set forth above, the Court concludes that the Government is entitled to summary judgment on the issue of Senser Metal Company, Inc.'s "arranger" liability under CERCLA.

### 17. *United Salvage Company, Inc.*

With respect to Defendant United Salvage Company, Inc., the Government argues as follows:

> Invoices document individual transactions involving junk batteries between United Salvage Co.[,] Inc.[,] and United Scrap Lead. Therefore, no genuine issue of material fact exists that United Salvage Company arranged for the treatment or disposal of hazardous substances at the United Scrap Lead Site.

(Doc. # 333 at 31) (footnotes with citations omitted).

Upon review, the Court concludes that the Government has demonstrated its entitlement to judgment as a matter of law on the issue of this Defendant's "arranger" liability under CERCLA. The record contains numerous invoices establishing that United Salvage sold batteries to USLC. (*Id.* at Exh. 1P). In addition, this Defendant has admitted that it sold lead-acid batteries to USLC. (*See* Doc. # 368 at Responses to Requests for Admissions). The record reflects that USLC never resold the whole batteries that it purchased, never sent them out for processing, and never shipped them to other sites. (Bailen

---

throughout and would have to be 'gotten rid of,' either by General, which could have cracked the batteries itself before selling the scrap lead, or as was the case here, by Kirk after it bought the entire battery." *Id.* The Ninth Circuit concluded that a seller of spent batteries "cannot escape having the battery casings defined as a discarded material simply by selling the battery to another party who then disposes of the casings." *Id.; see also Gould*, 871 F.Supp. at 1247 ("In selling whole spent batteries, the seller is merely getting rid of a product which has no use except to reclaim the lead inside. In such a case, the sale is actually a disposal."). As in *Catellus*, the batteries sold by Senser had no value for use *as batteries*. Based on the uncontroverted

evidence before it, the Court concludes that the batteries retained value only because lead, and possibly certain other materials, could be extracted from them, necessarily leaving the worthless, and contaminated, battery casings to be discarded. By selling spent batteries that were valuable only because they could be cracked, however, Senser necessarily intended to "arrange for" the disposal of a hazardous substance, namely the contaminated casings that inevitably remained.

**46.** Given that it purportedly had no idea what USLC did with the batteries after it picked them up, Senser does not controvert Bailen's testimony.

depo., August 7, 1995, at 40–41). Rather, as noted, *supra,* Charles Bailen and others operated the Site as a "battery breaking" operation, which involved "cracking" the batteries and extracting scrap lead from the worthless acid and casings. The acid and lead-contaminated casings then were discarded on the property. In particular, the undisputed evidence establishes that "battery-breaking" involved cutting off battery tops, draining the acid into a pit and grinding the lead-contaminated casings for disposal at the USLC Site. (*Id.* at 58–75).

Based on the evidence before it, the Court concludes that the role of United Salvage in the foregoing transactions constituted "arrangements for disposal," as a matter of law. Construing the evidence and all reasonable inferences drawn therefrom in a light most favorable to United Salvage, the only reasonable inference is that it intended to enter into a transaction that included an arrangement for disposal. In reaching this conclusion, the Court notes that United Salvage did not sell lead in the form of a raw material. Rather, it sold junk batteries that had to be "cracked" in order for the scrap lead to be extracted from the lead-contaminated casings. "The battery casings ... unlike the lead plates within the casings, were not the subject of recycling." *Catellus,* 34 F.3d at 753. "They retained their character as waste throughout and would have to be 'gotten rid of,' either by [United Salvage], which could have cracked the batteries itself before selling the scrap lead, or as was the case here, by [USLC] after it bought the entire battery." *Id.* United Salvage "cannot escape having the battery casings defined as a discarded material simply by selling the battery to another party who then disposes of the casings." *Id.*

Unlike *Cello–Foil,* the facts in the present case do not lend themselves to compet-

ing inferences, some of which would support the imposition of CERCLA liability on United Salvage and some of which would not. Unlike the defendants in *Cello–Foil,* United Salvage cites no evidence to suggest that it tried to remove all hazardous material before selling its junk batteries to USLC, or that the batteries it sold contained no hazardous material. As noted above, United Salvage also cites nothing to suggest that it asked for the lead-contaminated battery casings to be returned after USLC salvaged the lead plates. In short, unlike the defendants in *Cello–Foil,* United Salvage fails to cite any evidence from which a trier of fact could conclude that its sale of junk batteries did not include an intentional arrangement for the disposal of a hazardous substance. As a result, the record reveals no genuine issue of material fact precluding the entry of summary judgment in favor of the Government on its "arranger" liability claim against United Salvage.

In opposition to this conclusion, United Salvage advances a number of arguments, none of which raises a genuine issue of material fact for trial. United Salvage first contends that its sale of old batteries constituted the sale of a "useful product," thereby precluding the imposition of CERCLA liability. (Doc. # 368 at 3–7). The Court previously rejected this legal argument in *Atlas Lederer,* 85 F.Supp.2d at 836. Upon review, the Court again concludes that the sale of junk batteries to USLC did not constitute the sale of a "useful product," as a matter of law.

In support of its "useful product" argument, United Salvage curiously cites *TMG Enterprises,* which, as noted, *supra,* held that defendant K & R Corporation had the intent to "arrange for disposal," as a matter of law, when it sold scrap copper wire to a reclamation business, without first removing the insulation that covered the wire. *TMG Enterprises,* 979 F.Supp. at

1122–24. As a result, the district court entered summary judgment in favor of the Government and against K & R Corporation. *Id.* at 1131. United Salvage also cites *Pneumo*, 142 F.3d at 772, a case which this Court has distinguished, *supra*. In addition, United Salvage contends that "if a party merely sells a product, without additional evidence that the transaction includes an arrangement for the ultimate disposal of a hazardous substance, CERCLA liability cannot be imposed." (Doc. # 368 at 5). The Court does not dispute this general proposition. In the present case, however, the uncontroverted evidence establishes that United Salvage's transactions involving the sale of spent batteries necessarily did include an arrangement for the ultimate disposal of a hazardous substance, namely the lead-contaminated battery casings that it sold to USLC, along with the recyclable contents.[47]

United Salvage next insists that it did not intend to enter into a transaction that included an arrangement for disposal of hazardous waste. In support, it argues as follows:

> The actual facts surrounding United Salvage's sales transactions with [the] United Scrap Lead Site demonstrate that there was no intent to arrange for the disposal of hazardous waste. In fact, United Salvage never intended to sell batteries for the purpose of disposal. United Salvage made a business of selling materials, including batteries, for reclamation and never considered the batteries to be waste in need of disposal. United Salvage understood the batteries

to be valuable resources that were being purchased in order to recover and recycle the lead and other potentially valuable components contained therein.

> United Salvage never at any time tried to control or influence the process which the United Scrap Lead Site used to recycle the batteries once purchased. No person from United Salvage ever visited the United Scrap Lead Sit[e] at the time of the transactions. Once the batteries were shipped, United Salvage had no further knowledge of how they were processed or what components were recovered.

(Doc. # 368 at 8).[48]

For the reasons set forth, *supra*, the Court concludes that the foregoing arguments fail to raise a genuine issue of material fact for trial. The fact that United Salvage did not consider the batteries to be "waste" is immaterial. As a matter of law, the lead-contaminated battery casings sold by United Salvage were hazardous waste, without respect to the position of United Salvage on the issue. In addition, United Salvage's conclusory assertion that it lacked the intent to arrange for the disposal of hazardous waste is insufficient to avoid summary judgment. United Salvage's contention that it only intended to enter into an arrangement for the sale of "valuable resources" is belied by its own affirmative acts, which included selling recyclable lead enclosed in worthless, contaminated battery casings. Significantly, United Salvage did not sell lead in the form of a raw material. Rather, it sold junk batteries that had to be "cracked" in order for the lead to be extracted.[49] As

---

**47.** In opposition to this conclusion, United Salvage relies on *G.J. Leasing,* another case that this Court has distinguished, *supra.*

**48.** United Salvage's arguments are supported with an affidavit from Harold Miller, who served as the company's General Manager through 1980. (*See* Affidavit, attached to Doc. # 368).

**49.** United Salvage admits in its Memorandum that it knew the batteries "were being purchased in order to recover and recycle the lead and other potentially valuable components contained therein." (Doc. # 368 at 8). As the Ninth Circuit recognized in *Catellus,* however, an inevitable consequence of this recycling process is that contaminated battery

noted above, United Salvage did not ask for the contaminated battery casings to be returned. Nor did it attempt to "crack" the batteries and remove the lead plates from the casings before selling them to USLC. As the Sixth Circuit recognized in *Cello–Foil,* a party's intent to dispose of hazardous substances "need not be proven by direct evidence, but can be inferred from the totality of the circumstances." *Cello–Foil,* 100 F.3d at 1231. Furthermore, the best evidence of intent is often " 'evidence of what actually happened rather than evidence describing the subjective state of mind of the actor.' " *Id.* at 1233. Indeed, "courts have not hesitated to look beyond defendants' characterizations to determine whether a transaction in fact involves an arrangement for the disposal of a hazardous substance." *Aceto,* 872 F.2d at 1381; *see also TMG Enterprises,* 979 F.Supp. at 1123 ("It is the nature of the transaction, not the parties' characterization that determines whether the transaction was a sale of a useful product or an arrangement for disposal."). Under the facts of the present case, the actions of United Salvage demonstrate that it necessarily intended to enter into a transaction that included an arrangement for the disposal of a hazardous substance. Indeed, United Salvage cites absolutely no facts that would support a contrary inference.

For purposes of establishing CERCLA liability, it is also immaterial that United Salvage relinquished all control over the batteries that it sold, and had no knowledge about where USLC took them or how the lead was recycled. Defendants cannot

avoid CERCLA liability simply by "closing their eyes" to the disposal of their hazardous substances. *Catellus,* 34 F.3d at 752, quoting *Aceto,* 872 F.2d at 1382. The Sixth Circuit has recognized that "a party can be responsible for 'arranging for' disposal, even when it has no control over the process leading to the release of the substances." *Cello–Foil,* 100 F.3d at 1232. Moreover, "[a] party cannot escape liability by claiming that it had no intent to have the waste disposed of in a particular manner or at a particular site." *Id.* Once it has been determined that United Salvage intended to arrange for the disposal of a hazardous substance by selling lead enclosed in contaminated battery casings, "strict liability takes effect," and it is responsible for any resulting damages. *Id.; see also Aceto,* 872 F.2d at 1381 (recognizing that "[c]ourts have also held defendants 'arranged for' disposal of wastes at a particular site even when defendants did not know the substances would be deposited at that site or in fact believed they would be deposited elsewhere").

Finally, United Salvage argues that imposing CERCLA liability will have a chilling effect on recycling.[50] (Doc. # 368 at 9–10). In response to this argument, the Court makes two observations. *First,* United Salvage could have recycled the lead battery plates by removing them itself and disposing of the contaminated battery casings in an environmentally sound manner. By failing to do so, it incurred the risk of facing CERCLA liability. *Second,* insofar as the imposition of CERCLA liability on entities such as United Salvage

---

casings must be disposed of. United Salvage "cannot escape having the battery casings defined as a discarded material simply by selling the battery to another party who then disposes of the casings." *Catellus,* 34 F.3d at 752.

**50.** United Salvage also contends that the Government has failed to prove a release or

threatened release of a hazardous substance *from* the United Scrap Lead Site, as opposed to *at* the Site. In addition, it argues that certain deposition testimony cannot be used against it, given that the deposition was taken without proper notice. (Doc. # 368 at 10–11). The Court has addressed, and rejected, both of these arguments in its analysis, *supra.*

might have a "chilling effect" on recycling, such a concern is an issue properly addressed to the legislature. Based on the reasoning and citation of authority set forth above, the Court concludes that the Government is entitled to summary judgment on the issue of United Salvage's "arranger" liability under CERCLA.

18. *U.S. Waste Materials Company*

With respect to Defendant U.S. Waste Materials Company, the Government argues as follows:

> U.S. Waste Materials Co. admitted it was a party to transactions involving junk batteries with United Scrap Lead. U.S. Waste Materials Co.[ ] is listed on the United Scrap Lead Customer Price List. Charles Bailen has testified that U.S. Waste Materials Co.[ ] was a customer of United Scrap Lead. Therefore, no genuine issue of material fact exists that U.S. Waste Materials Co. arranged for the treatment or disposal of hazardous substances at the United Scrap Lead Site.

(Doc. # 333 at 32) (footnotes with citations omitted).

Upon review, the Court concludes that the Government has demonstrated its entitlement to judgment as a matter of law on the issue of this Defendant's "arranger" liability under CERCLA. U.S. Waste Materials Company has admitted that it "sold some scrap batteries to Ed Bailen and/or [the] United Scrap Lead Company." (*Id.* at Exh. 3L). In its Memorandum, U.S. Waste concedes that it sold the batteries "with the understanding that the company would recycle the lead from them." (Doc. # 340 at 6). The record reflects that USLC never re-sold the whole batteries that it purchased, never sent them out for processing, and never shipped them to other sites. (Bailen depo., August 7, 1995, at 40–41). Rather, as noted, *supra*, Charles Bailen and others operated the Site as a

"battery breaking" operation, which involved "cracking" the batteries and extracting scrap lead from the worthless acid and casings. The acid and lead-contaminated casings then were discarded on the property. In particular, the undisputed evidence establishes that "battery-breaking" involved cutting off battery tops, draining the acid into a pit and grinding the lead-contaminated casings for disposal at the USLC Site. (*Id.* at 58–75).

Based on the evidence before it, the Court concludes that the role of U.S. Waste in the foregoing transactions constituted "arrangements for disposal," as a matter of law. Construing the evidence and all reasonable inferences drawn therefrom in a light most favorable to U.S. Waste, the only reasonable inference is that it intended to enter into a transaction that included an arrangement for disposal. In reaching this conclusion, the Court notes that U.S. Waste did not sell lead in the form of a raw material. Rather, it sold junk batteries that had to be "cracked" in order for the scrap lead to be extracted from the lead-contaminated casings. "The battery casings … unlike the lead plates within the casings, were not the subject of recycling." *Catellus*, 34 F.3d at 753. "They retained their character as waste throughout and would have to be 'gotten rid of,' either by [U.S. Waste], which could have cracked the batteries itself before selling the scrap lead, or as was the case here, by [USLC] after it bought the entire battery." *Id.* U.S. Waste "cannot escape having the battery casings defined as a discarded material simply by selling the battery to another party who then disposes of the casings." *Id.*

Unlike *Cello–Foil*, the facts in the present case do not lend themselves to competing inferences, some of which would support the imposition of CERCLA liability on U.S. Waste and some of which would

not. Unlike the defendants in *Cello–Foil*, U.S. Waste cites no evidence to suggest that it tried to remove all hazardous material before selling its junk batteries to USLC, or that the batteries it sold contained no hazardous material. As noted above, U.S. Waste also cites nothing to suggest that it asked for the lead-contaminated battery casings to be returned after USLC salvaged the lead plates. In short, unlike the defendants in *Cello–Foil*, U.S. Waste fails to cite any evidence from which a trier of fact could conclude that its sale of junk batteries did not include an intentional arrangement for the disposal of a hazardous substance. As a result, the record reveals no genuine issue of material fact precluding the entry of summary judgment in favor of the Government on its "arranger" liability claim against U.S. Waste Materials Company.

In opposition to this conclusion, U.S. Waste advances a number of arguments, none of which raises a genuine issue of material fact for trial. U.S. Waste first contends that "the sale of raw materials to others for their use does not trigger CERCLA liability when the material is subsequently mismanaged, thus resulting in the release of hazardous substances." (Doc. # 340 at 6). Although this proposition may be true, it has no applicability herein, as U.S. Waste did not sell "raw materials." Instead, it sold recyclable lead plates contained in worthless, lead-contaminated battery casings. If U.S. Waste had extracted the lead itself and sold only the plates, its argument would be more compelling, but it did not. As noted above, the battery casings were not the subject of recycling, and they had to be discarded, either by U.S. Waste or by USLC. By selling the lead plates *and* the contaminated casings, U.S. Waste incurred the risk of facing CERCLA liability.

U.S. Waste next asserts that the purpose of CERCLA is "to address materials that have no commercial value, that are destined for the landfill or the incinerator and that pose potential societal problems because no one wants them, i.e., there is a likelihood of their abandonment unless they are controlled." (*Id.* at 8). Although U.S. Waste suggests that its sale of recyclable lead falls outside the scope of CERCLA, the present case is not about the sale of recyclable lead. Rather, it is about the disposal of lead-contaminated battery casings. Those battery casings unquestionably fit within the scope of CERCLA. Indeed, the casings have no commercial value, they are destined for a landfill and they pose potential environmental problems because no one wants them.

U.S. Waste also insists that it did not intend to arrange for the disposal of a hazardous substance when it sold junk batteries. (Doc. # 340 at 11–12). In support, it argues as follows:

The facts surrounding U.S. Waste's sales transactions with USLC fail to provide one shred of evidence demonstrating that U.S. Waste intended to arrange for the disposal of hazardous waste when [it] sold the batteries to the Bailens. To the contrary, it is undisputed [that] U.S. Waste never intended to send the batteries to the Site for purposes of disposal. Melvin Shapiro of U.S. Waste never considered the batteries sold to USLC to be waste which needed disposal, rather he understood that the batteries would be recycled for the lead contained therein.

Examining the objective, uncontested circumstances surrounding this transaction further supports U.S. Waste's complete lack of intent to arrange for disposal. The price U.S. Waste was paid for [its] scrap batteries was not based on the price to dispose of unwanted materials, but instead, based on Bailen's evalu-

ation of the price of new lead as indicated in such journals as the Wall Street Journal. Next, USLC actively solicited the business of U.S. Waste, to purchase batteries from the company. USLC would come to U.S. Waste's place of business, take the batteries, and engage in processing at the Site. U.S. Waste never attempted to control, direct, or influence the process which USLC used to recycle batteries once purchased. All of these objective factors taken together, critical under the Sixth Circuit's analysis, clearly indicate that U.S. Waste was completely lacking of any intent to dispose of waste. As such, Waste does not possess the status as an arranger and as a matter of law cannot be held liable under CERCLA.

(*Id.* at 12) (citations omitted).[51]

For the reasons set forth, *supra*, the Court concludes that these arguments fail to raise a genuine issue of material fact for trial. The fact that U.S. Waste did not consider its spent batteries to be "waste" is immaterial. As a matter of law, the lead-contaminated battery casings sold by U.S. Waste were hazardous waste, without respect to the position of U.S. Waste on the issue. In addition, U.S. Waste's conclusory assertion that it lacked the intent to arrange for the disposal of hazardous waste is insufficient to avoid summary judgment. U.S. Waste's contention that it only intended to enter into an arrangement for recycling is belied by its own affirmative acts, which included selling recyclable lead enclosed in worthless, contaminated battery casings. Significantly,

U.S. Waste did not sell lead in the form of a raw material. Rather, it sold junk batteries that had to be "cracked" in order for the lead to be extracted.[52] As noted above, U.S. Waste did not ask for the contaminated battery casings to be returned. Nor did it attempt to "crack" the batteries and remove the lead plates from the casings before selling them to USLC. As the Sixth Circuit recognized in *Cello–Foil*, a party's intent to dispose of hazardous substances "need not be proven by direct evidence, but can be inferred from the totality of the circumstances." *Cello–Foil*, 100 F.3d at 1231. Furthermore, the best evidence of intent is often " 'evidence of what actually happened rather than evidence describing the subjective state of mind of the actor.' " *Id.* at 1233. Indeed, "courts have not hesitated to look beyond defendants' characterizations to determine whether a transaction in fact involves an arrangement for the disposal of a hazardous substance." *Aceto*, 872 F.2d at 1381; *see also TMG Enterprises*, 979 F.Supp. at 1123 ("It is the nature of the transaction, not the parties' characterization that determines whether the transaction was a sale of a useful product or an arrangement for disposal."). In the present case, the actions of U.S. Waste demonstrate that it necessarily intended to enter into a transaction that included an arrangement for the disposal of a hazardous substance. Indeed, the company cites absolutely no facts that would support a contrary inference.

For purposes of establishing CERCLA liability, it is also immaterial that U.S. Waste relinquished all control over the

---

**51.** U.S. Waste supports the foregoing assertions with an affidavit from company representative Melvin Shapiro. (*See* Doc. # 340 at Exh. 1).

**52.** U.S. Waste admits in its Memorandum that it knew the batteries "would be recycled for the lead content contained therein." (Doc. # 340 at 12). As the Ninth Circuit

recognized in *Catellus*, however, an inevitable consequence of this recycling process is that contaminated battery casings must be disposed of. U.S. Waste "cannot escape having the battery casings defined as a discarded material simply by selling the battery to another party who then disposes of the casings." *Catellus*, 34 F.3d at 752.

batteries and never attempted to direct, control or influence the recycling process. Defendants cannot avoid CERCLA liability simply by "closing their eyes" to the disposal of their hazardous substances. *Catellus,* 34 F.3d at 752, quoting *Aceto,* 872 F.2d at 1382. The Sixth Circuit has recognized that "a party can be responsible for 'arranging for' disposal, even when it has no control over the process leading to the release of the substances." *Cello–Foil,* 100 F.3d at 1232. Moreover, "[a] party cannot escape liability by claiming that it had no intent to have the waste disposed of in a particular manner or at a particular site." *Id.* Once it has been determined that U.S. Waste intended to arrange for the disposal of a hazardous substance by selling lead enclosed in contaminated battery casings, "strict liability takes effect" and it is responsible for any resulting damages. *Id.; see also Aceto,* 872 F.2d at 1381 (recognizing that "[c]ourts have also held defendants 'arranged for' disposal of wastes at a particular site even when defendants did not know the substances would be deposited at that site or in fact believed they would be deposited elsewhere").

U.S. Waste next argues that its sale of old batteries constituted the sale of a "useful product," thereby precluding the imposition of CERCLA liability. (Doc. # 340 at 13–15). The Court previously rejected this legal argument in *Atlas Lederer,* 85 F.Supp.2d at 836. Upon review, the Court once again finds the "useful product" defense to be inapplicable to the sale of junk batteries to USLC. In support of its "useful product" argument, U.S. Waste curiously cites *TMG Enterprises,* which, as noted, *supra,* held that defendant K & R Corporation had the intent to "arrange for disposal," as a matter of law, when it sold scrap copper wire to a reclamation business without first removing the insulation that covered the wire. *TMG,* 979 F.Supp. at 1122–24. As a result, the district court

entered summary judgment in favor of the Government and against K & R Corporation. *Id.* at 1131. U.S. Waste also cites *Pneumo,* a case which this Court has distinguished, *supra.*

Finally, U.S. Waste argues that imposing CERCLA liability will have a chilling effect on recycling. (Doc. # 368 at 9–10). In response to this argument, the Court makes two observations. *First,* U.S. Waste could have recycled the lead battery plates by removing them itself and disposing of the contaminated battery casings in an environmentally sound manner. By failing to do so, it incurred the risk of facing CERCLA liability. *Second,* insofar as the imposition of CERCLA liability on entities such as U.S. Waste might have a "chilling effect" on recycling, such a concern is an issue properly addressed to the legislature. Based on the reasoning and citation of authority set forth above, the Court concludes that the Government is entitled to summary judgment on the issue of U.S. Waste Materials Company's "arranger" liability under CERCLA.

19. *Xenia Iron & Metal, Inc.*

With respect to Defendant Xenia Iron & Metal, Inc., the Government argues as follows:

Xenia Iron & Metal, Inc., has admitted that it sold lead batteries to United Scrap Lead. Xenia Iron & Metal, Inc.[,] is listed on the United Scrap Lead Customer Price List. Invoices document individual transactions involving junk batteries between Xenia Iron & Metal, Inc.[,] and United Scrap Lead. Charles Bailen has testified that Xenia Iron & Metal, Inc.[,] was a customer of United Scrap Lead. Therefore, no genuine issue of material fact exists that Xenia Iron & Metal, Inc.[,] arranged for the treatment or disposal of hazardous substances at the United Scrap Lead Site.

(Doc. # 333 at 32) (footnotes with citations omitted).

Upon review, the Court concludes that the Government has demonstrated its entitlement to judgment as a matter of law on the issue of this Defendant's "arranger" liability under CERCLA. Xenia Iron & Metal, Inc., has admitted that it sold lead batteries to USLC from approximately 1969 to 1980. (*Id.* at Exh. 4G). The record reflects that USLC never re-sold the whole batteries that it purchased, never sent them out for processing, and never shipped them to other sites. (Bailen depo., August 7, 1995, at 40–41). Rather, as noted, *supra*, Charles Bailen and others operated the Site as a "battery breaking" operation, which involved "cracking" the batteries and extracting scrap lead from the worthless acid and casings. The acid and lead-contaminated casings then were discarded on the property. In particular, the undisputed evidence establishes that "battery-breaking" involved cutting off battery tops, draining the acid into a pit and grinding the lead-contaminated casings for disposal at the USLC Site. (*Id.* at 58–75).

Based on the evidence before it, the Court concludes that the role of Xenia Iron & Metal, Inc., in the foregoing transactions constituted "arrangements for disposal," as a matter of law. Construing the evidence and all reasonable inferences drawn therefrom in a light most favorable to Xenia Iron & Metal, the only reasonable inference is that it intended to enter into a transaction that included an arrangement for disposal. In reaching this conclusion, the Court notes that Xenia Iron & Metal did not sell lead in the form of a raw material. Rather, it sold junk batteries that had to be "cracked" in order for the scrap lead to be extracted from the lead-contaminated casings. "The battery casings ... unlike the lead plates within the casings, were not the subject of recycling." *Catellus*, 34 F.3d at 753. "They retained

their character as waste throughout and would have to be 'gotten rid of,' either by [Xenia Iron & Metal], which could have cracked the batteries itself before selling the scrap lead, or as was the case here, by [USLC] after it bought the entire battery." *Id.* Xenia Iron & Metal, Inc., "cannot escape having the battery casings defined as a discarded material simply by selling the battery to another party who then disposes of the casings." *Id.*

Unlike *Cello–Foil*, the facts in the present case do not lend themselves to competing inferences, some of which would support the imposition of CERCLA liability on Xenia Iron & Metal and some of which would not. Unlike the defendants in *Cello–Foil*, Xenia Iron & Metal cites no evidence to suggest that it tried to remove all hazardous material before selling its junk batteries to USLC, or that the batteries it sold contained no hazardous material. As noted above, Xenia Iron & Metal also cites nothing to suggest that it asked for the lead-contaminated battery casings to be returned after USLC salvaged the lead plates. In short, unlike the defendants in *Cello–Foil*, Xenia Iron & Metal fails to cite any evidence from which a trier of fact could conclude that its sale of junk batteries did not include an intentional arrangement for the disposal of a hazardous substance. As a result, the record reveals no genuine issue of material fact precluding the entry of summary judgment in favor of the Government on its "arranger" liability claim against Xenia Iron & Metal, Inc.

## III. *Conclusion*

Based upon the reasoning and citation of authority set forth above, the Motion for Partial Summary Judgment (Doc. # 333) filed by the United States of America and the United Scrap Lead Respondent Group is sustained in part and overruled in part, as follows:

The Motion is *sustained,* insofar as the Government seeks summary judgment on the issue of the following Defendants' liability under § 107 of CERCLA: (1) Ace Iron & Metal Company, Inc.; (2) Beckner Iron & Metal Company; (3) Burns Iron & Metal Company; (4) Caldwell Iron & Metal; (5) Crispin Auto Wrecking; (6) Dayton Iron & Metal Company; (7) Decatur Salvage, Inc.; (8) Ebner & Sons; (9) Edison Automotive, Inc.; (10) Livingston & Company, Inc.; (11) Mid–Ohio Battery, Inc.; (12) Montgomery Iron & Metal, Inc.; (13) Norman's Auto Wrecking; (14) Senser Metal Co., Inc.; (15) United Salvage Company, Inc.; (16) U.S. Waste Materials Company; and (17) Xenia Iron & Metal, Inc. While the Court has ruled that the foregoing Defendants are liable to the Government for response costs under § 107(a) of CERCLA, it expresses no opinion, at this time, as to whether such liability is joint and several or divisible. As set forth more fully, supra, the Court has found a genuine issue of material fact, precluding the entry of summary judgment on the divisibility question.

The Motion is *overruled,* insofar as the Government seeks summary judgment on the issue of the following Defendants' liability under § 107 of CERCLA: (1) Broadway Iron & Metal Company; and (2) Moyer's Auto Wrecking, Inc.

The Motion is *overruled, as moot,* insofar as the Government seeks summary judgment on the issue of the CERCLA liability of the following Defendants, who entered into a Consent Decree with the United States and the Respondent Group after the filing of the Motion for Partial Summary Judgment: (1) Cohen Brothers Metal Corp., Inc., aka Cohen Brothers Metals Co.; (2) Galion Auto Wrecking, Inc.; (3) Glazer Scrap Co., Inc.; (4) Joyce Iron & Metal Co., Inc.; (5) Montgomery Iron & Paper Co., dba Montgomery Paper Co.; and (6) Piqua Battery, Inc.

Finally, the Motion is *overruled, as moot,* insofar as the Respondent Group seeks summary judgment on its non-existent claims for contribution under § 113(f) of CERCLA against: (1) Etna Battery Co., Inc.; (2) Tuttle Brothers; and (3) the other Defendants named above.

The Government is granted seven days from date to file an affidavit to establish that the various invoices attached to the Motion for Partial Summary Judgment (Doc. # 333) are true and accurate copies of exhibits identified by Charles Bailen during his depositions. If the Government fails to file such an affidavit, the Court will reconsider its ruling herein, without considering the invoices.

The Respondent Group is granted leave to file claims under § 113(f) of CERCLA against Certain Parties and any other Defendants against whom it wishes to assert such claims. All claims for contribution shall be filed within fourteen days from date.

Finally, the Government is directed to file a Status Report, within twenty days from date, identifying all Defendants against whom its claims for response costs under § 107(a) of CERCLA remain viable. In other words, the Government is directed to indicate which Defendants have not settled the § 107(a) claims against them. After receiving this information, the Court will file an Entry, establishing a date for a Settlement Conference in this matter. Included in this Entry will be a request for the Government and the Respondent Group to file a Settlement Conference Agenda, suggesting creative procedures to resolve this matter. Following the Settlement Conference, the Court will ask the remaining parties to submit a Case Management Plan.